Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE No. 8:21-CV-01038-WFJ-AAS

ANGELIA FOWLER,

   Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC. et al.,

   Defendants.
_____/

DEPOSITION OF ANGELIA FOWLER

Thursday, November 18, 2021
10:04 a.m. - 1:54 p.m.

Conducted Virtually

Stenographically Reported By
Pamela J. Pelino, RPR, FPR, CLR
Notary Public, State of Florida
TSG REPORTING

JOB NO. 202424

Page 2

A. FOWLER

APPEARANCES:

On behalf of the Plaintiff:

    DENNIS CREED, ESQUIRE

    CREED LAW GROUP

    13043 West Linebaugh Avenue

    Tampa, Florida 33626

On behalf of the Defendant Experian:

    TOM SCHULTE, ESQUIRE

    JONES DAY

    600 Brickell Avenue

    Miami, Florida 33131

On behalf of the Defendant Preferred Collection

Management Services:

    ROBERT VIGH, ESQUIRE

    SOLOMON, VIGH, & SPRINGER

    P.O. Box 3275

    Tampa, Florida 33601

Page 3

A. FOWLER

- - -

I N D E X

- - -

| ANGELIA FOWLER | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| BY MR. SCHULTE | 4 | | |
| BY MR. VIGH | | 126 | |

- - -

E X H I B I T S   M A R K E D

- - -

(The following index includes only those exhibits marked on the verbatim record.)

| DESCRIPTION | PAGE |
|---|---|
| Fowler Exhibit 1 | 39 |
|   (Complaint) | |
| Fowler Exhibit 2 | 54 |
|   (Experian Credit Report Information dated November 16, 2017) | |
| Fowler Exhibit 4 | 62 |
|   (Experian Dispute Results for 5/27/19) | |
| Fowler Exhibit 5 | 66 |
|   (Experian Dispute Results for two accounts dated 2/26/21) | |
| Fowler Exhibit 6 | 76 |
|   (Notice re Complaint ID 201102-5640746 Submitted on 2/26/21) | |
| Fowler Exhibit 7 | 77 |
|   (Dispute Letter from Witness to Experian 1/28/21) | |

Page 4

A. FOWLER

P R O C E E D I N G S

- - -

Deposition taken before Pamela J. Pelino, Registered Professional Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

- - -

Thereupon,

ANGELIA FOWLER,

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. SCHULTE:

Q.    Thank you, Ms. Fowler.  As you can probably see from the screen, my name is Tom Schulte.  I represent Experian in this case. And today we're going to be taking your deposition as a tool, essentially, to figure out some of the specifics of the claim that you're bringing against Experian today.

It'll sort of touch probably on claims that you have against Preferred Collection, but most of my questions today will be focused from the

Page 5

A. FOWLER

Experian point of view.  Does that make sense?

A.    Yes.

Q.    Okay.  And then we're going to go through a few ground rules and logistical stuff before we jump into the questioning.  Have you ever been deposed before?

A.    I have.

Q.    Okay.

A.    I have.

Q.    All right.  So you know a little bit how this works.  Essentially I ask the questions, you answer, and our court reporter will take down the answers word for word so that we have a record in writing of what is said today.

One thing I would like to remind you is to make verbal responses.  The court reporter can't write down a head shake or a head nod, so, you know, yes, no, all that stuff, verbally.

And then because it's on Zoom especially, it's important that we each let each other finish when the other one is talking.  Otherwise it kind of gets all garbled and really difficult to take down. So I'll try not to interrupt you and I ask that you do the same.

Page 6

A. FOWLER

If you don't understand a question, whether you didn't hear it correctly or it's just a confusing question, go ahead and ask me to clarify it, please, and I'll try to ask it in a better way. That way we can make sure that everything's clear.

If you remember something that you wanted to mention earlier in response to an earlier question, just let me know and we can go back to that and we can further add anything else that you think is relevant to answering that question.

And that doesn't really matter when you remember it. We can go back to the very beginning, if you need.

Let me see.

Do you have anyone else in the room with you right now?

A.    I do not.

Q.    Okay. So please keep it that way. Today is supposed to be your testimony with no one else helping or offering answers. And sort of related to that, you can absolutely, at any time, talk to your lawyer, except if I'm in the middle of asking a question or you're in the middle of answering a question, we sort of need to get to the end of that

Page 7

A. FOWLER

answer and then we can take a break and you can talk to Mr. Creed, if you'd like to.

Let me see. Your attorney may make objections throughout the questioning. Typically they're just objections to some sort of form of the question that I've asked, but if your lawyer tells you not to answer, obviously listen to that. But typically your lawyer will make the objection and then we'll just continue into answering the question that I've asked. Does that make sense?

A.    Understood.

Q.    Okay. We can take breaks whenever you need, except in the middle of a question, we'll go ahead and have you finish the answer and then we'll take the break if you need one.

So, yeah, I sort of plan to take one every hour or so, a short five-minute, ten-minute break. But if you need one earlier, just let us know.

And then lastly, I'm going to just talk about your ability to testify today. Are you on any medication or drugs that would affect your ability to answer my questions?

A.    No.

Page 8

A. FOWLER

Q.    Okay. Are you currently under a doctor's care for any illnesses?

A.    Not that have anything to do with psychological.

Q.    Okay. I'm sorry, I don't think the full -- it sort of broke off there at the end. Could you repeat that answer?

A.    Not that has anything to do with psychological, cognition or anything like that.

Q.    Okay. And then have you had any alcohol in the last eight hours?

A.    I don't drink.

Q.    Okay. Is there any other reason that you're aware of that you couldn't answer my questions fully today?

A.    No.

Q.    Okay. All right. Thank you, Ms. Fowler. We're going to go ahead and get right into this. And we're going to start with some background information on yourself.

So could you please state your full name and current address?

A.    Angelia Schiavonne Fowler. My mailing address is 516 Dixie Highway, Unit 265, West Palm

Page 9

A. FOWLER

Beach, Florida 33401.

My physical address is 8755 Southeast Hobe Ridge Avenue, Hobe Sound, Florida 33455.

Q.    What is your date of birth?

A.    My date of birth is July 18, 1957.

Q.    And what is your Social Security Number?

A.    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.

Q.    Have you always had the same Social Security Number?

A.    Yes.

Q.    Are you married?

A.    I'm divorced.

Q.    Am what is your spouse's name -- or your ex-spouse, I'm sorry?

A.    Paul Fowler.

Q.    Paul Fowler. And how long ago were you divorced from Paul Fowler?

A.    Thirty-three years.

Q.    Where does your ex-spouse live?

A.    California.

Q.    Do you have any children?

A.    I do.

Q.    What are their names and ages?

A.    I'm going to go from youngest to oldest.

Page 10

A. FOWLER

Darien (phonetic) is 26, Alex is 29, Chris is 36, Paula is 41, Araina is 45.

(Reporter clarifies.)

THE WITNESS: A-R-A-I-N-A.

BY MR. SCHULTE:

Q. Are they all same last name of Fowler?

A. No, they're not. Some are married, some aren't.

Q. Okay. Could you give me their last names?

A. Sure. Darien Taylor, Alex Shepherd, Chris Bryant, Paula Fowler, and Araina Cook.

Q. Thank you.

Where do your children live?

A. California, New Jersey, Florida, and that's it.

Q. What do your children do for a living?

A. Darren is an EMT. Alex is an executive chef. Paula's a homemaker. Chris is a cable installer. Araina is an RN practitioner.

Q. How long have you lived at your current address?

A. Almost two years. It'll be two years in June.

Page 11

A. FOWLER

Q. And for clarification, that's the Hobe Sound address; is that right?

A. Yes, that's correct.

Q. And then your mailing address on -- in I believe it was West Palm, how long have you -- how long has that been your mailing address?

A. About the same time.

Q. Did you ever live in -- at that address?

A. No, that's the mailing address.

Q. Okay. So it's not like an apartment or anything like that?

A. No.

Q. Who lives with you at your current address?

A. I have a housemate. Her name is Patricia Long.

Q. Do you have -- other than the Hobe Sound address, do you have any other residences?

A. No, I do not.

Q. Do you have any vacation homes or time shares, anywhere you spend a substantial amount of time other than the Hobe Sound address?

A. No, I do not.

Q. So you stated that your name was

Page 12

A. FOWLER

Angelia Fowler; is that the name that you go by in your day-to-day life?

A. Yes, it is.

Q. Do you have any nicknames?

A. No, I do not.

Q. What name do you use on legal documents?

A. Angelia Fowler. Oh, I might put MBA at the end.

Q. Okay. So, have you used, whether nickname, other legal name, any sort of other name other than Angelia Fowler?

A. Not that I can recall, no.

Q. Okay. Do you know of any family or friends that have a similar name to you?

A. No.

Q. Okay. Did you graduate high school?

A. Yes.

Q. In what year?

A. 1975.

Q. And where was that?

A. That was in San Fernando, California.

Q. And where did you go to college?

A. West Palm Beach, Florida.

Q. What was --

Page 13

A. FOWLER

A. In Palm Beach Gardens, Florida.

Q. What was the school's name?

A. The first school was Palm Beach Atlantic University.

Q. And did you receive a bachelor's degree from Palm Beach Atlantic?

A. I did.

Q. Okay. And then I can see that you went to graduate school. Where did you go to grad school?

A. Strayer University, Jack Welch Management Institute.

Q. Okay. And what year did you graduate from Strayer?

A. 2017.

Q. You mentioned the MBA. Did you get any other master's degrees while you were at Strayer?

A. No, that was -- that's it.

Q. Are you currently employed?

A. Yes.

Q. Where do you work?

A. I'm a contractor for the City of West Palm Beach, Florida.

Q. What type of work do you do in the

Page 14

A. FOWLER

contracting that you get?

A.   Contract specialist, engineering services department.

Q.   And do you work -- when you say you're a contractor for the city, do you work directly for the city or do you work for an outside company that gets contracts from the city?

A.   I work for an outside company that is contracted with the city.

Q.   And what's the name of that outside company?

A.   Accounting Principals.

Q.   How long have you been doing this contracting work for the City of West Palm?

A.   Since February of 2020.

Q.   What is your title as -- are you a head contractor or manager?  Is there any sort of specific title?

A.   Contract specialist.

Q.   Contract specialist.  And what is your yearly income pretax?

A.   I'm sorry?

Q.   What is your yearly income before taxes?

A.   45,763.

Page 15

A. FOWLER

Q.   And then from 2015 to the present, were you ever unemployed?

A.   Yes.

Q.   What were the -- what was the date range that you were unemployed?

A.   Hum, 2015, I was ill, so I didn't go back to work until 2016, the latter part of the year.  I believe it was August.  Give me a second, I'll find the document.

Yeah, I didn't go back to work until 2016, and I was employed in a contract position until November of that year, when the contract ended.

Q.   So from 2015 to August of 2016, you were unemployed, and then in August 2016 to November of 2016, you were employed as a contractor; is that correct?

A.   Yes.  Yes.

Q.   After November 2016, when that contract ended, did you immediately find a new job or did you remain unemployed for a period of time?

A.   I was looking, you know.  But it's kind of hard.  When you have multiple degrees, there's a lot of apprehension about, you know, salaries.  And

Page 16

A. FOWLER

it takes a little longer sometimes.  But I was constantly searching, and I was putting in applications.  And I didn't really understand why I wasn't getting a response until, you know, I realized what was on my credit.

Q.   When -- so from November 2016, when were you next employed?

A.   Hold on a second.

I had a couple of contracts that I worked in 2017, and I believe I did a short stint in an AutoZone because that was all I could get.  It was really sporadic, though.  Very sporadic.

Q.   So sort of on-and-off jobs until November -- or until 2020, when you got hired with the city; is that right?

A.   Right.  Yes.  That was the turning point.  I had applied with the SBA, you know, but I was kindly turned down because of my credit, even though I had all the credentials, so, you know, I just took what I could get.  Like I said, it was sporadic, it was underemployment because of my skill set and my education.  But I took what I could get.

Q.   Have you ever worked for a consumer reporting agency like Experian?

Page 17

A. FOWLER

A.   I've never worked for one, but because I've done mortgage processing, I do understand how credit works.  I've also done underwriting, so I understand how credit works.  And I understand how it affects and impacts, you know, a person's day-to-day and their financial as well as their economic situation.

Q.   Do you know -- and I'm sort of focusing only on the -- you might know as a credit bureau, some people call it a consumer reporting agency, credit reporting agencies.  Do you know of -- so you have not worked for one, but do you know anyone who has?

A.   No.  I call them credit repositories, but I do not know anyone that has worked for one.

Q.   Okay.  Have you ever consulted any websites or other material regarding credit reporting or credit repair?

A.   I once worked for a credit repair association where it was my job to -- that was one of the little sporadic contract jobs I had in like 2019, I think it was.  And consumers were attempting to repair their credit and just give them guidance on what they needed to do as far as, you know,

Page 18

A. FOWLER

monitoring and constantly being consistent about following through with whatever errors they found.

Q.   Okay.  Do you remember the name of that credit repair company that you worked for?

A.   Well, it was under a company called VCC Consulting.

Q.   And --

A.   I'm not sure what their d/b/a was.

Q.   In your time at VCC Consulting, did you -- you advised people on how to repair their credit; is that correct?

A.   No, I advised them on what they needed to maintain as far as calendars, records, how to monitor, you know, the follow-up, like 30 days after they submit a dispute, how to keep it in play, and, you know, generic things.  I never gave legal advice or anything like that.  But just basically how to follow up on a dispute situation and which would help them repair their credit.

(Reporter clarifies.)

BY MR. SCHULTE:

Q.   So from your time at VCC, do you believe that you gained sort of any special or inside knowledge on how consumer reporting agencies

Page 19

A. FOWLER

operate?

A.   No.  No more than I had previously.  No.

Q.   Did VCC give any training in how to better assist their customers in processing --

(Simultaneous conversation.)

A.   I'm sorry.

Q.   No, you go ahead.

A.   They had a manual.  That was it.

Q.   And what did the manual say about how to interact with the consumer reporting agencies like Experian?

A.   It was 360 pages long, so there was a lot of advice on how to interact with a -- and it depends on, you know, which context you're speaking in.

Q.   So in the dispute context.  What was just a general summary of what the manual told you to tell people in bettering their credit?

A.   Be consistent.  Be consistent in your recordkeeping, be consistent in your follow-up. And, you know, that's it.

Q.   Okay.  Ms. Fowler, have you ever been arrested?

A.   I was arrested a long time ago.  It's

Page 20

A. FOWLER

been expunged because it was a false arrest.

Q.   Were there any charges that resulted from that arrest?

A.   Charges were -- I was acquitted.  And my record was expunged.

Q.   So when you say you were acquitted, did the -- did the case go to trial?

A.   It did.

Q.   And where was that?

A.   In Palm Beach County.

Q.   Palm Beach.  And what was the arrest for, at least on the arresting agency's terms?

A.   I'm not really sure what they wrote, because, like I said, it was expunged.  It was deemed to be a false record.  I was accused of some type of battery that I was found to be not guilty of.  I never had any physical altercation.  So it was one of those phantom battery charges, you know, that we sometimes deal with.

Q.   So that charge you said went to trial and you were acquitted; is that correct?

A.   That's correct.

Q.   Have you ever been convicted of any crime?

Page 21

A. FOWLER

A.   No.

Q.   And then outside of the criminal context, so in the civil context, have you ever been involved in a lawsuit before?

A.   Yes, when I was in a car accident where I was hit on I-95.

Q.   And when was this?

A.   May 14th, 2011, was the accident.  I spent four days in ICU, and it was settled before trial.

(Reporter clarifies.)

THE WITNESS:  I spent four days in ICU subsequent to the accident, and it progressed to trial -- I mean, it progressed to settlement, which was before trial, before any type of trial.  And I'm not really sure of the settlement date.  I don't really remember.

BY MR. SCHULTE:

Q.   Have you been involved in any cases alleging a violation of the Fair Credit Reporting Act before this --

A.   Previous to this one?  No.

Q.   And have you been involved in any cases where Experian, TransUnion, or Equifax have been

Page 22

A. FOWLER

involved?

A.    No.

Q.    What have you done to prepare for this deposition?

A.    How do you mean?  Which context?

Q.    Have you reviewed any documents prior to this deposition?

A.    Only the ones that were submitted.

Q.    When you say "submitted," which documents?

A.    Interrogatories that you sent to me.

Q.    Did you review -- earlier in this case, your lawyer produced some documents, some of which had Experian, some Equifax, and stuff like that.  Do you remember reviewing those documents?

A.    What were -- what was the title?  What were they about?  Can you show them to me?  Maybe I can remember.

Q.    We'll get to it later.  I'll ask you about some of the specific ones.

So for this deposition, you reviewed the interrogatories; is that correct?  As a preparation?

A.    That's it.

Q.    Okay.  Did you talk with your lawyer

Page 23

A. FOWLER

before this deposition?

A.    Not really, just -- I mean, we had about a three-minute phone call as to what I should expect and how long it should last, which is when I decided to take off work.  That was it.

Q.    Have you spoken to anyone other than your attorney?

A.    About?

Q.    About the deposition.

A.    No.

Q.    Okay.  All right.  So now I want to talk a little bit about your credit history.  And I want to start with loans.  And when I say loans, I mean just by way of example, like a mortgage or a car loan, not every single credit account that you have.

Do you understand what I'm saying?

A.    No.

Q.    Okay.  Well, then we'll just jump in.  I won't try to explain it.  And if there's a question, you can always ask me to clarify.

Have you ever cosigned or guaranteed a loan for anyone?

A.    No.

Q.    Has anyone ever cosigned or guaranteed a

Page 24

A. FOWLER

loan for you?

A.    No.

Q.    Have you ever signed your name on any legal documents with anyone else?

A.    No.

Q.    Did you ever sign a marriage license or anything like that?

A.    In 1980.  In 1980, yes, I did.

Q.    Okay.  Have you ever signed any legal documents on behalf of your children?

A.    In which context?

Q.    Just really in any context, whether it be a loan or some sort of contract or anything like that?

A.    No.

Q.    I want to go back and ask about -- you mentioned the West Palm Beach address on Dixie Highway.  Do you remember, your mailing address.  What is at that address?  Is it an office building or -- any description that you can give would be helpful.

A.    It's a UPS Store, mail store.

Q.    Okay.  Other than that address, have you ever used any other addresses for really anything?

Page 25

A. FOWLER

So have you ever listed an address other than that West Palm address when you're applying for --

A.    I've used plenty of PO boxes in my lifetime.

Q.    To your knowledge, do your children know your Social Security Number?

A.    I'm sure they don't.

Q.    To your knowledge have your children ever used your Social Security Number on anything?

A.    Not that I'm aware of.

Q.    Has a collection agency ever contacted you about a past due account?

A.    In the past, yes.

Q.    What was the name of the collection agency that has contacted you?

A.    Do you have a specific agency in mind?

Q.    No, I'm asking you about prior interactions that you've had with debt collection agencies.

A.    Did you ask -- ask the question again, because I didn't know if you asked for the name or when they --

Q.    What was the name of the debt collection agency that has contacted you in the past?

Page 26

A. FOWLER

A.    Um, let's say Cavalry Portfolio.

Q.    Have there been any others?

A.    I'm sure.  But I don't remember them.

Q.    What were the circumstances surrounding the Calvary Portfolio debt collection?  What kind of debt were they trying to collect?

A.    I don't remember.  It's been too long.

Q.    When was -- when did Calvary contact you?  Do you remember a general timeframe?

A.    No, I don't.

Q.    Did -- do you remember an agency called Law Offices of MBA?

A.    Yes, I do.  Yes, I do.  Yeah, they put a bunch of entries on my credit.  And I didn't know who they were.  And I still don't.  And I had it removed.

Q.    Had they reached out -- had they physically contacted you, either by letter or phone or anything like that?

A.    I had never heard of them.  I had never heard from them.  And I -- I'm pretty sure that I became aware of it by pulling my credit.

Q.    Okay.

(Simultaneous conversation.)

Page 27

A. FOWLER

A.    I can't put that in stone because it's been a while.

Q.    Okay.  To your knowledge, has your identity ever been stolen?

A.    Not to my knowledge.

Q.    So now I want to talk a little bit more I guess about the specifics of this particular case against Experian and Preferred Collection.  And when I say Preferred Collection, do you understand that I mean the co-defendant in this case?

A.    Yes, the collection agency.

Q.    Have you ever received any services of any kind from Incare Medical Services?

A.    No.

(Reporter clarifies.)

MR. SCHULTE:  I-N-C-A-R-E.

BY MR. SCHULTE:

Q.    Have you ever worked at Incare Medical Services?

A.    No.

Q.    Do you know of anyone who has received any services from Incare Medical Services?

A.    Prior to this showing up on my credit, I've never heard of Incare Medical Services, and I

Page 28

A. FOWLER

still don't know who they are.

Q.    Did any of your -- strike that.

Did you receive medical care of any kind in December of 2016?

A.    No.

Q.    Did you receive medical care of any kind in November of 2016?

A.    No.

Q.    How about at all in 2016?  Did you receive any kind of medical care in 2016?

A.    No.

Q.    What about 2015?

A.    In 2015, I did, but it wasn't from Incare Medical.

Q.    Okay.  Could you tell me a little bit about the medical care that you received in 2015?

A.    I was in the hospital.  I got sick.  And it was through St. Mary's.

Q.    And where is St. Mary's located?

A.    West Palm Beach, Florida.

Q.    How long were you with St. Mary's, how long were you in the hospital?

A.    Thirty-two days.

Q.    At the hospital, did you receive any

Page 29

A. FOWLER

surgeries?

A.    No, I didn't.

Q.    Did you receive any tests, such as an MRI or a CT scan or an X-ray?  Do you remember anything like that?

A.    No, I don't.  Not that it didn't happen.  But I don't remember.

Q.    So when you were in the hospital -- when you were at St. Mary's for those 32 days, were you mostly just staying in bed?

A.    As far as I know, yes.

Q.    Okay.  And I don't mean to pry.  It's mainly to develop the record.  What was the illness that you were suffering in 2015?

A.    I had pneumonia.

Q.    Do you know if St. Mary's outsources any of their services to Incare Medical?

A.    I don't know.  But when I went to try and find out, I couldn't find that person's name, you know, on my medical bills.  And I'm pretty sure that if that person had been an attending -- you know, I sent for the medical bills.  I couldn't find them anywhere, because that was my first response.  Like is this legit?  And if it had been, I'm sure I would

Page 30

A. FOWLER

have found, you know, where they were an attending. But I didn't.

Q. When you say "that person," who --

A. It was Dr. Sheila someone. I'm sorry to interrupt you.

Q. It's --

A. I don't remember the name. I just remember it was Sheila something. I don't remember the name.

Q. This Dr. Sheila that you mentioned, was she or he your doctor at St. Mary's, is that what you remember?

A. No, I said I don't know who they are. I still don't know. I did not find them anywhere as far as being my doctor. And I don't know where this bill came from. I never received -- let's put it this way. I never received a bill from them. And when I contacted them they ignored me. And I said, okay. I understand that you're kind of bound by HIPAA, but have the actual provider send me the bill if it's legitimate. And I never got anything.

Q. All of this contact that you just talked about, that was with Incare Medical Services?

A. That was -- that was the letter I sent to

Page 31

A. FOWLER

Incare, yes. And then once it -- when I -- I also sent that contact to Preferred, and I said, you know, I understand that you're the collection agency, however, the bill had to come from somewhere. So have the provider send me the original bill, have them send me, you know, something where I agreed to pay the bill or I was treated. Nothing. They ignored me.

Q. Do you remember your doctor's name at St. Mary's?

A. Dr. Williker (phonetic).

Q. And you mentioned that you tried to contact Incare Medical Services but they ignored you. How did you try to contact them?

A. Initially, I -- I think initially I contacted Preferred, and then when I got no response, I tried to call Incare. I sent them a letter. I think it was in there, I'm not sure. But I did contact them. And I heard nothing.

Q. Okay. When did you first learn that Preferred Collection was trying to collect a debt from you?

A. Well, Preferred Collection wasn't trying to collect a debt from me, they just displayed debt

Page 32

A. FOWLER

on my credit. Because if they were trying to collect a debt, they would have contacted me.

I think it was around May 2019 when I pulled the credit. That's how I found out. It's not like I got a letter from them or an invoice or a notice or a phone call. They just put it on my credit.

Q. So to clarify, you never received any collection letters or phone calls from Preferred Collection; is that right?

A. Not one.

Q. Did you contact Preferred Collection at any point before filing this lawsuit?

A. I did.

Q. How many --

A. I sent them quite a few letters. I'm sure that I don't -- I didn't retain all of them. But I'm pretty sure I submitted, you know, a couple of them where I was basically, you know, disputing their entries on my credit.

And that would be about the same -- that was when it was at 28 entries. Because initially there were 28 separate entries on my credit. And I thought, oh, my goodness. And so I contacted them,

Page 33

A. FOWLER

and I was like, who are you? Why did you put this on my credit? And no response.

And so then I contacted Experian. And basically they gave the, you know, generic verification that the name and the address are correct. And that was it. And, oh, yeah, it's -- it's your debt. I was like, no, it's not. It's really not.

Q. When you said that Preferred Collection was placing these accounts on your credit, what credit agencies' reports were you looking at?

A. Experian. I looked at all of them. I only saw it on Experian.

Q. Did you ever contact Preferred Collection by phone?

A. That was a journey in futility, because I just kept getting -- and this was probably a month after -- I think it was a month, maybe a couple weeks after I discovered it on my credit. And they kept saying, oh, someone will call you back. And no one ever called me back.

Because they're -- I remember, because they're in Tampa, and it was an 83 number that I called.

Page 34

A. FOWLER

Q.    According to your allegations in the complaint, the Preferred Collection accounts do not belong to you; is that right?  Is that a fair statement?

A.    I do not know who those collection accounts belong to.  Because I was never shown a bill.  You know, I never said, oh, there's no way this is mine.  I said, show me a bill.  Show me where I agreed to pay for this.  Show me where I was treated.  I think that that's standard operating procedure, you know, when you are given a bill, you don't just say, oh, yeah, yeah, yeah, it's mine or it's not, I need to find out.  And I was never responded to, you know, to be able to determine anything.

So when I didn't hear from them myriad -- you know, time and time and time again, I was like, well, if it were mine, I'm sure they would send it to me.  But they're not sending me anything.  They're not even saying, okay, Ms. Fowler, we understand, blah, blah, blah.  Just radio silence, you know, nothing.

Q.    Do you have any idea why Preferred Collection might think these accounts belong to you?

Page 35

A. FOWLER

A.    I really don't.  Because, you know, I can't really speak to what their mindset is or what their objective is.  That would be speculation, you know.  I have no idea.

Q.    So now we're going to move a little bit into discussing the complaint that you filed in this action.  But before we get to that, can you just tell me, I guess in your own words, why you're suing Experian?

A.    Because time after time, I sought to show that this was not my debt.  And as a credit repository, reporting agency, it is Experian's duty to make sure that the information that they display to the world which affects people's livelihoods, affects their economic statuses, affects their ability to be gainfully employed, that it should be as correct as humanly possible.

And time and time again, I disputed these entries.  And especially, you know, what I considered to be an attempt at maximum, maximum hurt by putting 28 entries.  That's not saying that, you know, you took the total of the bill and put it on my credit.  No, you broke it down, charge by charge, and put each charge on my credit as if I went to see

Page 36

A. FOWLER

you 28 times.  And I don't even know who you are.

And I explained in a letter to Experian that, you know, I was kind of well versed on the FCRA's stance on this.  And I felt like I should be given the chance to have this debt validated properly and to make sure that it was mine, not just say, oh, yeah, that's the name, that's the address, that's fine, no because that does not validate the debt.  That simply verifies what it says my name is.

And I became frustrated after I couldn't get a job -- you know, I previously -- and I will tell you that working in the mortgage industry a long time ago, medical debt was never considered an impact on a credit file because medical debt sometimes slips through the cracks.  However, you know, this is a new digital age.  And I don't really know what the attempt is here.  But, you know, everything that goes on your credit file now is looked at as it's gospel.  And this was almost $7,000 worth of -- that didn't belong to me.

And I had jobs denied because of it.  I was not able to find a decent job.  And at -- I still owe student loans.  I paid for my education,

Page 37

A. FOWLER

you know.  I'm paying for it.  And I worked hard for my education.  And I'm not going to allow situations that are incorrect, erroneous, injurious, and hurtful to continue to hurt me, especially when I know, you know, I have no idea who this is.

Because, like I said, if it had been something that was legit, I'd grab the bull by the horns.  I don't run from my problems, I face them.  And I would have worked something out.  I would have tried to say, okay, well, you know what, let's figure this out.

But there was never an opportunity to do that.  Because they basically blew me off, Preferred as well as Experian.  And it was just frustrating.  And every time I applied for a job, I found out, yeah, you know, your credit is in the trash.

It's like, you know what, this is not even of my own doing, it's not like I went out and went rogue with a credit card or simply did not own up to my fiduciary responsibilities.  I don't know what this is about.  I don't know why it's here.  I've tried to have it eliminated.  I've tried to be, what I consider to be fair.  You know, I've said, hey, this is not mine.  And I even wrote a letter

Page 38

A. FOWLER

and said, you know, here's what the FCRA's stand is on, you know, erroneous reporting. Do you understand that I'm not going to let you continue to do this?

And they sent me back some little blip blip blob or whatever it was and saying they weren't responsible.

And I was like, yeah, but you are, because you're reporting this. That's like being complicit. Okay? And so that's why I decided to find a legal recourse, because that's what we do in this country when you have exhausted the peaceful means. You know, you don't resort to any type of craziness, you simply go the legal course.

Q. Okay, Ms. Fowler, I'm going to show you a document. And let me know if you have any trouble seeing it. Can you see that okay?

A. Yes, I can.

Q. Okay. Do you recognize this document?

A. That's the complaint.

Q. Okay. Have you -- did you read this before it was filed?

A. I'm pretty sure I did.

Q. Do you believe everything in here to be

Page 39

A. FOWLER

true?

A. Yes, I do.

Q. So I'm going to scroll down to paragraph 26.

MR. SCHULTE: And, Madame Court Reporter, can we admit this as Exhibit 1?

COURT REPORTER: So marked.

MR. SCHULTE: Thank you.

(Fowler Exhibit 1 was marked for identification.)

BY MR. SCHULTE:

Q. In paragraph 26, you allege that Experian failed to conduct a reasonable reinvestigation into your disputes. Do you see that?

A. Yes.

Q. Okay. In what way do you think Experian failed to conduct a reasonable reinvestigation?

A. There is a way to validate debt. That validation involves producing documents where the person involved that is claimed to owe the debt has agreed to pay the debt by a signature or acknowledges that this is the debt.

And that would involve bringing up the invoice showing the dates of service, showing what

Page 40

A. FOWLER

was done, where it was done, how it was done. And that basically is the legal way that we decide this debt belongs to that person. And that's all I was asking for. It wasn't brain surgery. I just needed to see something that said, Angelia, this is yours, you agreed to pay this. We treated you for this, that, blah, blah, blah, on that date.

And I just don't believe that it was too much to ask. That's the same thing that I received from, you know, Florida Power & Light every month. It says, you used this amount of kilowatts and you owe this amount of money. And so, yeah, okay, I agreed to pay that when I signed up for your service.

And I do not believe it was too much to ask that Experian, since you're going to report this as something that I owe, show me that I owe that or show me where it came from. Show me who it is. You know, if this is a doctor, who's the doctor?

Q. Do you think that Experian would have copies of those documents in its regular business --

A. Oh, no, but you know what? They would be able to access them. If they are reporting that -- if they are reporting information that comes from a

Page 41

A. FOWLER

subscriber, okay, then that subscriber should have that information. And so Experian should be able to access it. Or even if they don't do anything but say, hey, show us a signature. Because under HIPAA, yeah, it's hard to show things without violating HIPAA, but a signature is not a violation.

A medical bill doesn't really go into detail as far as -- it's not the hospital bill. It doesn't really go into detail as far as the treatment. So it would show dates, who, where. And, you know, what I don't understand is how Experian would expect me to accept that just the name of a company that I've never heard of, that I don't have any fiduciary responsibility to, would be something that would be acceptable on my credit. Especially when it's destroying my credit.

Q. So in this situation, you would have wanted Experian to have Preferred provide documents showing why you are being attributed this debt; is that correct?

A. I would expect Experian to show me why they are showing it as something that I owe since they are the repository that is showing this. I don't -- you know, I'm not sure which way you want

Page 42

A. FOWLER

to do that. But I do know that you can't report something that's not true.

Q.   And if they don't -- if Experian did not get that documentation to support the debt, do you believe that it should be deleted from your credit report?

A.   I believe that it should have been deleted and not shown as something that I owed. You know, because there was -- and from what I understand about credit reporting -- are you there? Can you hear me? Okay.

Q.   Yes.

A.   From what I understand about credit reporting, if you can't prove it, then you can't show it.

Q.   So is it your position that anytime Experian does not get documentary evidence to support a debt, they should remove it from a consumer's credit report?

A.   If that consumer disputes it and can basically provide proof or say, hey, you know what, show me, show me where I owe this. Because if they're saying it's not mine, then what's the balance if they're not going to show that, you know,

Page 43

A. FOWLER

it is theirs? Because you're the one tasked with that responsibility because you're the one that's showing it, you're the one that's telling the world, this is what she owes.

Q.   So in paragraph 26 of the complaint, you mentioned the reinvestigation. Do you have knowledge of what Experian did to reinvestigate your dispute?

A.   I can tell you what they showed me time and time again. They just came back and said yeah, it's yours.

And I was like, okay, how?

It's the same name, same address.

Okay. But how -- where is the proof that I owe this money? Where is the proof that I incurred this debt, you know.

And that's -- I'm pretty sure that Experian is versed in the FCRA's, you know, requirements on that. And so my thing was, you can't just go around saying that I owe something that I don't. And if I tell you that I don't, then you need to prove that I do.

Q.   Do you know -- I guess I'm going to kind of reask the question.

Page 44

A. FOWLER

Do you know what steps Experian took to reinvestigate your dispute, aside from --

(Simultaneous conversation.)

I was just going to say aside from sending you the results of the dispute.

A.   I have no idea what Experian did. I just know that they sent me the same response each time. And -- okay. The FCRA is a federal law first enacted in the '70s. The FCR requirements -- FCRA requirements are related --

(Reporter clarifies.)

THE WITNESS: Oh, I'm sorry.

BY MR. SCHULTE:

Q.   Ms. Fowler, I'm going to jump in and, for the sake of time, we're going to get to the document that I believe that you're reading. And in any event --

A.   Which document is that?

Q.   Is that anything that Experian has sent you?

A.   No.

Q.   Okay. Well, then, to be honest, it's not particularly responsive to the questions that I'm asking, and for the sake of time, if you -- if you

Page 45

A. FOWLER

really feel that you need to put it on the record, your attorney will have the chance at the end of this -- at the end of my questioning to ask you questions. And you can -- anything that you feel that needs to be said, you can put it in there. But if it's not exactly related to one of my questions, we're going to move along so that we can stay on track. And I'm sorry for interrupting. I just --

A.   I'm sorry, but I do believe it is related to your question. It says, "Defendant Experian failed to conduct a reasonable investigation -- reinvestigation of the information in Plaintiff's credit file after receiving actual notice of inaccuracies."

Before you interrupted me, what I was saying is FCRA compliance is designed to protect consumers. And those requirements mean that there's a primary law regulating how consumer reporting agencies are able to use the information and the personal information of consumers.

And if something is reported, it needs to be FCRA compliant. Meaning that to the best of their ability, they need to have made sure that this is verifiable, truthful information. That's all I

Page 46

A. FOWLER

was going to say.

Q.    In paragraph 26, you say that Experian did not conduct a reasonable reinvestigation.  In your -- or from your point of view, what exactly would a reasonable investigation look like?

A.    Validation of the debt.  Making sure -- or sending me some -- since your subscriber, Preferred, sent you this information and said that it was a debt that I owed, then your subscriber should also be able to send you information where I signed or agreed to pay it, or even just evidence of the debt.

Q.    So if I'm understanding you correctly, it would be some sort of documentary evidence to support --

A.    I'm not sure what that would look like, you know.  It's your subscriber, not mine.

Q.    So --

(Simultaneous conversation.)

A.    I'm sorry?

Q.    I was just going to ask.  Your testimony is that the subscriber should provide proof that the debt is yours; is that correct?

A.    Yeah, I believe that's universally

Page 47

A. FOWLER

understood.

Q.    What would that proof look like from --

A.    That would depend on the subscriber.  And, you know, I'm not -- I mean, I'm not going to sit here and pretend like I know what that would look like, because I don't.

But I do know that if you are saying that I owe a debt, then you should be able to prove it.

Q.    Do you think Experian intentionally decided to not reinvestigate your dispute?

A.    I cannot speak to Experian's intentions or not.  That still would be speculation.

Q.    Do you think --

(Simultaneous conversation.)

I'm sorry.

A.    I don't know if it was neglectful, I don't know what it was.  But I know that it was not up to standard and it was not within the legal parameters.

Q.    Do you think Experian acted out of malice in reinvestigating your disputes?

A.    I don't know.  I don't know.  I would question, you know, if a consumer is stating that, you know, this is not mine, can you please make sure

Page 48

A. FOWLER

it is, and each time the same situation occurs, you would kind of look and say, well, why is that?  Why is that, you know, when it's part of their duty.

Q.    We're going to move a little bit further down in the complaint to paragraph 30.  Can you see that on your screen?

A.    Yes.

Q.    Okay.  So in paragraph 30, you allege that Experian failed to establish or follow procedures to maintain the maximum possible accuracy of information.  Do you see that in paragraph 30?

A.    In preparation of the credit report and credit files maintained and published concerning plaintiff, in violation of 15 United States Code subsection 1681e(b).

Q.    Okay.  In what way do you think Experian's procedures do not maintain the reasonable -- or the maximum possible accuracy?

MR. CREED:  I'm going to object as far as it calls for a legal conclusion.

But you can go ahead and answer, Ms. Fowler.

THE WITNESS:  I'm going to follow my attorney.  If he objects, I'm not going to

Page 49

A. FOWLER

answer it.

BY MR. SCHULTE:

Q.    Your attorney objected to the form of the question because it, according to your attorney, calls for a legal conclusion.  But he did instruct you to answer the question.

A.    Okay.  But what's -- in what form should I answer it?  I mean, it calls for a legal conclusion.

I don't know what you failed to establish, but I do know that your responses and procedures to me were lacking.  And they were not up to legal standard as far as I can tell.  You know, it was a repeated sort of brush-off or, here, yeah, we did verify, it's your name, it's your address.  That tells me nothing, that it was the same -- it just was a repeated situation where that's all I got.

So I don't know what you established as far as your business model.  But I just know that you didn't -- you know, you didn't investigate, you didn't validate it.

Q.    Do you know -- I guess you sort of answered that already.  But I'll ask just for

Page 50

A. FOWLER

clarification purposes. Do you know what Experian's procedures are in maintaining the maximum possible accuracy of credit information?

A. I don't work for Experian. So, no, I don't, but I do know that as a public consumer reporting agency, they are tasked with making sure, to the best of their ability, they are reporting accurate, truthful information on any --

(Simultaneous conversation.)

Q. What do you think Experian's procedures should be to ensure maximum possible accuracy?

A. I think it's outlined in the FCRA requirements that you validate the debt.

Q. And what does that look like?

A. Making sure the debt belongs to that person.

Q. Do you know -- in this case, do you know if Experian followed its own internal procedures in maintaining your consumer information?

MR. CREED: Object to form.

THE WITNESS: I don't know what Experian's internal procedures are. I know what the FCRA requires, but I don't know what Experian's internal procedures are because I've

Page 51

A. FOWLER

never worked there.

BY MR. SCHULTE:

Q. With respect to Experian's actions in this case, do you think Experian intentionally tried to hurt you in any way?

A. I believe they were complicit by negligence or by omission.

Q. So is that a no to intentionally?

A. Intention would speak to you, you know, coming after me for what reason. I don't know about that. I don't know. I don't know.

But I do know that, you know, negligence or omission, I can definitely say I think -- I believe that. The intention, yeah, you know what, it kind of comes in there, because if you're not doing what you're supposed to do, then you're intentionally not doing it.

MR. SCHULTE: Let's take -- do we want to take a five- or ten-minute break for everyone, get some water, go to the restroom, whatever anyone needs?

(A brief recess was taken from 11:08 until 11:16 a.m.)

Page 52

A. FOWLER

BY MR. SCHULTE:

Q. Ms. Fowler, how did you first learn that the Preferred Collection accounts were reporting on your Experian credit report?

A. On May 18th, I pulled my credit.

Q. What year was that?

A. 2019.

Q. Did you contact Experian about the accounts that you thought were inaccurate?

A. Multiple times.

Q. When was your first contact with Experian about these Preferred Collection accounts?

A. Very soon after I discovered it.

Q. How did you contact them, by what means, if that makes sense?

A. I disputed it online.

Q. Did you ever speak with Experian on the phone?

A. I don't think so, not that I recall. I've spoken to them before, but I'm not -- I don't really recall the context of the conversation.

Q. Ms. Fowler, did you dispute these Preferred Collection accounts in 2017?

A. I might have. But, no, I don't think so,

Page 53

A. FOWLER

because when I discovered it, it was 2019.

MR. SCHULTE: I'm going to -- so I'm going to bring up a document here on the screen. Can everyone see that okay?

THE WITNESS: Yes.

BY MR. SCHULTE:

Q. Okay. So have you ever seen this document before, Ms. Fowler?

A. Yes. It's my credit file.

Q. Okay. Can you tell -- in the upper right corner of the document, can you tell me what the date says?

A. November 16, 2017.

Q. Okay. And then at the bottom left, it's written horizontally, but is this correct name and address information for you at the time of 2017?

A. Yes.

Q. Okay. So I'm going to scroll down a little bit --

A. Can you go back up, please -- can you go back up for a second.

Q. Sure. Which page?

A. Okay. Hold on. Hold on. Okay. You can go down now.

Page 54

A. FOWLER

Q.   And then here on page 3 --

MR. SCHULTE:  Oh, I'm sorry, Madame Court Reporter, can we mark this as Exhibit 2, please.

(Fowler Exhibit 2 was marked for identification.)

BY MR. SCHULTE:

Q.   And then here on page 3 of this document, do you see in the left portion where it says dispute results?

A.   Yes.

Q.   So now that you've seen this document -- well, actually, let me ask one more question.  Do you see that these dispute results, in addition to other accounts, talk about The Preferred Group of T?

A.   Yeah, I see it.

Q.   Do you know The Preferred Group to be the same organization as the co-defendant in this case?

A.   Yes, as far as I know.

Q.   Okay.  So now that you've seen this document, do you remember disputing the Preferred Collection accounts in 2017?

A.   Yes, because that's -- I think that's when I discovered it was 28 entries on there.

Page 55

A. FOWLER

Q.   Okay.  So I guess just to clarify, initially you had said in 20 -- in May of 2019 you discovered --

A.   Right.

Q.   -- the Preferred Collection.

A.   Uh-huh.

Q.   So is it now -- is it now correct that you discovered them in November or maybe earlier in 2017?

A.   It could have possibly been earlier in 2017, you know, because it all kind of ran together.  And that would make sense, because I believe that's when I'd applied for some jobs and didn't get them.  And it was based on my credit, you know.  Because they specifically pull credit, like the government does.

Q.   So when you disputed the Preferred Collection accounts in 2017, how did you dispute them, online, phone, mail?  Do you remember?

A.   Both, line and on -- and by mail.

Q.   Okay.  Can you tell me about the process of disputing these accounts online, like the steps you took?

A.   Yeah, I went online.  And there's

Page 56

A. FOWLER

basically a landing page which says you can dispute if you find something that's an error on your credit.  And I went through that landing page, through the process.

Q.   During your online dispute, did you select the accounts that you wanted Experian to reinvestigate?

A.   Of course.

Q.   All right.  So in November of 2017, specifically November 16 of 2017, you received the results of Experian's reinvestigation; is that correct?

A.   According to this statement on the page, yes.

Q.   Okay.  And then when was the next time that you disputed the Preferred Collections account with Experian?

A.   I know I -- I think I remember telling my attorney.  Now, I know I disputed it previously.  I'm not sure of the date.  I moved, so I may have misplaced some paperwork.  But I'm pretty sure I disputed it a few times, even up until before 2019.  Because I couldn't -- I just couldn't believe they weren't responding.  And that goes for

Page 57

A. FOWLER

Preferred.

Q.   Okay.  So I guess just to clarify here, you disputed with Experian first in November of 2017; is that right?

A.   Yes.

Q.   Okay.  When was the next time that you disputed with Experian?

A.   I don't recall.  There were a few times.  I'm trying to remember.  Do you have any more documents where you could show me?

Q.   Sure.  Does the date of May 2019, does that sound correct?

A.   What year?

Q.   2019.

A.   You don't have any in between?

Q.   Well, earlier, you stated that when you saw -- in May of 2019, when you saw that the accounts were on your credit report, you disputed shortly thereafter.  Do you remember saying that?

A.   Yes.

Q.   Okay.  So let's talk -- let's just talk about that dispute in May of 2019.

A.   Okay.

Q.   Do you remember, do you remember how you

Page 58

A. FOWLER

disputed in May of 2019?

A.   I probably disputed online as well as by mail.

Q.   Okay.  In this 2019 dispute, did you mention HIPAA to Experian?

A.   I probably did.

Q.   Why did you -- or I guess how does HIPAA play into your dispute?

A.   I know that Experian cannot legally send me the exact bill, but they can send me what the subscriber sent them.  And I let them know that I know you are bound by HIPAA by certain things, but I'm asking for whatever the subscriber sent you to show that there was a debt.

Q.   Did you ever say that the Preferred Collection accounts were a HIPAA violation?

A.   I might have.  I don't recall.

Q.   From your understanding, HIPAA limits the exchange of health information; is that correct?

A.   Yes.

Q.   And so -- I'm sorry, I think I might have misunderstood your answer.  Did you say whether you thought the Preferred Collection accounts were a violation of HIPAA?

Page 59

A. FOWLER

A.   Well, because I did not know where the bill -- where this information was coming from, I did not know who the provider was, I felt like if you are disseminating information and it's on a medical level, without my permission, then you are violating HIPAA.

So I asked -- that's when I kept asking Preferred, who are you, where did you get this from, who is the doctor, who's the provider, and, you know, I got nothing.  And so how are they going to pass information on to Experian and Experian is, you know, going to negligently report it as correct, when it can't be verified?  It can't be validated.  I can't -- you cannot show me where I owe this.

And so, you know, it just got to be a nasty little merry-go-round.  And it was really -- to me, if there is, you know, truth and legitimacy to the bill, then it would be -- it shouldn't be a problem.  It shouldn't be a problem with you saying, oh, yeah, here is the bill that you owe.  Here is where you agreed to sign it.  Here were the dates of service, blah, blah, blah.  But that's not what I got.

And it continued to be, you know,

Page 60

A. FOWLER

frustrating because it's affecting my ability to get a job, and the jobs I am able to get are not economically sound.  And I'm not able to take care of myself.

And consequently, when you can't take care of yourself -- I'm sure you don't know too much about that -- life becomes a struggle.  And I was tired of struggling because I had -- I in no way deserved that struggle.

I have tried to, you know, be the best possible citizen I can be.  But when someone just intentionally throws something on your background and says, oh, yeah, she did this and it affects you negatively, adversely, and it's injurious, no, that's not going to fly.

And to my understanding Experian is complicit in that, like I said before, because you didn't do your due diligence.  You know, you were negligent.  You did not find out that this was specifically my bill before you reported it.  I don't even know who these people are.  I've never heard of them.  If you're going to say I owe something, send me a bill.  Let me know who you are.

That way -- I think, you know -- United

Page 61

A. FOWLER

States says I have a right to face my accuser.  I mean, it doesn't really come down to that point here.  But it's on the same level.  I have a right to know who's reporting information on my credit file that's affecting me negatively.

And if, you know, I keep going back to Experian and saying, okay, this is not mine, and all they're doing is sending me, you know, a generic letter, yeah, it's yours, we investigated, how did you investigate?  How did you do that?  No response.

Q.   Earlier you mentioned wanting to know where Preferred Collections got your health information.  Do you remember saying that?

A.   I spoke to that when I tried to find out who they were, yes.

Q.   Could Preferred Collection have gotten your health information from Incare Medical Services?

A.   I don't know how they could have done that if I've never been serviced by Incare.

And the statement that I made at the time was if I've been serviced by Incare, show me it.  Because I don't have anything.  And you don't either.

Page 62

A. FOWLER

Q.   So after your dispute in May of 2019, do you remember receiving the results of that dispute from Experian?

A.   Can you show it to me?

Q.   I can.  So, do you recognize this document, Ms. Fowler?

A.   Yes, I do.

MR. SCHULTE:  Okay.  Madame Court Reporter, can we mark this as Exhibit, I believe this would be 4.

(Fowler Exhibit 4 was marked for identification.)

COURT REPORTER:  So marked.

MR. SCHULTE:  Thank you.

BY MR. SCHULTE:

Q.   So, Ms. Fowler, is this the dispute results from your May 2019 dispute?

A.   As far as I can see.

Q.   Okay.  And have you -- when you got this document in 2019, did you read it?

A.   I'm sure I did.

Q.   So I'm going to take that down now and continue.  Do you remember -- after your May 2019 dispute, do you remember what your next dispute or

Page 63

A. FOWLER

when your next dispute was?

A.   Can you show me --

Q.   With Experian?

A.   Do you have it?

Q.   I'm asking if you remember when you disputed.

A.   I don't.

Q.   Do you remember --

A.   But I do know -- I know it continued -- you know, it came down from 28 to 13.  I do remember that.  I don't remember exactly when I disputed, but I probably disputed again.

Q.   Does February of 2021 sound correct?

A.   I think there might have been one before that.  Like January 28th, 2021.

Q.   Can you tell me about the January 28th, 2021, dispute?

A.   Um, it was, once again, a dispute letter.  It was disputing, you know, the account.  And I basically -- I'm sure I told them on that one that I didn't know who Incare was, and I didn't know who Preferred was, again.

Q.   In February of 2021, do you -- I guess first, do you remember disputing in February of

Page 64

A. FOWLER

2021?

A.   In February 2021, I got a response to the dispute that I filed on January 28th.

Q.   How did you respond, by what -- or, I'm sorry, how did you dispute?

A.   Online and by mail.

Q.   Okay.  So with this February 2021 dispute, did you only dispute two of the Preferred Collection accounts?

A.   No.

Q.   How many did you dispute?

A.   I disputed them all.

Q.   You mentioned that you disputed online with this dispute that we're talking about; is that correct?

A.   Yes, I'm pretty sure -- I don't think I would go on there and just dispute two.  Now, could there have been some type of computer problems, yes.  But, you know, I never before just disputed one or two.  In fact, I disputed 28 initially and then, you know, when it came down to 13, I'm pretty sure I disputed -- I know it went -- I think it went to 15 and then to 13, and I'm sure I disputed whatever was there.

Page 65

A. FOWLER

You know, it doesn't make sense to only dispute partialities, you know, when your goal is to get this stuff off your credit.

Q.   When you dispute online, you select the accounts that you want Experian to reinvestigate; is that right?

A.   Yes.

Q.   Okay.  And then in February of 2021, do you remember receiving the results of your dispute?

A.   Yes.

Q.   So --

A.   Again, verified -- I'm sorry.

Q.   Do you --

A.   They always came back -- they always -- hello?

Q.   Can you hear me?

A.   Yes.  I can hear you.

Q.   Okay.  Do you recognize the document that's on your screen right now?

A.   Yes.

Q.   What is this document?

A.   It's your response of my dispute, your Experian.

MR. SCHULTE:  Madame Court Reporter, can

Page 66

A. FOWLER

we make this Exhibit 5.

(Fowler Exhibit 5 was marked for identification.)

COURT REPORTER:  So marked.

BY MR. SCHULTE:

Q.   So here on the left side of the page, do you see -- I'm going to highlight it for you, just because I can't really point to it.  But do you see this portion that I've highlighted?

A.   Yes.

Q.   Okay.  So that's two Preferred Collection and Management Services accounts; is that correct?

A.   Yes.

Q.   Okay.  Do you see any other accounts that were covered by this dispute?

A.   I'm sorry.  What do you mean?

Q.   So on this dispute results, it lists the two accounts that it is about, that the dispute results are about.  Does that make sense?

A.   It lists two of them.  And I'm pretty sure, like I said, I wouldn't just dispute two.

Q.   Okay.  And then -- so I'm going to scroll to page 2.  Do you see here where it says before dispute?

Page 67

A. FOWLER

A.   Yes, I see it.

Q.   Okay.  And then a little bit lower on the page, it also says after dispute.  Do you see that?

A.   Yes.

Q.   Okay.  And then if we go to page 3, you see it says before dispute, right here (indicating)?

A.   Yes.

Q.   Okay.  And then after dispute, toward the bottom of the page?

A.   Yes.

Q.   Okay.  So does this credit report -- or I'm sorry, does this dispute result show any other Preferred Collection accounts as being disputed?

A.   They're not listed.  That doesn't mean they weren't disputed.

Q.   Okay.  Are there any other disputes from 2021 that we haven't discussed?

A.   March 5th, 2021.

Q.   Okay.  Can you tell me about that?

A.   Don't you have a copy?

Q.   Ms. Fowler, I'm not really answering questions during this deposition.

A.   Well, I'm sorry, I'm not trying to be, you know, obtuse or facetious, I just -- since

Page 68

A. FOWLER

you're Experian, I'm just asking do you have it, because, you know, that helps with the memory.  Because this -- you know, it hasn't been that long ago, but coronavirus, okay?  So I'm not being facetious, I'm really asking is there a copy that you can help me with.

Q.   I have not submitted in this list of exhibits that I've prenotified everyone about, so I'd --

A.   Okay.

Q.   -- like you to tell me about the --

A.   I can't really tell you too much from memory.  I can only tell you the date.

Q.   Do you remember how you disputed?

A.   I always dispute, future reference, online and by mail.

Q.   Are there any other disputes of the Preferred Collection accounts, now that we've talked about the March one, that we haven't discussed?

A.   I think that might have been the last one.  I'm not really sure.  It's been a crazy couple years.  But that's -- that's the last one I can recall.

Q.   So from 2017 to 2019, you -- strike that.

Page 69

A. FOWLER

I'm sorry.

Why did you wait two years, from 2017 to 2019, to dispute a second time?

A.   I didn't wait two years.  I was trying to find a job.  I was in flux because, you know, of the problems that this credit report caused.  I could not find a sustainable job.  I had moved in with my son, in a single apartment, because, you know, nobody was hiring me.  I became a licensed insurance agency, and when I did, the company, you know, basically decided not to hire me because of all this stuff on my credit.  And the same happened with, you know, a government application that I made.  I didn't wait, light (phonetic).  I was trying to figure out how to live.

Because this, this (indicating), made my life miserable.  It caused so many problems.  And the first being not being able to take care of myself.  Not being able to have gainful employment, you know.  I had to put student loans in deference because I had no job.

And at this level, you know, I was an MBA.  My supposed salary is not supposed -- my salary was supposed to be about, 80, 90,000 a year,

Page 70

A. FOWLER

not 20 or 30,000. That's very insulting. But at the time, that was all I could get because my credit was being assaulted. And I got very tired of dealing with that. Because it put a strain on my mental health, it put a strain on my relationship with my son. I wasn't able to help with the bills. I was trying to find a job. I didn't just sit around and wait.

And every time I went to Experian, it was the same situation, verified as accurate, verified as accurate. No, it's not verified as accurate. Basically, you're being negligent in your duties. That's why we're here.

Q.    So let me rephrase the question. Why did you not dispute again before 2019 after your 2017 dispute?

A.    Say that again.

Q.    After your 2017 dispute, why did you not dispute again until 2019?

A.    I'm not going to say that I didn't. I'm going to say that maybe -- I probably put together letters and got caught up -- like I said, I'm trying to live my life, I'm trying to survive. I'm trying to survive. And that survival means I have to have

Page 71

A. FOWLER

a job. And I was not having very much luck with that because of what Experian was reporting on me.

So I was occupied trying to live my life, trying to survive my life, trying to survive the carnage of these credit reports.

Q.    Is your answer the same as to why, after the 2019 dispute, you did not dispute again until 2021?

A.    No. At that point, I was looking for legal help. And -- because I was -- you know, I was done rehashing this. I was done -- you know, I can imagine the frustration of consumers that don't have the knowledge that I do about this.

And so I was just done dealing with Experian on that level. You know, because I'm doing what I'm supposed to. I'm not getting, you know, any type of change, any type of response. It's just -- I'm being ignored over and over and over again. In the meantime, I still have to take care of myself. I still have to support myself, you know. And I have bills. And the bills are piling up.

And my credit is sinking lower and lower -- because it's 500 -- oh, my goodness, it was

Page 72

A. FOWLER

amazing, you know, how low it went because of someone putting what amounts to be an untruth on my credit. Because, you know what, the minute that I found an attorney, it was gone. I mean, gone. Like overnight. That's what I was doing. I was trying to find legal assistance.

Q.    Ms. Fowler, I'm going to ask you about a couple of documents here. So I will share my screen again.

Can you see the document that's on the screen?

A.    What is this? Oh, CFPB. Oh, yes. Yes.

Q.    Okay. And so down here in the bottom right corner, do you see the red lettering that says Fowler, A RTP documents?

A.    Yes.

Q.    Okay. Do you understand this to be one of the documents that your attorney turned over early on in this litigation?

A.    Yes. Because I submitted a complaint to the Consumer -- the CFPB. And basically they said they did not have a relationship with that collection agency and there was -- they were unable to send the complaint to the company for a response.

Page 73

A. FOWLER

Q.    Okay.

A.    So that was 2020 --

Q.    So you sort of answered my question already, but I just want to be clear. In this complaint with the CFPB, did you mention Experian?

A.    I don't know. I think at that point the -- Preferred was targeted on that.

Q.    Okay. I'm going to bring up another document.

Can you see that?

A.    Yes.

Q.    Okay. Do you recognize this document?

A.    Yes.

Q.    What is this document?

A.    It's a dispute letter that I sent to Experian.

Q.    And I'm going to scroll to the second page as well. From what you remember, is this in the same form as it was when you wrote it?

A.    As far as I can tell.

Q.    Okay. Did you write this letter?

A.    Yes.

Can you scroll down again?

Q.    Sure.

Page 74

A. FOWLER

That's all I can go --

A.    January -- I was looking at the date.

Q.    When did you send this letter to Experian?

A.    January 2021.

Q.    Do you remember if you sent it via mail?

A.    Can you scroll up?

I sent it via mail, and I think I added a certification to it and forgot to put the certification in the letter.

Q.    In this letter, you mentioned HIPAA a fair amount.  Do you see that?

(Simultaneous conversation.)

A.    Yes.

Q.    I'm sorry?

A.    Yes.

Q.    Can you explain to me how HIPAA affects your case against Experian?

A.    Like I said before, I was trying to explain to Experian that I understand that you cannot send me medical information.  Hey, I get that because you're a third party.  However, if your subscriber sent you data that lead you to say that I owe a debt, then you need to send me whatever that

Page 75

A. FOWLER

is.  HIPAA precludes you from sending specific medical information, yes.  But you can send me whatever your subscriber has sent you.  And if you're saying it's Incare Medical, then Incare Medical needs to send a bill to me or to you.  Because they're reporting it through you.  You're the conduit, so that makes you complicit.

Q.    And then in the first paragraph of the letter, you say that Preferred Collection illegally parked debt on my credit report.  Do you see that?

A.    Yes.

Q.    Can you --

A.    That's because they never contacted me before they put it on my credit.  They just put it there.  I never got a bill, I never got a phone call.  So, yes, it was illegally parked.  Because you -- I have 30 days as a consumer from the time that a collection agency receives or gets a bill or a debt that they are looking to collect.  I have 30 days from the day that they get that, when they're supposed to contact me and give me the opportunity to either dispute it, validate it, or whatever.  And I was never given that.  I received nothing.

So, yes, they illegally parked that debt

Page 76

A. FOWLER

on my credit with the help of Experian.

MR. SCHULTE:  And I'm going to pull up another document here.

Madame Court Reporter, I can't remember if I already asked this, but can we mark this as Exhibit 6, I believe.

(Fowler Exhibit 6 was marked for identification.)

COURT REPORTER:  So marked.

BY MR. SCHULTE:

Q.    Ms. Fowler, can you see the new document?

A.    Yes.

Q.    Okay.  Do you recognize this document?

A.    Yes.

Q.    Can you explain to me what it is?

A.    It's another dispute letter sent to Preferred Collections.

Q.    Did you send a copy of this letter to Experian?

A.    I don't know.

Q.    Did Preferred Collection respond to this letter?

A.    No, they responded to nothing that I sent.

Page 77

A. FOWLER

Q.    Okay.

MR. SCHULTE:  And, Madame Court Reporter, can we make this Exhibit 7, please.

(Fowler Exhibit 7 was marked for identification.)

COURT REPORTER:  So marked as number 7.

BY MR. SCHULTE:

Q.    Okay.  Ms. Fowler, let's take -- we can take another break if anyone wants.  We're kind of at a transition period.

A.    I didn't need a break.  I don't need a break.  I don't need a break.

Q.    Okay.

A.    I'd like to go ahead and continue.

Q.    Okay.  Ms. Fowler, do you think you've been damaged by Experian's credit reporting?

A.    Yes.

Q.    How?

A.    By their credit reporting, by their erroneous, incorrect, inaccurate, negligent credit reporting.  And because if you're not doing -- you know, if you're not completing the duties that are required to do by law, then you are intentionally hurting me.

Page 78

A. FOWLER

Your unintentional, you know -- your unintentional neglect of doing the right thing is intentionally hurting me. And I have been damaged. I am still suffering.

I mean, yeah, life is better now since it was removed, but it was stressful. It was damaging. And that along with whatever, you know, whatever life throws you already. It's too crazy because it could have been resolved. It could have been different. You know, all I was asking, what was legally -- is what was legally required. Yes, I've been damaged. And, you know, now my goal is to help other people, because I know, I know what it feels like to be ignored, to be treated as if you don't count, to be, you know, just fly, like a fly. I'm not a fly, I'm a person, and I have a right to be taken seriously. I have a right for my rights to be upheld.

I'm very angry about that. You know, not, you know, cuckoo angry, I'm just angry because it doesn't have to be that way. If I owed it, fine. Let's deal with that. But if I don't, let's deal with that, too.

Q. Do you think you were ever denied credit

Page 79

A. FOWLER

based on Experian's credit reporting?

A. Yes.

Q. From whom?

A. From -- first of all, when I would go to apply for like car insurance, we know that credit plays a role in the rates that you get. So even if there's -- if you get the insurance, it's going to be at a much higher rate than it would be if your credit wasn't affected. And my credit was in the trash can. It was a 500 and something score most of the time.

And no matter how many times I tried to fix it -- you know, you can apply for credit if you want to with a 500 score with open collections on there, they're going to laugh at you. So if the next question is, well, did you apply for credit, why would I? I already know what's going to happen. Anyone with a brain could figure out that you are not going to be granted credit with a subpar credit score and open collections, whether they are medical or not.

(Simultaneous conversation.)

Q. So are you testifying that you did not apply for credit?

Page 80

A. FOWLER

A. I probably did, but after the first or second time, why am I going to waste my time?

Q. Do you remember who you applied --

(Simultaneous conversation.)

COURT REPORTER: Please wait for the question.

THE WITNESS: No, I did not, I do not.

BY MR. SCHULTE:

Q. So just to clarify, you testified that you think that you applied for credit, but you do not remember with what companies you applied for credit; is that correct?

A. No, I don't remember. Like I said, I was trying to survive.

Q. So you're not sure if you were denied credit?

A. Oh, I'm sure I was.

Q. How do you know that you were denied credit?

A. Because the score is 500 and like 30.

Q. Do you have any documents, such as a letter or an email from a company saying you were denied credit?

A. I'm sure I could find some, but I don't

Page 81

A. FOWLER

right now. But let me ask you this. No, strike that.

I'm pretty sure that I applied for credit and was denied, because I don't know very many companies in the credit business that are going to extend credit on a 500 score with open collections.

Q. So with these credit denials that you think happened, do you believe that Experian is responsible for them?

A. Yes.

Q. Why do you think that?

A. Because of what you reported that was inaccurate and wrong and injurious to my credit.

Q. Did anybody that you applied for credit with tell you that they denied you based on Experian's credit reporting?

A. There is a generic letter that you get when credit is denied. They will -- they might mention the credit bureau if you ask them to. But I already knew. TransUnion wasn't reporting 500 score. TransUnion wasn't reporting open collections. Equifax wasn't reporting, you know, open collections to the tune of five -- 15 or 16 entries.

Page 82

A. FOWLER

That alone and in itself is criminal, or it should be. You know, because that basically constitutes maximum damage. You know, maximum damage is being imposed by taking a bill and itemizing it line by line and placing each item on the credit.

Q. So --

A. That's maximum -- I'm sorry -- that's maximum -- that's a maximum way to injure credit, because I've never seen that before, and I've looked at a lot of credit reports. I've never seen a company take a so-called debt and break it down item by item and put each item on the credit.

So, yeah, the fact that Experian allowed it is ludicrous.

Q. Did any of the companies that you applied with tell you all of that?

A. No. They don't have to. I have experience with credit. Like I said, I used to process mortgage loans. Never seen that type of behavior.

Q. Did anybody that you applied for credit with tell you that the denial was based on the Preferred Collection accounts?

Page 83

A. FOWLER

A. I can tell you that a job that I applied for told me that. That was with Mass Mutual. They told me that I was not, you know, being hired because of the credit entries on my credit. And also the SBA, small Business Administration.

Q. You mentioned these employment denials, and I'd like to talk about them a little bit.

When did you apply -- well, you mentioned -- I'm sorry. I'll restart.

You mentioned the Small Business Administration. You mentioned Mass Mutual. Are there any other employment applications that you had denied?

A. No, because after that, I went contract. I got tired of being denied.

Q. So with the Small Business Administration, when did you apply for a job there?

A. That was whenever that horrific disaster was, when that storm hit Puerto Rico.

Q. Do you -- can you remember a year?

A. No.

Q. And when did you receive the denial from the Small Business Administration?

A. About a week -- about two -- well, you

Page 84

A. FOWLER

say -- they did a background and that passed. And so it's probably about two weeks after I applied.

Q. Did you interview with the company before you were denied?

A. Yes, telephonically.

Q. How long did that interview last?

A. I don't remember.

Q. Was it sort of a traditional interview where they just ask a bunch of questions and you answer them?

A. Yes.

Q. And then for Mass Mutual, when did you apply?

A. November 2017.

Q. When were you denied?

A. Almost immediately. They called me in for a meeting with the then VP. And he didn't give me anything in writing, he just basically told me that, sorry, your credit file precludes me being able to make an employment offer.

Q. Do you remember the VP's name at the time?

A. I don't.

Q. Did you interview with Mass Mutual before

Page 85

A. FOWLER

you were denied?

A. I don't remember. I just know -- well, I think I did. Because, you know, the escalation to the VP was kind of surprising to me. I think I did interview with him prior to that.

Q. Do you have any documents related to these employment denials that we've discussed?

A. No. I think I submitted something from the SBA. But I don't have anything from Mass Mutual.

Q. Did you -- I guess just to make sure that I'm understanding you correctly, did you receive any documents from either the SBA or Mass Mutual that told you you were being denied employment?

A. No.

Q. Okay. Why do you think Experian caused these employment denials?

A. Because of what Experian was reporting on my credit file.

(Simultaneous conversation.)

We've entered a new era where people can be denied employment for medical debt. It wasn't like that before.

And so when you take and put 28 listings,

Page 86

A. FOWLER

28 entries, 28 individual entries, and then it skips down to 15, then to 13. It's still overkill. And the way it affects, you know, your credit reporting is crazy. Because it's a open collection. It was almost $7,000. And so that makes me look very irresponsible. That's where the damage comes in, because I wasn't irresponsible. It's not mine. I don't know who it belongs to. I don't know who it came from. So there's the injurious part, you know, because it makes me appear irresponsible.

Perception is everything, and especially when you're dealing with an employment situation where, you know, this employer doesn't know you, they can only judge you by the documents, by the references, by the background that they receive. That includes a credit report.

So that's what paints the picture of maybe the employee that you might be or what they might not be looking for because of things that are reported.

Q.    Did the employers tell you that they were going to look at your credit?

A.    Yes.

Q.    Did any of the employers mention Experian

Page 87

A. FOWLER

as a reason for denying employment?

A.    When they say you have open collections, I know which reports had open collections. You were kind of segregated to yourself because of what you were reporting. They didn't have to specifically say Experian. You were the only one reporting those open collections. You were the only one with all those entries on my credit. Equifax didn't have those. Neither did TransUnion. So it was only Experian, by a process of elimination.

Q.    Did any of the employers mention the Preferred Collection accounts by name?

A.    No, they said "open collections."

Q.    What position did you apply for with the Small Business Administration?

A.    Disaster specialist.

Q.    What was -- based on what they told you, what was included in that role?

A.    Processing disaster relief in a FEMA-blighted area, which would have taken me to Puerto Rico. And I would help with recovery efforts.

Q.    Do you remember what the salary would have been?

Page 88

A. FOWLER

A.    Thirty-seven dollars an hour plus unlimited overtime.

Q.    What position did you apply for with Mass Mutual?

A.    Sales agent.

Q.    Was that for selling insurance?

A.    Yes.

Q.    Do you remember what the salary was, or would have been?

A.    It's commission based. It's specifically on your efforts.

Q.    At the time that you applied with Mass Mutual, were you licensed to sell insurance?

A.    Yes.

Q.    When did you get licensed?

A.    November of 2017.

Q.    Did you have any background in selling insurance?

A.    No.

(Simultaneous conversation.)

Q.    So we talked about -- I'm sorry?

A.    I was trained.

Q.    We talked about the credit denials, we talked about employment denials. Now I'd like to

Page 89

A. FOWLER

talk a little bit about potential insurance denials. Have you had an application for insurance denied?

A.    I have had applications for insurance escalated to higher rates. I haven't had them denied. I've had to pay higher rates.

Q.    What companies did you apply with for insurance that gave you these higher rates?

A.    Progressive. Geico. Infinity.

Q.    When did you apply with Progressive?

A.    2019, I think.

Q.    And when were you denied, how shortly after?

A.    I was not denied. I was approved with a higher rate.

Q.    How do you know that the rate for which you were approved was higher than what you would have gotten? Did you apply for a specific rate?

A.    I have been driving since I was 16 years old. I'm now 64. So that gives me experience as a seasoned driver. Okay.

Now, the only parameters that you are judged by on insurance are your credit and your driving record. There are some times they use your zip code. But, you know, all of those things factor

Page 90

A. FOWLER

into the rates that you will pay. And your credit is a factor in that choice that they make.

Q. So how do you know that the rate you were charged is higher than --

A. Because I know what someone who is basically the same age, same type of demographic, what they're paying, as to what -- as opposed to what I'm paying.

Q. Did Progressive ever give an explanation for why the rate was supposedly higher?

A. Progressive -- or most insurance companies do not give an explanation. They simply give you a rate and what it's based on.

Q. Were you -- did you get insurance -- other than Progressive, did you get insurance with any other company?

A. I didn't need any insurance for another company. I had Progressive.

Q. Were you insuring your car or something else?

A. My car.

Q. Had you been in any car accidents before applying for Progressive?

A. Not where I was at fault. I got hit.

Page 91

A. FOWLER

But I've never been in an -- well, let me take that back. I think I had one at-fault accident, and the three years had lapsed. So that was no longer being considered.

Q. How many accidents had you been in before applying with Progressive?

A. One.

Q. Was that the at-fault accident?

A. Yes. Three years prior to applying for Progressive. So the window that they look at is in the last three years, have you had an accident or a ticket. No.

Q. You mentioned -- I'm sorry. You mentioned earlier that you were in a car accident that was not your fault where you had gotten hit; is that right?

A. Yes.

Q. So how many -- whether your fault or not, how many accidents have you been in with your car?

A. Two.

Q. And to clarify, none of the insurers that you applied with told you why you were getting the rate that you were getting; is that correct?

A. They don't have to.

Page 92

A. FOWLER

Q. But is that correct was my statement.

A. It's correct that they didn't put it in writing. But it's universally known what factors are considered when you apply for insurance. If you have credit with open collections, that's going to be a factor.

Q. Did Progressive ever say that your rate was based on Experian's credit reporting?

A. No, they would never do that.

Q. Okay. Did Progressive ever say it was because of the Preferred Collection accounts?

A. They said open collections.

Q. Progressive said that it was based on open collections?

A. Yes, because I questioned them. Open collections.

Q. Did they -- did Progressive ever say Preferred Collections by name?

A. Open collections is what they said.

Q. I'm going to bring the complaint back up.

MR. SCHULTE: Madame Court Reporter, that was Exhibit 1.

BY MR. SCHULTE:

Q. Can you see that, Ms. Fowler?

Page 93

A. FOWLER

A. Give me a second, please.

Okay. You're on 30?

Q. I'm actually going to be in paragraph 23.

A. Okay.

Q. Okay. So in paragraph 23, you mentioned that you suffered loss, credit. Do you see that?

A. Yes.

Q. What does that mean?

A. That means as long as you have open collections and a subpar, substandard, trash can credit report, then you are basically excluded from enjoying the ability to apply for credit. Because to do so would be asinine. You are going to be denied across the board. So that limits your ability to procure credit.

Q. So when you say "suffered lost credit," you didn't -- and tell me if this is correct, please -- you didn't lose any credit that you already had; is that correct?

A. Were accounts closed because of that, no. But was I able to get any credit, yes, I was not able to get any credit. Nothing. And so, you know, this is a capitalistic society. Most people have credit. So I was denied the ability to have that.

Page 94

A. FOWLER

So that damages me because it limits my buying power, limits my economic ability. It limits a lot of things.

Q. In paragraph 23, you also mention increased insurance rates. Do you see that?

A. That's what I said about Progressive.

Q. Before you applied with Progressive, had you made any insurance claims?

A. No.

Q. So none of your accidents resulted in you making an insurance claim; is that correct?

A. The three years prior, the three years before, which the three years are not counted after three years, there was a small claim on my credit from that accident. But that's not considered after three years.

Q. Where were you living when you applied for insurance with Progressive?

A. West Palm Beach.

Q. In paragraph 23, it also says increased interest rates. Do you see that?

A. Yes, I see it.

Q. What interest rates have increased for you?

Page 95

A. FOWLER

A. Well, let me put it this way. If I go and apply for a credit card and my credit is questionable, I'm going to be given a higher interest rate. As a matter of fact, I think I did have a credit card where the interest rate was very, very high. And it was -- I think I applied for that card. Matter of fact, I'm sorry, I did apply for credit. And the only credit I was given was secured credit. And the interest rate was like at 24 or 25 percent. And I think that's First Progress. So, yeah, it was higher interest rate, and it was -- I could only get secured credit.

Q. Do you remember when you applied with First Progress?

A. Sometime in 20 -- I think 2017. I'm not sure about that. I'm not sure.

Q. How do you know that the interest rates were higher? You say that they're increased. How do you know that they were increased?

A. All you have to do is Google a card and it'll tell you what the interest rates are based on, you know, your credit. And so if I'm getting a card at 25 percent, which is ridiculous, then there has to be a reason for that. And if my credit were

Page 96

A. FOWLER

clear or if my credit were up to par, then I would have been given the going rate, maybe prime or less than prime. But that wasn't the case.

So as we know in this society, credit affects everything. And if you have a horrible credit score and open collections on your credit, you're going to suffer.

Q. So is the interest rate that you got with First Progress, you're saying that's higher than what we would call normal; is that correct?

A. It's higher than prime.

Q. Is that what you base normal on being?

A. It depends on the product. But I know that it was high. Twenty-five percent is not a good rate for a credit card. It's a horrible rate.

Q. Did you ever apply for a certain interest rate and get denied but get granted a higher interest rate?

A. I applied for a credit card, and they sent me to a secured credit card as opposed to the unsecured credit card. Same --

Q. Do you --

A. Same -- the same type of punishment, it says you cannot be extended credit because you are

Page 97

A. FOWLER

not creditworthy. So you have to secure this account with a deposit so that we can be sure we will get our money. Because your credit history says you don't pay your bills. Your credit history says you're irresponsible.

Q. Do you have any documents to show the difference between the interest rates that were available to you before Preferred Collection appeared on your credit report?

A. No.

Q. Do you know whether the increased interest rates that you talk about were based on Experian's credit reporting?

A. Yes.

Q. How do you know that?

A. It's the only anomaly.

Q. Did anybody -- did any lender ever tell you that it was based on Experian's credit reporting?

A. I used to work for lenders. I don't need a lender to tell me when it's an anomaly when it's an open collection. Charge-offs and collections are two of the worst things you can have on your credit, that along with late payments. But late payments

Page 98

A. FOWLER

can be negotiated. They can be forgiven. A collection account that's sitting there open says that you're irresponsible because you have not paid your bill.

Q. So --

A. The only worse part of that could be a charge-off.

Q. So to clarify, no lender told you specifically that a denial was based on Experian's credit reporting; is that correct?

A. I've been told it was due to open collections and low credit score.

Q. You also mention at the very end of paragraph 23 the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

What credit denials are you talking about in that paragraph?

A. Well, first of all, I can't have credit. As an adult, that's a handicap. That's insulting in and of itself because I'm an adult. I'm a functioning adult.

And if the reason I cannot have credit is to somebody else's inaccuracy, negligence, intentional humiliation, yes, it's horrible. And

Page 99

A. FOWLER

not being able to establish credit is the same as being denied. Because I can't establish credit, not as long as those parameters remain as they did.

Because as soon as they were removed, not only was I gainfully employed, I established credit, because that was no longer sitting there. That was no longer an obstacle.

You know, we could play this game all day long, but the bottom line is that in this capitalist society, credit matters. And if there are things that are affecting your credit and they're out of your control, they are not because of your misdeeds, that is almost criminal.

Because it's one thing for me to go out and ruin my own credit. It's completely different for someone to do that for me maliciously.

Q. So when you say a credit denial in paragraph 23 of the complaint, do you mean that you would not have been able to establish credit even if you had applied for credit?

A. That counts, too. They both, they work the same, you know. And when you're denied unsecured credit and sent to a secured, okay, you already don't have credit. So now you're supposed

Page 100

A. FOWLER

to go and come up with this money. It basically seeks to keep people in poverty. Because this society is run on credit.

Q. Can you tell me about the -- when you say anguish in paragraph 23, can you please describe that for me?

A. It's anger and anguish and basically stress, anxiety, and causes physical problems, it causes depression. And all of those things are basically due to the fact that you're unable to live your life with any sort of -- (technical interruption)

-- guarantee (phonetic), there's nothing that you can do about it because this company over here refuses to acknowledge that they're making a mistake, that they're basically reporting things that are incorrect. So you just continue to struggle with it.

Like I said, there was a time that you say I was sitting there and I did not submit -- I was stressed out. I was trying to find work. I grabbed anything I could. I worked at an auto parts store for like $9.25 an hour. That is so beneath me. That is so not the level that I'm at, you know,

Page 101

A. FOWLER

education-wise and experience-wise, so, yeah, it's troubling. Not only that, it's -- that's a job for a high schooler. I've been out of high school a long time ago. You know, so it did not fit, it did not benefit me. I could not survive on that.

And all of this, you know, like I said, we can play this game as long as we want. But what it comes down to is that there were inaccurate, incorrect, damaging entries sitting on my credit open for '17, '18, '19, '20. I believe they were wiped out in 2021. So, how many years is that? You think about what people are able to accomplish -- '17 to '21 -- that's six years. I should have been able to accomplish a lot more than I was. I am behind the eightball because of those things and because of what was done to me.

And if this is, you know, what I have to deal with to get to the other side, then fine. But I'm not going to let it fly like it was something that I did or something that I caused.

And, you know, when you try to be a responsible adult, everybody should be held to being a responsible adult, and that includes corporations.

Q. The things that you mention in paragraph

Page 102

A. FOWLER

23, the emotional pain, the anguish, the humiliation, how did those things manifest?

A.    I ended up in therapy --

Q.    Did --

A.    -- I had PTSD therapy for over a year.

I just stopped my therapy about maybe three months ago.  I'm going back, because I have remnants.  You know, there are days I wake up so angry, I can't see straight, and it's just because of the unfairness of it all.  You know, this society, capitalistic, whatever, there are things that happen to you, and sometimes it's -- you know, due to the negligence and whatever of someone else.  It's just very unfair.  And I've had my share in these last six years.

And it's just -- to me, it's -- some of it is just -- it denies -- it denies logic, it denies explanation.  You have no idea why when all you have to do is do what you're supposed to do.  You know, and if a company says I owe something, then show me that, and we'll figure it out.  But to take that away from me, to just park something on my credit, you know, I wake up and it's there... And then you didn't even basically give me the decency

Page 103

A. FOWLER

or the right to say, hey, no, this is not mine, I don't owe this.

And then the other party just goes along with it.  It speaks to being complicit, you know.  And it's very painful.  It causes a lot of drama, a lot of drama.

Q.    Who else knew that you were going through the things that you mention in paragraph 23 --

A.    Everybody in my life.  I'm sorry to cut you off.  Everybody in my life.  My son, my friends, my therapist, all knew.

Q.    You mention humiliation and embarrassment.  Who were you embarrassed or humiliated in front of?

A.    My friends.  My son.  I'm supposed to be an example of a functioning adult.  I wasn't that to my son.  I had four other kids, you know.  And I'm supposed to be an example because I'm their parent.  I couldn't be that.

Q.    How did --

(Simultaneous conversation.)

How did your friends, your family that you're mentioning, how did they know about this situation?

Page 104

A. FOWLER

A.    I shared it.

Q.    Were there any other stressful events going on in your life that could have contributed to the emotional suffering you felt?

A.    No.  You know, my son is an amazing young man.  He's an executive chef at an institute in Big Sur, California.  And he told me when he was ten years old he wanted to be a chef.  And I said, yeah, okay, whatever, because kids always say stuff like that.  But you know what, I found him a culinary program in junior high school.  And his first job was working for Tiger Woods as a chef.  He started as a dishwasher.  But that's the kind of example that I try to set for my kids.

My oldest daughter is an RN practitioner, because excellence, education, and living your best life was what I tried to display to my kids.  And then it was snatched away from me.

My daughter is an EMT.  She was in paralegal school.  And here I am, their mother, I can't even have a credit card.  You know, if I go visit my kids, most of the bills are going to be footed by them, because I don't have a decent job that would afford me the ability to enjoy a regular,

Page 105

A. FOWLER

standard vacation, and that's simply because of what's on my credit.

You know, there are so many people in this world that live below the poverty level.  And one or two things that -- yeah, there are some extenuating circumstances sometimes, like addiction.  I've never been addicted to anything but life.  Sometimes there's people that haven't had the opportunity to go to school.  I went to school.  I handled that.  Okay.

And so intelligent, yeah, I'm very intelligent, and I know that.  So there is no reason for me not to be successful and do the things that I want to do, unless there's a barrier put in my way.  There was nothing else going on in my life that would have precluded me from seeking gainful employment, from having a good credit score, from trying to buy the house that I'm trying to buy.  Because now I'm approved for that house.  Previously I couldn't -- I wouldn't dare, because I was a processor.

I was an underwriter back in the day, so I know what they're looking for.  I know what kind of scores it has to be and I know what your credit

Page 106

A. FOWLER

has to look like, I know what your ratios have to look like. I know that things need to be paid off. So, yeah, there was a lot of anxiety and a lot of problems, because it effectively brought life to a standstill, completely.

Q. Do you have any medical conditions that could have contributed to the stress you were feeling?

A. No.

(Discussion held off the record.)

MR. SCHULTE: Okay. I have about two or three more questions, and then we'll be at a good stop.

BY MR. SCHULTE:

Q. I'm sorry, did you say you do not have any medical conditions that would have contributed to the stress?

A. I said no, yes.

Q. Do you have any medical conditions that you feel have arisen from this credit reporting situation?

A. Depression, that's what sent me into therapy. It was ridiculous. You keep fighting and fighting and fighting and trying to -- you try that,

Page 107

A. FOWLER

you try this, nothing works, because you already know what's at the root of the problem. And constantly being ignored, constantly being brushed off, you know, especially when I know, within myself, I am a person of integrity, Mr. Schulte. And if I owed a bill, I would have sat down with that company and tried to figure out a way to manage to pay it. Monthly payments, whatever I had to do, okay? But when I don't know who's the provider, the debtor, I don't know who the company is, I don't know what kind of debt. I'm questioning why is this happening? Why is this on my credit? Why is Experian so quick to tell me it's verified as accurate, when all you've really done is looked at my name, my address, that's it.

That does not verify a debt as accurate. It just doesn't, not by any means. Not by any means, that's what's spoken of in the U.S. Code. It says it needs to be verified as a debt. Not verified as information correct but as a real debt that belongs to me. And that's all I was asking. That's all I've pleaded for for years.

So to get to this place, where we are here today, is because of negligence and intentional

Page 108

A. FOWLER

deniability, denying me my rights, my rights as a consumer, my rights as a person.

Q. Do you have any heart illness?

A. Do I have any what?

(Reporter clarifies.)

BY MR. SCHULTE:

Q. Do you have any issues with your heart health?

A. Oh, no. No, I don't. I'm a raw vegan, and I work out every day.

MR. SCHULTE: All right. This is a good stopping point. I don't have that much more after this, just for everyone's reference. But we can go off the record.

(A luncheon recess was taken from 12:35 p.m. until 1:21 p.m.)

BY MR. SCHULTE:

Q. Ms. Fowler, have you gotten professional help for what's happened in this case?

A. Wait a minute. Something's going on with the volume. I can barely hear you.

(Discussion held off the record.)

THE WITNESS: Repeat the question.

(Simultaneous conversation.)

Page 109

A. FOWLER

BY MR. SCHULTE:

Q. Oh, I'm sorry.

A. No, I said please repeat your question.

Q. Sure. Have you gotten professional help for the things that we've been talking about today in relation to the Experian credit reporting?

A. In which context?

Q. So you mentioned therapy, and we'll talk about that in a second. But I just wanted to see if there was anything on top of that, like have you gone to any other doctors?

A. No. I went into therapy for over a year.

Q. Okay. So in regard to the therapy, that's what we're going to be focusing on here. Who did you receive therapy from?

A. My therapist.

Q. What's her name?

A. Catherine Doe.

Q. How often did you go see Ms. Doe?

A. I participated in a weekly therapy session.

Q. When did you start going to see Ms. Doe?

A. I don't know. It was probably -- well, let me back up. Because I've gone to two

Page 110

A. FOWLER

therapists, and I had a therapist before that, name was Hugo, and that started in 2017. And then I went -- it went for about a year, and then I started back again in 2020 with Catherine.

(Reporter clarifies.)

THE WITNESS: D-O-E.

BY MR. SCHULTE:

Q. And these sessions with Ms. Doe, you said you went to them weekly?

A. Yes.

Q. Were they group or individual sessions?

A. Both.

Q. How often would they be an individual session versus a group session?

A. Well, there were times I would meet with her before the group session if I needed to. You know, but I didn't do a lot of individual. I did mostly group. Because it was more camaraderie and support for people who had, you know, been kind of dealing with some of the same things.

Q. Did you pay Ms. Doe for her services?

A. No. It was through a community program.

Q. So did you have any costs related to getting therapy from Ms. Doe?

Page 111

A. FOWLER

A. Going to therapy, you know, there's costs in that, but as far as what it cost me, it wasn't through my insurance.

(Discussion held off the record.)

BY MR. SCHULTE:

Q. So just to clarify, Ms. Fowler, did you pay anything -- any money out of pocket to have therapy sessions with Ms. Doe?

A. It was a community program, as I stated before. I didn't have to pay for that. Not that I could afford it.

Q. Were you going to the community -- well, actually, what's the community center called?

A. Compass Community Action.

Q. Were you going to Compass Community before the Preferred Collection accounts showed up on your credit report?

A. No, I was not. I didn't even know about it.

Q. When did you first start going --

(Simultaneous conversation.)

THE WITNESS: 2020.

BY MR. SCHULTE:

Q. Can you tell me about what Compass

Page 112

A. FOWLER

Community is? You mentioned it's a community center. But can you tell me a little bit more about it?

A. That's all I know. It's a community center. They have -- they do a lot of different things.

Q. So in these group sessions that you would do, did anyone else talk about credit reporting?

A. I'm not going to disclose that.

Q. So in this case, Ms. Fowler, you're seeking monetary damages; is that correct?

A. And it's not just for counseling. It's for a lot of different things. But, you know, there is an expected privilege of what we talk about to be confidential in those meetings, just like it would be if it were a AA meeting, where they don't name people's last names. I'm not seeing that I need to do that. But, you know, I just feel like it's not something that needs to be discussed here. Because I think what suffices it is that I went in to counseling. And it was for help with what I was dealing with, depression, anxiety, all of that.

Q. Do you know if Compass Community Center is a community center focused on bettering the lives

Page 113

A. FOWLER

of LGBTQ individuals?

A. As other people also -- it's not -- it's not only geared to LGBT, but I know they do work with LGBT.

Q. So when I asked you earlier about what you could tell me about Compass Community Center, why didn't you disclose what you knew?

A. Why would I? It's not -- that's not the only demographic they work with. What's the objective on that. Are you asking me if I'm LGBT?

Q. No, ma'am.

A. Okay. Well, then, what would the objective be? Because I -- you know, that's not the only group they work with, so why would I single that out?

Q. Because I asked you, Ms. Fowler, and here I'm asking the questions.

A. No, you didn't ask -- you didn't ask me that. You asked me are -- is that somebody they work with. Now you asked a specific question. But why would I specifically single that out? They work with a lot of different groups.

Q. Do you know what the mission statement of the Compass Community Center is?

Page 114

A. FOWLER

A.    No, I don't.

Q.    In this case you're seeking monetary damages; is that correct?

A.    Yes.

Q.    What is the total amount of monetary damages you're seeking from Experian?

A.    I'm not sure.

Q.    What factors contribute to the amount of monetary damages that you would seek?

A.    Everything.  Everything that was visited upon me.

Q.    Can you give me some specifics?

A.    Well, it was everything.  What can I say? It's loss of credit, loss of employment, you know, stress, anxiety, depression.

Q.    How would you calculate value of those things?

A.    I'm not sure.  I would have to speak with my attorneys.

Q.    Ms. Fowler, we're going to look at one more document.

A.    Okay.

Q.    Can you see that?

A.    Yes.

Page 115

A. FOWLER

Q.    Okay.  Do you recognize what this document is?

A.    It's the -- I guess it's the -- one of the pages of the report.  I have no idea.  My information.

Q.    So have you seen this document before?

A.    Probably.

Q.    I'm going to scroll down a little bit. You see in the bottom right where it says, in the red print, Fowler RTP documents?

A.    What does that mean?

Q.    Do you not know what it means?

A.    Fowler RTP document, I don't know what that means.  That's why I asked.

Q.    Okay.  Well -- it's all right.  We don't have to get into --

A.    I just want to know what it means. Because that's the second time you've asked me about that.

Q.    If you'd like to know what it means, you can talk to your attorney about it.  But we're not going to get into the detail of it.

Is this -- from what you understand, is this a credit report containing your personal credit

Page 116

A. FOWLER

information?

A.    It's part of either a dispute, a response, or --

Q.    If you look at -- I'll try to be a little more direct.  If you look up here in the top center of the page, I've highlighted it, what does that say?

A.    "Annual Credit Report - Experian."

Q.    Okay.  So, would this be your annual credit report generated by Experian?

A.    I guess it would be.  Is there more to it?

Q.    There is.  There are several pages.  And we can scroll through.

A.    Okay.  Okay.

Q.    So as I'm scrolling through, from what you can tell, is this a annual credit report with your information?

A.    It looks to be.

Q.    Okay.  And I'd like to talk about a few of the accounts here, the first one being this "1st Progress/1st Equity/TS."  Do you see what I'm talking about?

A.    Yes.

Page 117

A. FOWLER

Q.    Okay.  So do you see underneath where it says "Potentially Negative"?

A.    Yes.

Q.    So if we come down to the next page and we look at this little grid, do you see with the years and then the months across the top?

A.    Uh-huh.

Q.    Zero?

A.    Uh-huh.

(Reporter clarifies.)

THE WITNESS:  Yeah, that's a yes.  I'm sorry.

BY MR. SCHULTE:

Q.    Do you see where it says "CO" in several of the months?

A.    Yes.

Q.    Do you know what CO stands for?

A.    No.

Q.    So in your response to the -- Experian's requests for admissions, you stated that the First Progress account, as reflected in this credit report, was inaccurate.  Do you remember saying that?

A.    Yes.

Page 118

A. FOWLER

Q.   Okay.  So what is inaccurate about it?

A.   The balance that was owed.  And the date that it was opened.

Q.   When you say balance, are you talking about where it says balance a hundred and --

A.   The balance that's owed.  The balance that is owed, that they're saying was owed.

Q.   And so when was the date opened?

A.   It was sometime in 2017, but what I accused them of was re-aging and incorrect balance.

Q.   Ms. Fowler, do you know what a charge-off is?

A.   We talked about that earlier, yes, I do.

Q.   Can you explain to me what a charge-off is?

A.   A charge-off is when a debt is no longer collectible.  The time has passed where the company feels it needs to write it off.  But that doesn't mean it doesn't collect if it's offered.

Q.   And earlier you said that a charge-off was viewed very negatively by potential lenders; is that right?

A.   Yes, it is, especially if it's -- you know, the balance is wrong.

Page 119

A. FOWLER

Q.   So is it possible that people who denied you credit, insurance, employment, any of those things that we talked about, is it possible that part of their denial was based on this First Progress account?

A.   For $187, maybe.  But I doubt it.

Because what -- let's compare the balances.  That was $7,000 versus 187.  Even if there's another one, unless it comes close -- let me see what that percentage would be.  I could figure it out, but I don't have my calculator.  I don't think the percentage comes anywhere near $7,000, as to whatever was left on the credit at that time, you know.

Because, like I said, I disputed it, because it was a secured account.  It was paid.  And when it was finally figured out, that's what it came out to be.  It was already paid.  Now, why they were showing it is -- you know what, I don't know.  But they're not showing it anymore.  And now they're showing it paid.  I didn't pay them.

And the next thing is this.  Yeah, it's a charge-off.  They're saying it's a charge-off.  That doesn't mean it's correct.  As we know, corporations

Page 120

A. FOWLER

make mistakes all the time, just like I do.  And so if you're showing this as, oh, you know, maybe they denied you for this.  $187, I think they would have given the opportunity to pay it, versus an open $7,000 collection.

Q.   In your response to Experian's request for admissions, you also say that your First Premier account was inaccurate?

A.   Yes.

Q.   What was inaccurate?

A.   The balance.  It was a $300 balance.  And I basically said, I'm not paying it until you fix it.  Now, when they fixed it, I paid it.

Q.   So when you say that the balance was wrong, are you saying that the balance was too high?

A.   Yes.

Q.   What did you actually owe?

A.   $300.

Q.   And what was the balance that they were saying you owed?

A.   550.

(Reporter clarifies.)

THE WITNESS:  550.

Once again, even if you put the two

Page 121

A. FOWLER

together, let's compare, okay, let's say it was $550 and $187, let's compare that to 7,000.  It's a drop in the bucket.  The percentage is miniscule.

BY MR. SCHULTE:

Q.   Did anybody tell you that when you were applying for credit or --

(Simultaneous conversation.)

Did anyone tell you that these accounts were not as harmful as the Preferred Collection accounts when you were applying for insurance, credit, or employment?

A.   I'm going to refer you again to what I used to do for a living, and that was credit analysis for mortgages.  Okay.  That's probably the biggest purchase most people make.

If there's something on a credit file that's $500, even $500, or $187, the opportunity to pay that is going to be given first.  They're going to say, what's the status of this open debt here?

Oh, well, you know, I'm having a dispute with the company because blah, blah, blah, blah, blah.

Okay.  We need to reconcile that.

Page 122

A. FOWLER

However, $7,000 open collections that I don't know who it belongs to, I can't answer that. And you're not going to tell me that they're the same. They're not.

First of all, there's a difference in monetary balances. That comes to a little over $800. That's something that's easily remedied. And, like I said, when we sat down and I presented them with paperwork and documents, it was done, it was closed. But I couldn't -- and that's what I tried to do with Preferred. That's what I tried to do with Experian. Tell me who these people are. Show me the bills. We'll figure it out. But we can't if you ignore me and if you act like I'm not, you know -- I'm not serious -- I'm not to be taken serious.

So, you know, no, there's no way you're going to compare the two. That's the only thing that I had on my credit. And the only reason it sat there is because I refused to pay it because it was incorrect on both of them. And when we figured it out, I paid the First Premier. The other one was closed out because I sent them the same information I sent them before.

Page 123

A. FOWLER

But it also depends on the company, you know, who you get that day, because companies are what? People. But the same people that I tried to talk to at Preferred and Experian just kept ignoring me. And the size of the damage is much bigger. The size of the crater is bigger.

So no, it has nothing to do -- yeah, it was a blip, but it wasn't $7,000.

Q. So nobody told you that the Preferred Collection accounts would be viewed more negatively than --

A. They don't have to tell me that.

(Reporter clarifies.)

THE WITNESS: Oh, God, I keep doing that. Please forgive me.

Nobody told me that the Preferred what?

BY MR. SCHULTE:

Q. Nobody told you that the Preferred Collection accounts would be viewed more negatively than the First Progress and the First Premier accounts; is that correct?

A. Ha ha ha. They don't have to tell me that. There's more damage. That's like asking, you know, if there's a big hole and a small hole, which

Page 124

A. FOWLER

one is going to cause the most damage.

Q. So nobody told you that; is that correct?

A. They don't have to. They don't have to.

Q. So we're -- the answer -- I'm going to assume the answer was no to that question.

Do you have any reason -- actually, let me rephrase that.

Do you believe that you were singled out by Experian?

A. I don't know Experian. They don't know me. What I think is bad was their practices and some of their -- you know, whatever goes on with their model. I'm not, you know, a conspiracy theorist, and I'm not the person that's running around saying they're trying to gyp me.

No, I don't know why they did this. Because they were given plenty of time to correct the problem and they didn't. So I would have to, you know -- if I could speak to Experian maybe I could find out. You know, why didn't you perform your due diligence. Why didn't you do what is required of you.

Do I think that sometimes stupidity takes over, yeah. Because maybe they think I won't fight.

Page 125

A. FOWLER

I don't know. I have no idea. I can't tell you why Experian did not do what they were supposed to. I can't tell you that.

Q. Do you believe --

A. I don't know that.

Q. Do you believe that you were singled out by Experian?

A. I'm going to answer it again. I don't know Experian, so, no. I believe it was negligence on their part, yes. But I don't know them and they don't know me.

Q. Do --

A. I believe they were negligent.

MR. SCHULTE: I believe that's all I have on direct. Dennis, did you have anything you wanted to ask while we're on the record?

MR. CREED: I don't have any questions for my client on the record. We can always address it later.

MR. VIGH: I have a few questions.

MR. CREED: Mr. Vigh, did you provide a deposition notice for today?

MR. VIGH: I did not.

MR. CREED: Okay. Go ahead, this is your

Page 126

A. FOWLER

chance to ask questions, then.

MR. VIGH:  Thank you.

CROSS EXAMINATION

BY MR. VIGH:

Q.    Ms. Fowler, you stated that you worked for a company called VCC?

A.    VCC Consulting.

Q.    Okay.  And is that the company that you help people with credit reporting issues?

A.    Yes.

Q.    Okay.  What type of help did you afford them?

A.    I think I said this before.  What I showed them was when they needed to dispute something on their credit, the steps that they should probably take.  There was a manual and it talked about, you know, submitting the dispute and basically following through and making sure you're consistent in your paperwork, your recordkeeping, and just not dropping the ball.  And that was that.

Q.    You showed them in person?

A.    No.

Q.    How did you demonstrate it to them?

A.    I had phone conversations.  We did share

Page 127

A. FOWLER

screens like Zoom or whatever.  And, you know, I'd show them the manual and let them know, you know, certain parts of it, let them know what they needed to do as far as disputes or what they -- you know, sample letters, sample responses.

Q.    Okay.  And what was the time period that you worked for VCC?

A.    It went out of business, so it was probably only about three months, three or four months, I think.

Q.    Do you know the dates?

A.    No.  Sometime in 2019.

Q.    2019.  Okay.

When you were showing them on the screen shares, did you show them how to dispute the debt online?

A.    I gave them the link to the site where they could do it and, you know, told them, it's easy, all you've got to do is follow the steps.  And I shared my experience with them, you know, and that type of thing.

Q.    Okay.  And did you prepare the disputes yourself to the Preferred files?

A.    I did.

Page 128

A. FOWLER

Q.    And do you know how many disputes you prepared in total?

A.    Four.

Q.    Four occasions or four disputes total?

A.    No, I don't.

Q.    Okay.  Did you dispute multiple accounts at the same time?

A.    Regarding?

Q.    The Preferred debts that you disputed?

A.    Yes.  Yes.

Q.    Okay.  And you mentioned a landing page. What was -- where did you get the access to the landing page for filing the disputes?

A.    I have no idea.  I -- like I said, I've been in the -- I was in the mortgage industry for a long time, so I learned a lot of stuff.

Q.    Okay.

A.    And I can't sit here and, you know, recite it back to you because it's been too long.

Q.    Right.  But you knew how to access the dispute page?

A.    Yes.

Q.    Okay.  Was it from the Experian website that you had the landing page access?

Page 129

A. FOWLER

A.    I think I know how to access all of them.

Q.    Okay.  All the credit reporting agencies?

A.    Yes.

Q.    Okay.  And then if you look at a file and you want to dispute it, there's a link that you can use to make the dispute; is that how it works?

A.    It depends on the agency.  They're not all the same.

Q.    All right.

A.    But as far as, you know -- it's very user friendly.

Q.    Okay.  I'm just -- I'm sorry, I didn't mean to interrupt you.

A.    No, you said you were just trying to --

Q.    I'm trying to establish how did you get to the dispute page.  You mentioned a landing page, which indicates to me that you started somewhere else, and it sent you to this page.  Maybe I'm --

A.    Well, there's a landing page whenever you open up Experian.com.  I have a monitoring service with Experian.

Q.    Okay.

A.    And there's a landing page that you come to, and it's going to basically ask you what you

Page 130

A. FOWLER

want to do, you know, what are you here for. Okay. That type of landing page. Not something special or secretive or CIA. Just a landing page.

Q.    I'm just trying to clarify that.

A.    It's okay.

Q.    All right. And so as part of the options, if you wanted to dispute an item in your credit report, there would be a link on that landing page that would allow you to do that?

A.    You would go to the disputes area, yes.

Q.    And then from the disputes area, did it give you options as to how to dispute the debt?

A.    It gives you options as to what you're disputing it for.

Q.    Okay. And is that like a dropdown menu?

A.    Yes, it is.

Q.    Okay. And you have a list of options that you can select from that is tailored to your specific dispute?

A.    No. They're generic.

Q.    Okay. Such as?

A.    I don't know. I just know they're there. I don't -- I can't -- you know, I know one of them is this debt is not mine.

Page 131

A. FOWLER

Q.    All right.

A.    Yeah. Now, I can't tell you very many of the others, because I haven't done it in a while, and it's not something I walk around thinking about. But I know there's one like -- this is someone else's -- I -- identity theft is another one. So, you know, so there's just options as to how you want to dispute the debt.

Q.    Okay. Right. Did they allow you to make your own comments in the dispute, the comments?

A.    You can put -- there's a section for comments below that, yes.

Q.    How about attaching images?

A.    Some of them you can and some of them you can't.

Q.    Okay. All right. Do you know if you could do that on these?

A.    Which repository?

Q.    Experian.

A.    I don't remember. I do know I could do it on TransUnion. I don't remember -- and I'm not -- I'm sure that you probably can. I'm not saying that you can't. I just don't remember.

Q.    Okay. Did you ever contact Incare about

Page 132

A. FOWLER

the debts?

A.    I tried. I think I sent them a letter and I think when I tried to call them, I got nothing but the runaround.

And then later I found out they weren't in business anymore or they had moved or -- I couldn't contact them.

Q.    Okay.

A.    I pulled up their business -- I pulled up their business listing, and I think they had moved somewhere else, and I think I tried calling that number and I didn't get the response or I didn't engage.

Q.    When you said nothing but the runaround, what do you mean by "runaround"?

A.    They were asking me for specific information, and I said, I can't give you specific information because I don't know what this -- where this is coming from. I'm just trying to find out why you're on my credit.

Q.    So you spoke with them and they would not identify the debt to you?

A.    No, no, no, they would not. And, you know, I'm not going to give you any of my personal

Page 133

A. FOWLER

information because I don't know who you are. All I want to know is why you're on my credit file. And I gave them my name and, oh, well, you know, I don't know. And I'll get back to you. Never called back. Never.

Q.    Do you know the timeframe when you attempted to communicate with Incare?

A.    No, I really don't.

MR. VIGH:  I don't have any further questions. Thank you.

THE WITNESS:  Okay. You're welcome.

Okay. Are we going to just sit here and stare or are we done?

MR. SCHULTE:  Dennis, did you have anything after Rob went?

MR. CREED:  No follow-up.

MR. SCHULTE:  All right. Madame Court Reporter, I think that's it for our depo.

(Discussion held off the record.)

(Deposition concluded at 1:54 p.m.)

- - -

Page 134

A. FOWLER

CERTIFICATE OF OATH

THE STATE OF FLORIDA

COUNTY OF PALM BEACH

I, the undersigned authority, certify that ANGELIA FOWLER personally appeared before me and was duly sworn.

Dated this 2nd day of December, 2021.

_____

Pamela J. Pelino, RPR, FPR

Notary Public - State of Florida

My Commission No.: GG 225932

My Commission Expires: June 7, 2022

---

Page 135

A. FOWLER

C E R T I F I C A T E

THE STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Pamela J. Pelino, Registered Professional Court Reporter and Notary Public in and for the State of Florida at large, do hereby certify that I was authorized to and did report said deposition in stenotype; and that the foregoing pages are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

Dated this 2nd day of December, 2021.

_____

Pamela J. Pelino, RPR, FPR

---

Page 136

J U R A T

I, _____, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on _____; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this _____ day of _____, 20 ,

at _____, _____ .

_____

SIGNATURE OF WITNESS

---

Page 137

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

Pg.  No. Now Reads      Should Read  Reason

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

___ ___ _____  _____  _____

_____

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS _____ DAY OF _____, 2021.

_____

(Notary Public)   MY COMMISSION EXPIRES:_____

**$**

**$187** 119:7 120:4 121:3,19

**$300** 120:12,19

**$500** 121:19

**$550** 121:3

**$7,000** 36:22 86:6 119:9,13 120:6 122:2 123:9

**$800** 122:8

**$9.25** 100:24

**1**

**1** 39:7,10 92:23

**11:08** 51:23

**11:16** 51:24

**12:35** 108:16

**13** 63:11 64:22,24 86:3

**14th** 21:9

**15** 48:15 64:23 81:24 86:3

**16** 53:14 56:11 81:24 89:19

**1681e(b)** 48:16

**17** 101:11,14

**18** 9:6 101:11

**187** 119:9

**18th** 52:6

**19** 101:11

**1957** 9:6

**1975** 12:20

**1980** 24:9

**1:21** 108:17

**1:54** 133:21

**1st** 116:23

**2**

**2** 54:4,6 66:24

**20** 55:3 70:2 95:16 101:11

**2011** 21:9

**2015** 15:2,7,15 28:13, 14,17 29:15

**2016** 15:8,12,15,16, 17,20 16:7 28:5,8,10, 11

**2017** 13:16 16:11 52:24 53:14,17 54:23 55:10,12,19 56:10,11 57:5 68:25 69:3 70:16,19 84:15 88:17 95:16 110:3 118:10

**2019** 17:23 32:4 52:8 53:2 55:3 56:23 57:12,15,18,23 58:2, 5 62:2,18,21,24 68:25 69:4 70:16,20 71:8 89:11 127:13,14

**2020** 14:16 16:15 73:3 110:5 111:23

**2021** 63:14,16,18,24 64:2,3,8 65:9 67:18, 19 71:9 74:6 101:12

**21** 101:14

**23** 93:4,6 94:5,21 98:15 99:19 100:6 102:2 103:9

**24** 95:10

**25** 95:11,24

**26** 10:2 39:5,13 43:6 46:3

**265** 8:25

**28** 32:23,24 35:22 36:2 54:25 63:11 64:21 85:25 86:2

**28th** 63:16,17 64:4

**29** 10:2

**3**

**3** 54:2,9 67:6

**30** 18:15 48:6,9,12 75:18,20 80:21 93:3

**30,000** 70:2

**32** 29:10

**33401** 9:2

**33455** 9:4

**36** 10:2

**360** 19:13

**4**

**4** 62:11,12

**41** 10:3

**45** 10:3

**45,763** 14:25

**5**

**5** 66:2,3

**500** 71:25 79:11,15 80:21 81:7,21

**516** 8:25

**550** 120:22,24

**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** 9:8

**5th** 67:19

**6**

**6** 76:7,8

**64** 89:20

**7**

**7** 77:4,5,7

**7,000** 121:3

**70s** 44:10

**8**

**80** 69:25

**83** 33:24

**8755** 9:3

**9**

**90,000** 69:25

**A**

**A-R-A-I-N-A** 10:5

**a.m.** 51:24

**AA** 112:17

**ability** 7:22,23 35:17 45:24 50:8 60:2 93:13,16,25 94:3 104:25

**absolutely** 6:22

**accept** 41:13

**acceptable** 41:16

**access** 40:24 41:4 128:13,21,25 129:2

**accident** 21:6,9,14 91:3,9,12,15 94:16

**accidents** 90:23 91:6,20 94:11

**accomplish** 101:13, 15

**account** 23:16 25:13 56:17 63:20 97:3 98:3 117:22 119:6,17 120:9

**Accounting** 14:13

**accounts** 33:11 34:3,7,25 52:4,10,13, 24 54:16,23 55:19,23 56:7 57:19 58:17,24 64:10 65:6 66:13,15, 19 67:14 68:19 82:25 87:13 92:12 93:21 111:17 116:22 121:10,12 123:11,20, 22 128:7

**accuracy** 48:11,19 50:4,12

**accurate** 50:9 70:11, 12 107:15,17

**accused** 20:16 118:11

**accuser** 61:2

**acknowledge** 100:16

**acknowledges** 39:23

**acquitted** 20:5,7,22

**act** 21:22 122:15

**acted** 47:21

**action** 35:8 111:15

**actions** 51:4

**actual** 30:21 45:14

**add** 6:10

**added** 74:9

**addicted** 105:8

**addiction** 105:7

**addition** 54:15

**address** 8:23,25 9:3 10:23 11:3,5,7,9,10, 15,19,23 24:18,19, 20,24 25:2,3 33:6 36:8 43:14 49:16 53:17 107:16 125:20

**addresses** 24:25

**Administration** 83:6,12,18,24 87:16

**admissions** 117:21 120:8

**admit** 39:7

**adult** 98:20,21,22 101:23,24 103:17

**adversely** 60:15

**advice** 18:17 19:14

**advised** 18:11,13

**affect** 7:23

**affected** 79:10

**affecting** 60:2 61:6 99:12

**affects** 17:6 35:15,16 60:14 74:18 86:4 96:6

**affirmed** 4:11

**afford** 104:25 111:12 126:12

**age** 36:18 90:7

**agencies** 17:12 18:25 19:11 25:20 45:20 129:3

**agencies'** 33:12

**agency** 16:25 17:11 25:12,16,17,25 26:12 27:12 31:5 35:13 50:7 69:11 72:24 75:19 129:8

**agency's** 20:13

**agent** 88:6

**ages** 9:24

**agreed** 31:8 34:10 39:22 40:7,14 46:12 59:22

**ahead** 6:4 7:15 8:19 19:8 48:22 77:15 125:25

**alcohol** 8:11

**Alex** 10:2,12,19

**allegations** 34:2

**allege** 39:13 48:9

**alleging** 21:21

**allowed** 82:15

**altercation** 20:18

**amazing** 72:2 104:6

**amount** 11:22 40:12, 13 74:13 114:6,9

**amounts** 72:3

**analysis** 121:16

**Angelia** 4:10 8:24 12:2,8,12 40:6

**anger** 100:8

**angry** 78:20,21 102:10

**anguish** 98:15 100:6,8 102:2

**annual** 116:9,10,18

**anomaly** 97:17,22

**answering** 6:11,24 7:10 67:22

**answers** 5:14 6:21

**anxiety** 100:9 106:4 112:23 114:16

**anymore** 119:21 132:7

**anytime** 42:17

**apartment** 11:11 69:9

**appeared** 97:10

**application** 69:14 89:3

**applications** 16:4 83:13 89:4

**applied** 16:18 37:16 55:14 80:4,11,12 81:4,15 82:17,23 83:2 84:3 88:13 91:23 94:8,18 95:7, 14 96:20 99:21

**apply** 79:6,14,17,25 83:9,18 84:14 87:15 88:4 89:7,10,18 92:5 93:13 95:3,8 96:17

**applying** 25:3 90:24 91:7,10 121:8,12

**apprehension** 15:25

**approved** 89:14,17 105:20

**Araina** 10:3,13,21

**area** 87:21 130:11,12

**arisen** 106:21

**arrest** 20:2,4,12

**arrested** 19:24,25

**arresting** 20:13

**asinine** 93:14

**assaulted** 70:4

**assist** 19:5

**assistance** 72:7

**association** 17:21

**assume** 124:6

**at-fault** 91:3,9

**Atlantic** 13:4,7

**attaching** 131:14

**attempt** 35:21 36:19

**attempted** 133:8

**attempting** 17:23

**attending** 29:22 30:2

**attorney** 7:4 23:8 45:3 48:25 49:4,5 56:20 72:5,19 115:22

**attorneys** 114:20

**attributed** 41:20

**August** 15:9,15,16

**auto** 100:23

**Autozone** 16:12

**Avenue** 9:4

**aware** 8:15 25:11 26:23

---

**B**

**bachelor's** 13:6

**back** 6:9,13 15:7,11 24:17 33:21,22 38:6 43:11 53:21,22 61:7 65:15 91:3 92:21 102:8 105:23 109:25 110:5 128:20 133:5

**background** 8:20 60:13 84:2 86:16 88:18

**bad** 124:12

**balance** 42:25 118:3, 5,6,7,11,25 120:12, 15,16,20

**balances** 119:9 122:7

**ball** 126:21

**barely** 108:22

**barrier** 105:15

**base** 96:13

**based** 55:15 79:2 81:16 82:24 87:18 88:11 90:14 92:9,14 95:22 97:13,19 98:10 119:5

**basically** 18:18 32:20 33:5 37:14 40:3 42:22 56:2 63:21 69:12 70:13 72:22 82:3 84:19 90:7 93:12 100:2,8, 11,17 102:25 120:13 126:19 129:25

**battery** 20:17,19

**Beach** 9:2 12:24 13:2,4,7,24 20:11,12 24:18 28:21 94:20

**bed** 29:11

**beginning** 6:13

**behalf** 24:11

**behavior** 82:22

**belong** 34:4,7,25 36:22

**belongs** 40:4 50:16 86:9 107:22 122:3

**beneath** 100:24

**benefit** 101:6

**bettering** 19:19 112:25

**big** 104:8 123:25

**bigger** 123:6,7

**biggest** 121:17

**bill** 30:17,18,21 31:5, 7,8 34:8,9,12 35:23 41:8,9 58:11 59:3,19, 21 60:21,24 75:6,16, 19 82:5 98:5 107:7

**bills** 29:21,23 70:7 71:22 97:5 104:23 122:14

**birth** 9:5,6

**bit** 5:11 23:13 27:7 28:16 35:6 48:5 53:20 67:3 83:8 89:2 112:3 115:9

**blah** 34:22 40:8 59:23 121:23,24

**blew** 37:14

**blip** 38:6,7 123:9

**blob** 38:7

**board** 93:15

**bottom** 53:15 67:10 72:14 99:10 115:10

**bound** 30:20 58:13

**boxes** 25:4

**brain** 40:5 79:19

**break** 7:2,16,19 51:20 77:10,12,13 82:13

**breaks** 7:13

**bring** 53:4 73:9 92:21

**bringing** 4:21 39:24

**broke** 8:7 35:24

**brought** 106:5

**brush-off** 49:15

**brushed** 107:4

**Bryant** 10:13

**bucket** 121:4

**building** 24:20

**bull** 37:8

**bunch** 26:15 84:10

**bureau** 17:10 81:20

**business** 40:22 49:21 81:6 83:6,11, 17,24 87:16 127:9 132:7,10,11

**buy** 105:19

**buying** 94:2

## C

**cable** 10:20

**calculate** 114:17

**calculator** 119:12

**calendars** 18:14

**California** 9:21 10:16 12:22 104:8

**call** 17:11,15 23:4 31:18 32:7 33:21 75:17 96:11 132:4

**called** 18:6 26:12 33:22,25 84:17 111:14 126:7 133:5

**calling** 132:12

**calls** 32:10 48:21 49:6,9

**Calvary** 26:6,9

**camaraderie** 110:19

**capitalist** 99:10

**capitalistic** 93:24 102:12

**car** 21:6 23:15 79:6 90:20,22,23 91:15,20

**card** 37:20 95:3,6,8, 21,23 96:16,20,21,22 104:22

**care** 8:3 28:4,7,11,17 60:4,7 69:19 71:20

**carnage** 71:6

**case** 4:18 20:8 22:13 27:8,11 50:18 51:5 54:19 74:19 96:4 108:20 112:11 114:3

**cases** 21:20,24

**Catherine** 109:19 110:5

**caught** 70:23

**caused** 69:7,18 85:17 101:21

**Cavalry** 26:2

**center** 111:14 112:3, 6,24,25 113:7,25

116:6

**certification** 74:10, 11

**CFPB** 72:13,22 73:6

**chance** 36:6 45:3 126:2

**change** 71:18

**charge** 20:21 35:24, 25

**charge-off** 98:8 118:12,15,17,21 119:24

**Charge-offs** 97:23

**charged** 90:5

**charges** 20:3,5,19

**chef** 10:20 104:7,9,13

**children** 9:22 10:15, 18 24:11 25:6,9

**choice** 90:3

**Chris** 10:2,13,20

**CIA** 130:4

**circumstances** 26:5 105:7

**citizen** 60:12

**city** 13:23 14:6,7,8, 10,15 16:16

**civil** 21:4

**claim** 4:21 94:12,15

**claimed** 39:21

**claims** 4:23 94:9

**clarification** 11:2 50:2

**clarifies** 10:4 18:21 21:12 27:16 44:12 108:6 110:6 117:11 120:23 123:14

**clarify** 6:4 23:21 32:9 55:2 57:3 80:10 91:22 98:9 111:7 130:5

**clear** 6:6 73:5 96:2

**client** 125:19

**close** 119:10

**closed** 93:21 122:11, 24

**co-defendant** 27:11 54:19

**code** 48:15 89:25 107:19

**cognition** 8:10

**collect** 26:7 31:22,25 32:3 75:20 118:20

**collectible** 118:18

**collection** 4:24 25:12,15,19,24 26:6 27:9,10,12 31:4,22, 24 32:10,11,13 33:10,15 34:3,6,25 52:4,13,24 54:23 55:6,19 58:17,24 61:17 64:10 66:12 67:14 68:19 72:24 75:10,19 76:22 82:25 86:5 87:13 92:12 97:9,23 98:3 111:17 120:6 121:11 123:11, 20

**collections** 56:17 61:13 76:18 79:15,21 81:7,23,24 87:3,4,8, 14 92:6,13,15,17,19, 20 93:11 96:7 97:23 98:13 122:2

**college** 12:23

**comments** 131:11, 13

**commission** 88:11

**communicate** 133:8

**community** 110:23 111:10,13,14,15,16 112:2,5,24,25 113:7, 25

**companies** 80:12 81:6 82:17 89:7 90:13 123:3

**company** 14:7,9,12 18:5,6 41:14 69:11 72:25 80:23 82:13 84:4 90:17,19 100:15 102:21 107:8,11

118:18 121:23 123:2 126:7,9

**compare** 119:8 121:2,3 122:19

**Compass** 111:15,16, 25 112:24 113:7,25

**complaint** 34:3 35:7 38:21 43:6 48:6 72:21,25 73:6 92:21 99:19

**completely** 99:16 106:6

**completing** 77:23

**compliance** 45:17

**compliant** 45:23

**complicit** 38:11 51:7 60:18 75:8 103:5

**computer** 64:19

**concluded** 133:21

**conclusion** 48:21 49:6,10

**conditions** 106:7,17, 20

**conduct** 39:14,18 45:12 46:4

**conduit** 75:8

**confidential** 112:16

**confusing** 6:4

**considered** 35:21 36:15 91:5 92:5 94:16

**consistent** 18:2 19:20,21 126:20

**conspiracy** 124:14

**constantly** 16:3 18:2 107:4

**constitutes** 82:4

**consulted** 17:17

**Consulting** 18:7,10 126:8

**consumer** 16:24 17:11 18:25 19:11 42:21 45:19 47:24

50:6,20 72:22 75:18 108:3

**consumer's** 42:20

**consumers** 17:23 45:18,21 71:13

**contact** 26:9 30:23 31:3,14,15,20 32:13 33:15 52:9,12,15 75:22 131:25 132:8

**contacted** 25:12,16, 25 26:19 30:19 31:17 32:3,25 33:4 75:14

**context** 19:15,17 21:3,4 22:6 24:12,13 52:22 109:8

**continue** 7:10 37:5 38:4 62:24 77:15 100:18

**continued** 59:25 63:10

**contract** 14:3,20,21 15:12,13,20 17:22 24:14 83:15

**contracted** 14:10

**contracting** 14:2,15

**contractor** 13:23 14:6,18 15:17

**contracts** 14:8 16:10

**contribute** 114:9

**contributed** 104:4 106:8,17

**control** 99:13

**conversation** 19:6 26:25 44:4 46:20 47:15 50:10 52:22 74:14 79:23 80:5 85:21 88:21 103:22 108:25 111:22 121:9

**conversations** 126:25

**convicted** 20:24

**Cook** 10:13

**copies** 40:22

**copy** 67:21 68:6 76:19

**corner** 53:12 72:15

**coronavirus** 68:5

**corporations** 101:24 119:25

**correct** 11:4 15:18 18:12 20:22,23 22:23 33:7 35:18 41:21 46:24 53:16 55:8 56:13 57:13 58:20 59:13 63:14 64:16 66:13 80:13 91:24 92:2,3 93:18,20 94:12 96:11 98:11 107:21 112:12 114:4 119:25 123:22 124:3, 18

**correctly** 6:3 46:14 85:13

**cosigned** 23:22,25

**cost** 111:3

**costs** 110:24 111:2

**counseling** 112:13, 22

**count** 78:16

**counted** 94:14

**country** 38:13

**counts** 99:22

**County** 20:11

**couple** 16:10 32:19 33:19 68:22 72:9

**court** 4:5 5:13,17 39:6,8 54:3 62:9,14 65:25 66:5 76:5,10 77:3,7 80:6 92:22 133:18

**covered** 66:16

**cracks** 36:17

**crater** 123:7

**craziness** 38:15

**crazy** 68:22 78:9 86:5

**credentials** 16:20

**credit** 16:6,19 17:4,5, 10,12,15,18,19,20,24 18:5,12,20 19:19

21:21 23:13,16 26:15,23 27:24 32:2, 5,8,21,24 33:3,11,12, 20 35:12,24,25 36:16,20 37:17,20 41:16,17 42:6,11,14, 20 45:14 48:13,14 50:4 52:5,6 53:10 55:15,16 56:4 57:19 61:5 65:4 67:12 69:7, 13 70:3 71:6,24 72:4 75:11,15 76:2 77:17, 20,21 78:25 79:2,6, 10,14,17,20,25 80:11,13,17,20,24 81:4,6,7,8,14,15,17, 19,20 82:7,10,12,14, 20,23 83:5 84:20 85:20 86:4,17,23 87:9 88:24 89:23 90:2 92:6,9 93:7,12, 13,16,17,19,22,23,25 94:15 95:3,6,9,10,13, 23,25 96:2,5,7,16,20, 21,22,25 97:4,5,10, 14,19,24 98:11,13, 16,17,19,23 99:2,3,6, 11,12,16,18,20,21, 24,25 100:4 101:10 102:24 104:22 105:3, 18,25 106:21 107:13 109:7 111:18 112:9 114:15 115:25 116:9, 11,18 117:22 119:3, 14 121:8,13,15,18 122:20 126:10,16 129:3 130:9 132:21 133:3

**creditworthy** 97:2

**Creed** 7:3 48:20 50:21 125:18,22,25 133:17

**crime** 20:25

**criminal** 21:3 82:2 99:14

**CROSS** 126:4

**CT** 29:5

**cuckoo** 78:21

**culinary** 104:11

**current** 8:23 10:22 11:14

**customers** 19:5

**cut** 103:10

---

**D**

**D-O-E** 110:7

**d/b/a** 18:9

**damage** 82:4,5 86:7 123:6,24 124:2

**damaged** 77:17 78:4,13

**damages** 94:2 112:12 114:4,7,10

**damaging** 78:7 101:10

**dare** 105:21

**Darien** 10:2,12

**Darren** 10:19

**data** 74:24

**date** 9:5,6 15:5 21:18 40:8 53:13 56:21 57:12 68:14 74:3 118:3,9

**dates** 39:25 41:11 59:22 127:12

**daughter** 104:16,20

**day** 75:21 99:9 105:23 108:11 123:3

**day-to-day** 12:3 17:7

**days** 18:15 21:10,13 28:24 29:10 75:18,21 102:9

**deal** 20:20 78:23 101:19

**dealing** 70:5 71:15 86:13 110:21 112:23

**debt** 25:19,24 26:6,7 31:22,25 32:3 33:8 35:12 36:6,10,15,16 39:19,21,22,23 40:4 41:20 42:5,19 43:17 46:7,10,13,24 47:9 50:14,16 58:15 74:25 75:11,20,25 82:13 85:23 107:12,17,20,

21 118:17 121:21 127:16 130:13,25 131:9 132:23

**debtor** 107:11

**debts** 128:10 132:2

**December** 28:5

**decency** 102:25

**decent** 36:24 104:24

**decide** 40:3

**decided** 23:5 38:11 47:11 69:12

**deemed** 20:16

**Defendant** 45:11

**deference** 69:21

**degree** 13:6

**degrees** 13:18 15:24

**deleted** 42:6,9

**demographic** 90:7 113:10

**demonstrate** 126:24

**deniability** 108:2

**denial** 82:24 83:23 98:10 99:18 119:5

**denials** 81:8 83:7 85:8,18 88:24,25 89:2 98:16,17

**denied** 36:23 78:25 80:16,19,24 81:5,16, 19 83:14,16 84:5,16 85:2,15,23 89:3,6,12, 14 93:15,25 96:18 99:3,23 119:2 120:4

**denies** 102:18,19

**Dennis** 125:16 133:15

**denying** 87:2 108:2

**department** 14:4

**depend** 47:4

**depends** 19:15 96:14 123:2 129:8

**depo** 133:19

**deposed** 5:7

**deposit** 97:3

**deposition** 4:4,19 22:5,8,22 23:2,10 67:23 125:23 133:21

**depression** 100:10 106:23 112:23 114:16

**describe** 100:6

**description** 24:21

**deserved** 60:10

**designed** 45:17

**destroying** 41:17

**detail** 41:9,10 115:23

**determine** 34:15

**develop** 29:14

**difference** 97:8 122:6

**difficult** 5:23

**digital** 36:18

**diligence** 60:19 124:22

**direct** 4:14 116:6 125:16

**directly** 14:6

**disaster** 83:19 87:17,20

**disclose** 112:10 113:8

**discovered** 33:20 52:14 53:2 54:25 55:4,9

**discussed** 67:18 68:20 85:8 112:20

**discussing** 35:7

**discussion** 106:11 108:23 111:5 133:20

**dishwasher** 104:14

**display** 35:14 104:18

**displayed** 31:25

**dispute** 18:16,19 19:17 43:9 44:3,6

47:11 52:23 54:10,15 55:19 56:2,6 57:23 58:5,9 62:2,3,17,18, 25 63:2,18,19 64:4,6, 9,12,15,18 65:3,5,10, 23 66:16,18,19,22,25 67:4,7,9,13 68:16 69:4 70:16,17,19,20 71:8 73:16 75:23 76:17 116:3 121:22 126:15,18 127:16 128:7,22 129:6,7,17 130:8,13,20 131:9,11

**disputed** 35:19 52:17 55:18 56:17, 20,23 57:4,8,19 58:2, 3 63:7,12,13 64:13, 14,20,21,23,24 67:14,16 68:15 119:16 128:10

**disputes** 39:15 42:21 47:22 67:17 68:18 127:5,23 128:2,5,14 130:11,12

**disputing** 32:20 54:22 55:23 63:20,25 130:15

**disseminating** 59:5

**divorced** 9:13,18

**Dixie** 8:25 24:18

**doctor** 30:12,16 40:20 59:10

**doctor's** 8:2 31:10

**doctors** 109:12

**document** 15:10 38:17,20 44:16,19 53:4,9,12 54:9,13,22 62:7,21 65:19,22 72:11 73:10,13,15 76:4,12,14 114:22 115:3,7,14

**documentary** 42:18 46:15

**documentation** 42:5

**documents** 12:7 22:7,11,14,16 24:5, 11 39:20 40:22 41:19 57:11 72:9,16,19

80:22 85:7,14 86:15 97:7 115:11 122:10

**Doe** 109:19,20,23 110:9,22,25 111:9

**dollars** 88:2

**doubt** 119:7

**drama** 103:6,7

**drink** 8:13

**driver** 89:21

**driving** 89:19,24

**drop** 121:4

**dropdown** 130:16

**dropping** 126:21

**drugs** 7:23

**due** 25:13 60:19 98:12 100:11 102:14 124:22

**duly** 4:11

**duties** 70:13 77:23

**duty** 35:13 48:4

———————————

**E**

**earlier** 6:8 7:19 22:13 55:9,11 57:17 61:12 91:15 113:6 118:14, 21

**early** 72:20

**easily** 122:8

**easy** 127:20

**economic** 17:8 35:16 94:3

**economically** 60:4

**education** 16:23 36:25 37:3 104:17

**education-wise** 101:2

**effectively** 106:5

**efforts** 87:23 88:12

**eightball** 101:16

**eliminated** 37:23

**elimination** 87:11

**else's** 98:24 131:7

**email** 80:23

**embarrassed** 103:14

**embarrassment** 98:16 103:14

**emotional** 98:15 102:2 104:5

**employed** 13:20 15:12,17 16:8 35:17 99:6

**employee** 86:19

**employer** 86:14

**employers** 86:22,25 87:12

**employment** 69:20 83:7,13 84:21 85:8, 15,18,23 86:13 87:2 88:25 105:18 114:15 119:3 121:13

**EMT** 10:19 104:20

**enacted** 44:10

**end** 6:25 8:7 12:9 45:3,4 98:14

**ended** 15:14,21 102:4

**engage** 132:14

**engineering** 14:3

**enjoy** 104:25

**enjoying** 93:13

**ensure** 50:12

**entered** 85:22

**entries** 26:15 32:21, 23,24 35:20,22 54:25 81:25 83:5 86:2 87:9 101:10

**Equifax** 21:25 22:15 81:23 87:9

**Equity/ts** 116:23

**era** 85:22

**erroneous** 37:4 38:3 77:21

**error** 56:3

**errors** 18:3

**escalated** 89:5

**escalation** 85:4

**essentially** 4:20 5:12

**establish** 48:10 49:12 99:2,3,20 129:16

**established** 49:20 99:6

**event** 44:18

**events** 104:3

**everyone's** 108:14

**everything's** 6:6

**evidence** 42:18 46:12,15

**ex-spouse** 9:15,20

**exact** 58:11

**EXAMINATION** 4:14 126:4

**examined** 4:12

**excellence** 104:17

**exchange** 58:20

**excluded** 93:12

**executive** 10:19 104:7

**exhausted** 38:13

**Exhibit** 39:7,10 54:4, 6 62:10,12 66:2,3 76:7,8 77:4,5 92:23

**exhibits** 68:9

**expect** 23:4 41:13,22

**expected** 112:15

**Experian** 4:18,22 5:2 16:25 19:12 21:25 22:15 27:9 33:4,13, 14 35:10 36:3 37:15 39:13,17 40:17,21 41:3,13,19,22 42:4, 18 43:8,19 44:2,7,20 45:11 46:3 47:10,21 48:10 50:5,19 51:5

52:5,9,12,18 56:7,18 57:4,8 58:6,10 59:12 60:17 61:8 62:4 63:4 65:6,24 68:2 70:10 71:3,16 73:6,17 74:5, 19,21 76:2,20 81:9 82:15 85:17,19 86:25 87:7,11 107:14 109:7 114:7 116:9,11 122:13 123:5 124:10, 11,20 125:3,8,10 128:24 129:22 131:20

**Experian's** 35:13 47:12 48:18 50:2,11, 23,25 51:4 56:12 77:17 79:2 81:17 92:9 97:14,19 98:10 117:20 120:7

**Experian.com.** 129:21

**experience** 82:20 89:20 127:21

**experience-wise** 101:2

**explain** 23:20 74:18, 21 76:16 118:15

**explained** 36:3

**explanation** 90:10, 13 102:19

**expunged** 20:2,6,15

**extend** 81:7

**extended** 96:25

**extenuating** 105:7

———————————

**F**

**face** 37:9 61:2

**facetious** 67:25 68:6

**fact** 64:21 82:15 95:5, 8 100:11

**factor** 89:25 90:3 92:7

**factors** 92:4 114:9

**failed** 39:14,18 45:12 48:10 49:11

**fair** 21:21 34:4 37:24 74:13

**false** 20:2,16

**family** 12:14 103:23

**fault** 90:25 91:16,19

**FCR** 44:10

**FCRA** 44:9,10 45:17, 23 50:13,24

**FCRA's** 36:5 38:2 43:19

**February** 14:16 63:14,24,25 64:3,8 65:9

**federal** 44:9

**feel** 45:2,5 106:21 112:19

**feeling** 106:9

**feels** 78:14 118:19

**felt** 36:5 59:4 104:5

**FEMA-BLIGHTED** 87:21

**Fernando** 12:22

**fiduciary** 37:21 41:15

**fight** 124:25

**fighting** 106:24,25

**figure** 4:20 37:12 69:16 79:19 102:22 107:8 119:11 122:14

**figured** 119:18 122:22

**file** 36:16,20 45:14 53:10 61:6 84:20 85:20 121:18 129:5 133:3

**filed** 35:7 38:23 64:4

**files** 48:14 127:24

**filing** 32:14 128:14

**finally** 119:18

**financial** 17:7

**find** 15:9,21 29:20,23 30:15 34:14 36:24

38:12 56:3 60:20 61:15 69:6,8 70:8 72:7 80:25 100:22 124:21 132:20

**fine** 36:9 78:22 101:19

**finish** 5:21 7:15

**fit** 101:5

**five-** 51:20

**five-minute** 7:18

**fix** 79:14 120:13

**fixed** 120:14

**Florida** 4:6 9:2,4 10:16 12:24 13:2,24 28:21 40:11

**flux** 69:6

**fly** 60:16 78:16,17 101:20

**focused** 4:25 112:25

**focusing** 17:9 109:15

**follow** 18:19 48:10, 24 127:20

**follow-up** 18:15 19:21 133:17

**footed** 104:24

**forgive** 123:16

**forgiven** 98:2

**forgot** 74:10

**form** 7:6 49:4,8 50:21 73:20

**found** 18:3 20:17 30:2 32:5 37:16 72:5 104:11 132:6

**fowler** 4:1,10,16 5:1 6:1 7:1 8:1,18,24 9:1, 16,17,18 10:1,7,13 11:1 12:1,2,8,12 13:1 14:1 15:1 16:1 17:1 18:1 19:1,23 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1,21 35:1 36:1 37:1 38:1,16

39:1,10 40:1 41:1 42:1 43:1 44:1,15 45:1 46:1 47:1 48:1, 23 49:1 50:1 51:1 52:1,3,23 53:1,9 54:1,6 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,7,12,17 63:1 64:1 65:1 66:1,3 67:1,22 68:1 69:1 70:1 71:1 72:1,8,16 73:1 74:1 75:1 76:1, 8,12 77:1,5,9,16 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1,25 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1,19 109:1 110:1 111:1,7 112:1, 11 113:1,17 114:1,21 115:1,11,14 116:1 117:1 118:1,12 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,6 127:1 128:1 129:1 130:1 131:1 132:1 133:1

**friendly** 129:12

**friends** 12:15 103:11,16,23

**front** 103:15

**frustrated** 36:12

**frustrating** 37:15 60:2

**frustration** 71:13

**full** 8:7,22

**fully** 8:16

**functioning** 98:22 103:17

**futility** 33:17

**future** 68:16

**G**

**gained** 18:24

**gainful** 69:20 105:17

**gainfully** 35:17 99:6

**game** 99:9 101:8

**garbled** 5:23

**Gardens** 13:2

**gave** 18:17 33:5 89:8 127:18 133:4

**geared** 113:4

**Geico** 89:9

**general** 19:18 26:10

**generated** 116:11

**generic** 18:17 33:5 61:9 81:18 130:21

**give** 10:10 15:9 17:24 19:4 24:21 75:22 84:18 90:10,13,14 93:2 102:25 114:13 130:13 132:18,25

**goal** 65:3 78:13

**God** 123:15

**good** 96:15 105:18 106:14 108:12

**goodness** 32:25 71:25

**Google** 95:21

**gospel** 36:21

**government** 55:16 69:14

**grab** 37:8

**grabbed** 100:23

**grad** 13:10

**graduate** 12:17 13:10,14

**granted** 79:20 96:18

**grid** 117:6

**ground** 5:5

**group** 54:16,18 110:12,15,17,19 112:8 113:15

**groups** 113:23

**guarantee** 100:14

**guaranteed** 23:22, 25

**guess** 27:8 35:9 43:24 49:24 55:2 57:3 58:8 63:24 85:12 115:4 116:12

**guidance** 17:24

**guilty** 20:17

**gyp** 124:16

**H**

**ha** 123:23

**handicap** 98:20

**handled** 105:11

**happen** 29:7 79:18 102:13

**happened** 69:13 81:9 108:20

**happening** 107:13

**hard** 15:24 37:2 41:6

**harmful** 121:11

**head** 5:18 14:17

**health** 58:20 61:13, 18 70:6 108:9

**hear** 6:3 34:17 42:12 65:17,18 108:22

**heard** 26:21,22 27:25 31:20 41:14 60:23

**heart** 108:4,8

**held** 101:23 106:11 108:23 111:5 133:20

**helpful** 24:22

**helping** 6:21

**helps** 68:3

**hey** 37:25 41:5 42:22 74:22 103:2

**high** 12:17 95:7 96:15 101:4 104:12 120:16

**higher** 79:9 89:5,6,8, 15,17 90:5,11 95:4, 12,19 96:10,12,18

**highlight** 66:8

**highlighted** 66:10 116:7

**Highway** 8:25 24:19

**HIPAA** 30:21 41:5,7 58:6,8,13,17,19,25 59:7 74:12,18 75:2

**hire** 69:12

**hired** 16:15 83:4

**hiring** 69:10

**history** 23:13 97:4,5

**hit** 21:7 83:20 90:25 91:16

**Hobe** 9:4 11:2,18,23

**Hold** 16:9 53:24

**hole** 123:25

**homemaker** 10:20

**homes** 11:21

**honest** 44:23

**horizontally** 53:16

**horns** 37:9

**horrible** 96:6,16 98:25

**horrific** 83:19

**hospital** 28:18,23,25 29:9 41:9

**hour** 7:18 88:2 100:24

**hours** 8:12

**house** 105:19,20

**housemate** 11:16

**Hugo** 110:3

**humanly** 35:18

**humiliated** 103:15

**humiliation** 98:16, 25 102:3 103:13

**hundred** 118:6

**hurt** 35:21 37:5 51:6

**hurtful** 37:5

**hurting** 77:25 78:4

**I**

**I-95** 21:7

**I-N-C-A-R-E** 27:17

**ICU** 21:10,13

**idea** 34:24 35:5 37:6 44:7 102:19 115:5 125:2 128:15

**identification** 39:11 54:7 62:13 66:4 76:9 77:6

**identify** 132:23

**identity** 27:5 131:7

**ignore** 122:15

**ignoring** 123:5

**ill** 15:7

**illegally** 75:10,17,25

**illness** 29:14 108:4

**illnesses** 8:3

**images** 131:14

**imagine** 71:13

**immediately** 15:21 84:17

**impact** 36:16

**impacts** 17:6

**important** 5:21

**imposed** 82:5

**inaccuracies** 45:15

**inaccuracy** 98:24

**inaccurate** 52:10 77:21 81:14 101:9 117:23 118:2 120:9, 11

**Incare** 27:14,19,23, 25 28:14 29:18 30:24 31:2,14,18 61:18,21, 23 63:22 75:5 131:25 133:8

**included** 87:19

**includes** 86:17

101:24

**income** 14:22,24

**incorrect** 37:4 77:21 100:18 101:10 118:11 122:22

**increased** 94:6,21, 24 95:19,20 97:12

**incurred** 43:17

**indicating** 67:7 69:17

**individual** 86:2 110:12,14,18

**individuals** 113:2

**industry** 36:14 128:16

**Infinity** 89:9

**information** 8:21 35:14 40:25 41:3 45:13,20,21,25 46:9, 11 48:12 50:4,9,20 53:17 58:20 59:3,5, 12 61:5,14,18 74:22 75:3 107:21 115:6 116:2,19 122:24 132:18,19 133:2

**initially** 31:16 32:23 55:3 64:21

**injure** 82:10

**injurious** 37:4 60:15 81:14 86:10

**inside** 18:24

**installer** 10:21

**institute** 13:13 104:7

**instruct** 49:6

**insulting** 70:2 98:20

**insurance** 69:10 79:6,8 88:7,14,19 89:2,3,4,8,23 90:12, 15,16,18 92:5 94:6,9, 12,19 111:4 119:3 121:12

**insurers** 91:22

**insuring** 90:20

**integrity** 107:6

**intelligent** 105:12,13

**intention** 51:10,15

**intentional** 98:25 107:25

**intentionally** 47:10 51:5,9,18 60:13 77:24 78:4

**intentions** 47:12

**interact** 19:11,14

**interactions** 25:19

**interest** 94:22,24 95:5,6,10,12,18,22 96:9,17,19 97:8,13

**internal** 50:19,23,25

**interrogatories** 22:12,23

**interrupt** 5:24 30:6 129:14

**interrupted** 45:16

**interrupting** 45:9

**interruption** 100:13

**interview** 84:4,7,9, 25 85:6

**investigate** 49:22 61:11

**investigated** 61:10

**investigation** 45:12 46:6

**invoice** 32:6 39:25

**involve** 39:24

**involved** 21:4,20,24 22:2 39:21

**involves** 39:20

**irresponsible** 86:7, 8,11 97:6 98:4

**issues** 108:8 126:10

**item** 82:6,13,14 130:8

**itemizing** 82:6

**J**

**Jack** 13:12

**January** 63:16,17 64:4 74:3,6

**Jersey** 10:16

**job** 15:21 17:21 36:13,24 37:16 60:3 69:6,8,22 70:8 71:2 83:2,18 101:3 104:12,24

**jobs** 16:14 17:22 36:23 55:14 60:3

**journey** 33:17

**judge** 86:15

**judged** 89:23

**July** 9:6

**jump** 5:6 23:19 44:15

**June** 10:25

**junior** 104:12

**K**

**kids** 103:18 104:10, 15,18,23

**kilowatts** 40:12

**kind** 5:22 15:23 26:6 27:14 28:4,7,11 30:20 36:4 43:24 48:3 51:16 55:12 77:10 85:5 87:5 104:14 105:24 107:12 110:20

**kindly** 16:19

**knew** 81:21 103:8,12 113:8 128:21

**knowledge** 18:25 25:6,9 27:4,6 43:8 71:14

**L**

**lacking** 49:13

**landing** 56:2,4 128:12,14,25 129:17, 20,24 130:3,4,9

**lapsed** 91:4

**Large** 4:6

**lastly** 7:21

**late** 97:25

**laugh** 79:16

**law** 26:13 44:9 45:19 77:24

**lawsuit** 21:5 32:14

**lawyer** 6:23 7:7,9 22:14,25

**lead** 74:24

**learn** 31:21 52:3

**learned** 128:17

**left** 53:15 54:10 66:7 119:14

**legal** 12:7,11 18:17 24:5,10 38:12,15 40:3 47:19 48:21 49:6,9,14 71:11 72:7

**legally** 58:10 78:12

**legit** 29:25 37:8

**legitimacy** 59:18

**legitimate** 30:22

**lender** 97:18,22 98:9

**lenders** 97:21 118:22

**letter** 26:19 30:25 31:19 32:6 36:3 37:25 61:10 63:19 73:16,22 74:4,11,12 75:10 76:17,19,23 80:23 81:18 132:3

**lettering** 72:15

**letters** 32:10,17 70:23 127:6

**level** 59:6 61:4 69:23 71:16 100:25 105:5

**LGBT** 113:4,5,11

**LGBTQ** 113:2

**license** 24:7

**licensed** 69:10 88:14,16

**life** 12:3 60:8 69:18 70:24 71:4,5 78:6,9 100:12 103:10,11 104:4,18 105:8,16

106:5

**lifetime** 25:5

**light** 40:11 69:15

**limits** 58:19 93:15 94:2,3

**link** 127:18 129:6 130:9

**list** 68:8 130:18

**listed** 25:2 67:15

**listen** 7:8

**listing** 132:11

**listings** 85:25

**lists** 66:18,21

**litigation** 72:20

**live** 9:20 10:15 11:9 69:16 70:24 71:4 100:11 105:5

**lived** 10:22

**livelihoods** 35:15

**lives** 11:14 112:25

**living** 10:18 94:18 104:17 121:15

**loan** 23:16,23 24:2,14

**loans** 23:14 36:25 69:21 82:21

**located** 28:20

**logic** 102:18

**logistical** 5:5

**long** 9:17 10:22 11:6, 7,17 14:14 19:13,25 23:5 26:8 28:22,23 36:15 68:4 84:7 93:10 99:4,10 101:5, 8 128:17,20

**longer** 16:2 91:4 99:7,8 118:17

**looked** 33:13 36:21 82:11 107:15

**lose** 93:19

**loss** 93:7 114:15

**lost** 93:17

**lot** 15:25 19:13 82:12 94:3 101:15 103:6,7 106:4 110:18 112:6, 14 113:23 128:17

**low** 72:2 98:13

**lower** 67:3 71:24,25

**luck** 71:2

**ludicrous** 82:16

**luncheon** 108:16

---

**M**

**Madame** 39:6 54:3 62:9 65:25 76:5 77:3 92:22 133:18

**made** 45:24 61:22 69:14,17 94:9

**mail** 24:23 55:20,21 58:4 64:7 68:17 74:7, 9

**mailing** 8:24 11:5,7, 10 24:19

**maintain** 18:14 48:11,18

**maintained** 48:14

**maintaining** 50:3,20

**make** 5:2,17 6:6 7:4, 9,11 35:14 36:7 47:25 55:13 65:2 66:2,20 77:4 84:21 85:12 90:3 120:2 121:17 129:7 131:10

**makes** 52:16 75:8 86:6,11

**making** 46:7 50:7,16 94:12 100:16 126:19

**malice** 47:21

**maliciously** 99:17

**man** 104:7

**manage** 107:8

**Management** 13:12 66:13

**manager** 14:18

**manifest** 102:3

**manual** 19:9,10,18 126:17 127:3

**March** 67:19 68:20

**mark** 54:4 62:10 76:6

**marked** 39:8,10 54:6 62:12,14 66:3,5 76:8, 10 77:5,7

**marriage** 24:7

**married** 9:12 10:8

**Mary's** 28:19,20,22 29:10,17 30:12 31:11

**Mass** 83:3,12 84:13, 25 85:11,14 88:5,14

**master's** 13:18

**material** 17:18

**matter** 6:12 79:13 95:5,8

**matters** 99:11

**maximum** 35:21 48:11,19 50:3,12 82:4,9,10

**MBA** 12:8 13:17 26:13 69:24

**Meaning** 45:23

**means** 38:14 52:15 70:25 93:10 107:18, 19 115:13,15,18,21

**meantime** 71:20

**medical** 27:14,19,23, 25 28:4,7,11,15,17 29:18,21,23 30:24 31:14 36:15,16 41:8 59:6 61:18 74:22 75:3,5,6 79:21 85:23 106:7,17,20

**medication** 7:23

**meet** 110:16

**meeting** 84:18 112:17

**meetings** 112:16

**memory** 68:3,14

**mental** 70:6 98:15

**mention** 6:8 58:6

73:6 81:20 86:25 87:12 94:5 98:14 101:25 103:9,13

**mentioned** 13:17 24:18 30:11 31:13 43:7 61:12 64:14 74:12 83:7,10,11,12 91:14,15 93:6 109:9 112:2 128:12 129:17

**mentioning** 103:24

**menu** 130:16

**merry-go-round** 59:17

**middle** 6:23,24 7:14

**mind** 25:17

**mindset** 35:3

**mine** 34:9,13,19 36:7 37:25 42:24 46:18 47:25 61:8 86:8 103:2 130:25

**miniscule** 121:5

**minute** 72:4 108:21

**misdeeds** 99:13

**miserable** 69:18

**misplaced** 56:22

**mission** 113:24

**mistake** 100:17

**mistakes** 120:2

**misunderstood** 58:23

**model** 49:21 124:14

**monetary** 112:12 114:3,6,10 122:7

**money** 40:13 43:16 97:4 100:2 111:8

**monitor** 18:15

**monitoring** 18:2 129:21

**month** 33:18,19 40:11

**Monthly** 107:9

**months** 102:8 117:7, 16 127:10,11

**mortgage** 17:3 23:15 36:14 82:21 128:16

**mortgages** 121:16

**mother** 104:21

**move** 35:6 45:8 48:5

**moved** 56:21 69:8 132:7,11

**MRI** 29:4

**multiple** 15:24 52:11 128:7

**Mutual** 83:3,12 84:13,25 85:11,14 88:5,14

**myriad** 34:17

**N**

**names** 9:24 10:11 112:18

**nasty** 59:17

**needed** 17:25 18:13 40:5 110:17 126:15 127:4

**Negative** 117:3

**negatively** 60:15 61:6 118:22 123:11, 20

**neglect** 78:3

**neglectful** 47:17

**negligence** 51:8,13 98:24 102:14 107:25 125:10

**negligent** 60:20 70:13 77:21 125:14

**negligently** 59:13

**negotiated** 98:2

**nickname** 12:11

**nicknames** 12:5

**nod** 5:18

**normal** 96:11,13

**Notary** 4:5

**notice** 32:7 45:14 125:23

**November** 15:13,16, 20 16:7,15 28:8 53:14 55:9 56:10,11 57:4 84:15 88:17

**number** 9:7,10 25:7, 10 33:24 77:7 132:13

**O**

**object** 48:20 50:21

**objected** 49:4

**objection** 7:9

**objections** 7:5,6

**objective** 35:4 113:11,14

**objects** 48:25

**obstacle** 99:8

**obtuse** 67:25

**occasions** 128:5

**occupied** 71:4

**occurs** 48:2

**offer** 84:21

**offered** 118:20

**offering** 6:21

**office** 24:20

**Offices** 26:13

**oldest** 9:25 104:16

**omission** 51:8,14

**on-and-off** 16:14

**online** 52:17 55:20, 23,25 56:6 58:3 64:7, 14 65:5 68:17 127:17

**open** 79:15,21 81:7, 22,24 86:5 87:3,4,8, 14 92:6,13,15,16,20 93:10 96:7 97:23 98:3,12 101:11 120:5 121:21 122:2 129:21

**opened** 118:4,9

**operate** 19:2

**operating** 34:11

**opportunity** 37:13

75:22 105:10 120:5 121:19

**opposed** 90:8 96:21

**options** 130:8,13,14, 18 131:8

**organization** 54:19

**original** 31:7

**outlined** 50:13

**outsources** 29:17

**overkill** 86:3

**overnight** 72:6

**overtime** 88:3

**owe** 36:25 39:21 40:13,18 41:23 42:23 43:16,21 47:9 59:15, 21 60:23 74:25 102:21 103:3 120:18

**owed** 42:9 46:10 78:22 107:7 118:3,7, 8 120:21

**owes** 43:5

**P**

**p.m.** 108:17 133:21

**pages** 19:13 115:5 116:14

**paid** 36:25 98:4 106:3 119:17,19,22 120:14 122:23

**pain** 98:15 102:2

**painful** 103:6

**paints** 86:18

**Palm** 8:25 11:6 12:24 13:2,4,7,24 14:15 20:11,12 24:18 25:3 28:21 94:20

**Pamela** 4:4

**paperwork** 56:22 122:10 126:20

**par** 96:2

**paragraph** 39:4,13 43:6 46:3 48:6,9,12 75:9 93:4,6 94:5,21

98:15,18 99:19 100:6 101:25 103:9

**paralegal** 104:21

**parameters** 47:20 89:22 99:4

**parent** 103:19

**park** 102:23

**parked** 75:11,17,25

**part** 15:8 48:4 86:10 98:7 116:3 119:5 125:11 130:7

**partialities** 65:3

**participated** 109:21

**parts** 100:23 127:4

**party** 74:23 103:4

**pass** 59:12

**passed** 84:2 118:18

**past** 25:13,14,25

**Patricia** 11:17

**Paul** 9:16,17,18

**Paula** 10:3,13

**Paula's** 10:20

**pay** 31:8 34:10 39:22 40:7,14 46:12 89:6 90:2 97:5 107:9 110:22 111:8,11 119:22 120:5 121:20 122:21

**paying** 37:2 90:8,9 120:13

**payments** 97:25 107:9

**peaceful** 38:13

**Pelino** 4:4

**people** 17:11 18:11 19:19 60:22 78:14 85:22 93:24 100:3 101:13 105:4,9 110:20 113:3 119:2 121:17 122:13 123:4 126:10

**people's** 35:15 112:18

**percent** 95:11,24 96:15

**percentage** 119:11, 13 121:4

**Perception** 86:12

**perform** 124:21

**period** 15:22 77:11 127:7

**permission** 59:6

**person** 29:22 30:4 39:21 40:4 50:17 78:17 107:6 108:3 124:15 126:22

**person's** 17:6 29:20

**personal** 45:21 115:25 132:25

**phantom** 20:19

**phone** 23:4 26:19 32:7,10 33:16 52:19 55:20 75:16 126:25

**phonetic** 10:2 31:12 69:15 100:14

**physical** 9:3 20:18 100:9

**physically** 26:19

**picture** 86:18

**piling** 71:22

**place** 107:24

**placing** 33:11 82:6

**plaintiff** 48:15

**Plaintiff's** 45:13

**plan** 7:17

**play** 18:16 58:9 99:9 101:8

**plays** 79:7

**pleaded** 107:23

**plenty** 25:4 124:18

**pneumonia** 29:16

**PO** 25:4

**pocket** 111:8

**point** 5:2 16:17 32:14

46:5 61:3 66:9 71:10 73:7 108:13

**Portfolio** 26:2,6

**portion** 54:10 66:10

**position** 15:12 42:17 87:15 88:4

**possibly** 55:11

**potential** 89:2 118:22

**Potentially** 117:3

**poverty** 100:3 105:5

**power** 40:11 94:3

**practices** 124:12

**practitioner** 10:21 104:16

**precluded** 105:17

**precludes** 75:2 84:20

**Preferred** 4:24 27:9, 10 31:3,17,22,24 32:10,13 33:10,15 34:3,24 37:14 41:19 46:9 52:4,13,24 54:16,18,22 55:6,18 56:17 57:2 58:16,24 59:9 61:13,17 63:23 64:9 66:12 67:14 68:19 73:8 75:10 76:18,22 82:25 87:13 92:12,19 97:9 111:17 121:11 122:12 123:5, 10,17,19 127:24 128:10

**Premier** 120:8 122:23 123:21

**prenotified** 68:9

**preparation** 22:23 48:13

**prepare** 22:4 127:23

**prepared** 128:3

**present** 15:2

**presented** 122:9

**pretax** 14:22

**pretend** 47:6

**pretty** 26:22 29:21 32:19 38:24 43:18 56:22 64:17,22 66:21 81:4

**Previous** 21:23

**previously** 19:3 36:13 56:20 105:20

**primary** 45:19

**prime** 96:3,4,12

**Principals** 14:13

**print** 115:11

**prior** 22:7 25:18 27:24 85:6 91:10 94:13

**privilege** 112:15

**problem** 59:20 107:3 124:19

**problems** 37:9 64:19 69:7,18 100:9 106:5

**procedure** 34:12

**procedures** 48:11, 18 49:13 50:3,11,19, 23,25

**process** 55:22 56:5 82:21 87:11

**processing** 17:3 19:5 87:20

**processor** 105:22

**procure** 93:16

**produced** 22:14

**producing** 39:20

**product** 96:14

**professional** 4:5 108:19 109:5

**program** 104:12 110:23 111:10

**Progress** 95:11,15 96:10 117:22 119:6 123:21

**Progress/1st** 116:23

**progressed** 21:14, 15

**Progressive** 89:9,10 90:10,12,16,19,24 91:7,11 92:8,11,14, 18 94:7,8,19

**proof** 42:22 43:15,16 46:23 47:3

**properly** 36:7

**protect** 45:17

**prove** 42:15 43:23 47:9

**provide** 41:19 42:22 46:23 125:22

**provider** 30:21 31:6 59:4,10 107:10

**pry** 29:13

**psychological** 8:5, 10

**PTSD** 102:6

**public** 4:5 50:6

**published** 48:14

**Puerto** 83:20 87:22

**pull** 55:16 76:3

**pulled** 32:5 52:6 132:10

**pulling** 26:23

**punishment** 96:24

**purchase** 121:17

**purposes** 50:2

**put** 12:8 26:14 27:2 30:17 32:7 33:2 35:23,25 45:2,6 69:21 70:5,6,22 74:10 75:15 82:14 85:25 92:3 95:2 105:15 120:25 131:12

**putting** 16:3 35:22 72:3

**Q**

**question** 6:2,4,9,11, 24,25 7:7,10,14 23:20 25:21 43:25 45:11 47:24 49:5,7

54:14 70:15 73:4 79:17 80:7 108:24 109:4 113:21 124:6

**questionable** 95:4

**questioned** 92:16

**questioning** 5:6 7:5 45:4 107:12

**questions** 4:25 5:12 7:24 8:16 44:24 45:5, 7 67:23 84:10 106:13 113:18 125:18,21 126:2 133:11

**quick** 107:14

**R**

**radio** 34:22

**ran** 55:12

**range** 15:5

**rate** 79:9 89:15,16,18 90:4,11,14 91:24 92:8 95:5,6,10,12 96:3,9,16,18,19

**rates** 79:7 89:5,6,8 90:2 94:6,22,24 95:18,22 97:8,13

**ratios** 106:2

**raw** 108:10

**re-aging** 118:11

**reached** 26:18

**read** 38:22 62:21

**reading** 44:17

**real** 107:21

**realized** 16:6

**reask** 43:25

**reason** 8:14 51:11 87:2 95:25 98:23 105:13 122:20 124:7

**reasonable** 39:14,18 45:12 46:4,6 48:19

**recall** 12:13 52:20,22 57:9 58:18 68:24

**receive** 13:6 28:4,7, 11,25 29:4 83:23

85:13 86:16 109:16

**received** 27:13,22 28:17 30:17,18 32:9 40:10 56:11 75:24

**receives** 75:19

**receiving** 45:14 62:3 65:10

**recess** 51:23 108:16

**recite** 128:20

**recognize** 38:20 62:6 65:19 73:13 76:14 115:2

**reconcile** 121:25

**record** 5:14 20:6,16 29:14 45:2 89:24 106:11 108:15,23 111:5 125:17,19 133:20

**recordkeeping** 19:21 126:20

**records** 18:14

**recourse** 38:12

**recovery** 87:22

**red** 72:15 115:11

**refer** 121:14

**reference** 68:16 108:14

**references** 86:16

**reflected** 117:22

**refused** 122:21

**refuses** 100:16

**regard** 109:14

**Registered** 4:5

**regular** 40:22 104:25

**regulating** 45:19

**rehashing** 71:12

**reinvestigate** 43:8 44:3 47:11 56:8 65:6

**reinvestigating** 47:22

**reinvestigation** 39:14,18 43:7 45:13

46:4 56:12

**related** 6:21 44:11 45:7,10 85:7 110:24

**relation** 109:7

**relationship** 70:6 72:23

**relevant** 6:11

**relief** 87:20

**remain** 15:22 99:4

**remedied** 122:8

**remember** 6:7,13 18:4 21:18 22:16,19 24:19 26:4,8,10,12 29:5,8 30:8,9,13 31:10 33:23 54:22 55:20 56:19 57:10, 20,25 61:14 62:3,24, 25 63:6,9,11,12,25 65:10 68:15 73:19 74:7 76:5 80:4,12,14 83:21 84:8,22 85:3 87:24 88:9 95:14 117:23 131:21,22,24

**remind** 5:16

**remnants** 102:9

**remove** 42:19

**removed** 26:17 78:7 99:5

**repair** 17:19,20,24 18:5,11,20

**repeat** 8:8 108:24 109:4

**repeated** 49:15,18

**rephrase** 70:15 124:8

**report** 40:17 42:2,7, 20 48:13 52:5 57:19 59:13 67:12 69:7 75:11 86:17 93:12 97:10 111:18 115:5, 25 116:9,11,18 117:23 130:9

**reported** 45:22 60:21 81:13 86:21

**reporter** 4:5 5:13,17 10:4 18:21 21:12

27:16 39:6,8 44:12 54:4 62:10,14 65:25 66:5 76:5,10 77:3,7 80:6 92:22 108:6 110:6 117:11 120:23 123:14 133:19

**reporting** 16:25 17:11,12,19 18:25 19:11 21:21 35:13 38:3,10 40:24,25 42:11,15 45:19 50:7, 8 52:4 61:5 71:3 75:7 77:17,20,22 79:2 81:17,21,22,23 85:19 86:4 87:6,7 92:9 97:14,20 98:11 100:17 106:21 109:7 112:9 126:10 129:3

**reports** 33:12 71:6 82:12 87:4

**repositories** 17:15

**repository** 35:13 41:24 131:19

**represent** 4:18

**request** 120:7

**requests** 117:21

**required** 77:24 78:12 124:23

**requirements** 43:20 44:10,11 45:18 50:14

**requires** 50:24

**residences** 11:19

**resolved** 78:10

**resort** 38:14

**respect** 51:4

**respond** 64:5 76:22

**responded** 34:15 76:24

**responding** 56:25

**response** 6:8 16:5 29:24 31:18 33:3 44:8 61:11 64:3 65:23 71:18 72:25 116:4 117:20 120:7 132:13

**responses** 5:17

49:12 127:6

**responsibilities** 37:21

**responsibility** 41:15 43:3

**responsible** 38:8 81:10 101:23,24

**responsive** 44:24

**restart** 83:10

**restroom** 51:21

**result** 67:13

**resulted** 20:3 94:11

**results** 44:6 54:11,15 56:12 62:3,18 65:10 66:18,20

**retain** 32:18

**review** 22:13

**reviewed** 22:7,22

**reviewing** 22:16

**Rico** 83:20 87:22

**Ridge** 9:4

**ridiculous** 95:24 106:24

**rights** 78:18 108:2,3

**RN** 10:21 104:16

**Rob** 133:16

**rogue** 37:20

**role** 79:7 87:19

**room** 6:16

**root** 107:3

**RTP** 72:16 115:11,14

**ruin** 99:16

**rules** 5:5

**run** 37:9 100:4

**runaround** 132:5,15, 16

**running** 124:15

## S

**sake** 44:16,25

**salaries** 15:25

**salary** 69:24,25 87:24 88:9

**Sales** 88:6

**sample** 127:6

**San** 12:22

**sat** 107:7 122:9,20

**SBA** 16:18 83:6 85:10,14

**scan** 29:5

**Schiavonne** 8:24

**school** 12:17 13:4, 10,11 101:4 104:12, 21 105:10

**school's** 13:3

**schooler** 101:4

**Schulte** 4:15,18 10:6 18:22 21:19 27:17,18 39:6,9,12 44:14 49:3 51:3,19 52:2 53:3,7 54:3,8 62:9,15,16 65:25 66:6 76:3,11 77:3,8 80:9 92:22,24 106:12,15 107:6 108:7,12,18 109:2 110:8 111:6,24 117:14 121:6 123:18 125:15 133:15,18

**score** 79:11,15,21 80:21 81:7,22 96:7 98:13 105:18

**scores** 105:25

**screen** 4:17 48:7 53:5 65:20 72:9,12 127:15

**screens** 127:2

**scroll** 39:4 53:19 66:23 73:18,24 74:8 115:9 116:15

**scrolling** 116:17

**searching** 16:3

**seasoned** 89:21

**secretive** 130:4

**section** 131:12

**secure** 97:2

**secured** 95:9,13 96:21 99:24 119:17

**Security** 9:7,10 25:7, 10

**seek** 114:10

**seeking** 105:17 112:12 114:3,7

**seeks** 100:3

**segregated** 87:5

**select** 56:7 65:5 130:19

**sell** 88:14

**selling** 88:7,18

**send** 30:21 31:6,7 34:19 46:11 58:10,11 60:24 72:25 74:4,22, 25 75:3,6 76:19

**sending** 34:20 44:6 46:8 61:9 75:2

**sense** 5:2 7:11 52:16 55:13 65:2 66:20

**separate** 32:24

**service** 39:25 40:15 59:23 129:21

**serviced** 61:21,23

**services** 14:3 27:13, 14,20,23,25 29:18 30:24 31:14 61:19 66:13 110:22

**session** 109:22 110:15,17

**sessions** 110:9,12 111:9 112:8

**set** 16:22 104:15

**settled** 21:10

**settlement** 21:16,18

**shake** 5:18

**share** 72:9 102:15

126:25

**shared** 104:2 127:21

**shares** 11:22 127:16

**Sheila** 30:5,9,11

**Shepherd** 10:12

**short** 7:18 16:11

**shortly** 57:20 89:12

**show** 22:18 34:9,10 35:11 38:16 40:18,19 41:5,6,11,22 42:16, 23,25 57:11 58:15 59:15 61:23 62:5 63:3 67:13 97:7 102:22 122:14 127:3, 16

**showed** 43:10 111:17 126:15,22

**showing** 27:24 39:25 41:20,23,24 43:4 119:20,21,22 120:3 127:15

**shown** 34:7 42:9

**sick** 28:18

**side** 66:7 101:19

**sign** 24:7 59:22

**signature** 39:22 41:5,7

**signed** 24:4,10 40:14 46:12

**silence** 34:22

**similar** 12:15

**simply** 36:10 37:20 38:15 90:13 105:2

**simultaneous** 19:6 26:25 44:4 46:20 47:15 50:10 74:14 79:23 80:5 85:21 88:21 103:22 108:25 111:22 121:9

**single** 23:16 69:9 113:15,22

**singled** 124:9 125:7

**sinking** 71:24

**sit** 47:6 70:8 128:19 133:13

**site** 127:18

**sitting** 98:3 99:7 100:21 101:10

**situation** 17:8 18:19 41:18 48:2 49:18 70:11 86:13 103:25 106:22

**situations** 37:3

**size** 123:6,7

**skill** 16:22

**skips** 86:2

**slips** 36:17

**small** 83:6,11,17,24 87:16 94:15 123:25

**snatched** 104:19

**so-called** 82:13

**Social** 9:7,9 25:7,10

**society** 93:24 96:5 99:11 100:4 102:12

**Something's** 108:21

**son** 69:9 70:7 103:11, 16,18 104:6

**sort** 4:23 6:21,25 7:6, 17 8:7 12:11 14:18 16:14 17:9 18:24 24:14 46:15 49:15,24 73:4 84:9 100:12

**sought** 35:11

**sound** 9:4 11:3,18,23 57:13 60:4 63:14

**Southeast** 9:3

**speak** 35:3 47:12 51:10 52:18 114:19 124:20

**speaking** 19:15

**speaks** 103:5

**special** 18:24 130:3

**specialist** 14:3,20,21 87:17

**specific** 14:19 22:21 25:17 75:2 89:18

113:21 130:20 132:17,18

**specifically** 55:16 56:11 60:21 87:6 88:11 98:10 113:22

**specifics** 4:21 27:8 114:13

**speculation** 35:4 47:13

**spend** 11:22

**spent** 21:10,13

**spoke** 61:15 132:22

**spoken** 23:7 52:21 107:19

**sporadic** 16:13,21 17:22

**spouse's** 9:14

**St** 28:19,20,22 29:10, 17 30:12 31:11

**stance** 36:5

**stand** 38:2

**standard** 34:11 47:19 49:14 105:2

**stands** 117:18

**standstill** 106:6

**stare** 133:14

**start** 8:20 23:14 109:23 111:21

**started** 104:13 110:3,4 129:18

**state** 4:6 8:22

**stated** 11:25 57:17 111:10 117:21 126:6

**statement** 34:5 56:14 61:22 92:2 113:24

**States** 48:15 61:2

**stating** 47:24

**status** 121:21

**statuses** 35:16

**stay** 45:8

**staying** 29:11

**steps** 44:2 55:23 126:16 127:20

**stint** 16:11

**stolen** 27:5

**stone** 27:2

**stop** 106:14

**stopped** 102:7

**stopping** 108:13

**store** 24:23 100:24

**storm** 83:20

**straight** 102:10

**strain** 70:5,6

**Strayer** 13:12,15,18

**stress** 100:9 106:8, 18 114:16

**stressed** 100:22

**stressful** 78:7 104:3

**strike** 28:3 68:25 81:2

**struggle** 60:8,10 100:19

**struggling** 60:9

**student** 36:25 69:21

**stuff** 5:5,19 22:15 65:4 69:13 104:10 128:17

**stupidity** 124:24

**submit** 18:16 100:21

**submitted** 22:9,10 32:19 68:8 72:21 85:9

**submitting** 126:18

**subpar** 79:20 93:11

**subscriber** 41:2 46:8,10,18,23 47:4 58:12,14 74:24 75:4

**subsection** 48:16

**subsequent** 21:14

**substandard** 93:11

**substantial** 11:22

**successful** 105:14

**suffer** 96:8

**suffered** 93:7,17

**suffering** 29:15 78:5 104:5

**suffices** 112:21

**suing** 35:9

**summary** 19:18

**support** 42:5,19 46:16 71:21 110:20

**supposed** 6:20 51:17 69:24,25 71:17 75:22 99:25 102:20 103:16,19 125:3

**supposedly** 90:11

**Sur** 104:8

**surgeries** 29:2

**surgery** 40:5

**surprising** 85:5

**surrounding** 26:5

**survival** 70:25

**survive** 70:24,25 71:5 80:15 101:6

**sustainable** 69:8

**sworn** 4:11

---

**T**
---

**tailored** 130:19

**takes** 16:2 124:24

**taking** 4:19 82:5

**talk** 6:22 7:2,21 22:25 23:12 27:7 54:16 57:22 83:8 89:2 97:13 109:9 112:9,15 115:22 116:21 123:5

**talked** 30:23 68:19 88:22,24,25 118:14 119:4 126:18

**talking** 5:22 64:15 98:17 109:6 116:24 118:5

**Tampa** 33:24

**targeted** 73:8

**tasked** 43:2 50:7

**taxes** 14:24

**Taylor** 10:12

**technical** 100:12

**telephonically** 84:6

**telling** 43:4 56:19

**tells** 7:7 49:17

**ten** 104:8

**ten-minute** 7:18 51:20

**terms** 20:13

**testified** 4:12 80:10

**testify** 7:22

**testifying** 79:24

**testimony** 6:20 46:22

**tests** 29:4

**theft** 131:7

**theorist** 124:15

**therapist** 103:12 109:17 110:2

**therapists** 110:2

**therapy** 102:4,6,7 106:24 109:9,13,14, 16,21 110:25 111:2,9

**thing** 5:16 40:10 43:20 78:3 99:15 119:23 122:19 127:22

**things** 18:17 41:6 58:13 86:20 89:25 94:4 97:24 99:11 100:10,17 101:16,25 102:3,12 103:9 105:6,14 106:3 109:6 110:21 112:7,14 114:18 119:4

**thinking** 131:5

**Thirty-seven** 88:2

**Thirty-three** 9:19

**Thirty-two** 28:24

**thought** 32:25 52:10 58:24

**three-minute** 23:4

**throws** 60:13 78:9

**ticket** 91:13

**Tiger** 104:13

**time** 6:22 11:8,21,23 15:22 18:10,23 19:25 34:18 35:11,19 36:15 37:16 43:10,11 44:8, 16,25 48:2 53:17 56:16 57:7 61:22 69:4 70:3,10 75:18 79:12 80:3 84:23 88:13 100:20 101:5 115:19 118:18 119:14 120:2 124:18 127:7 128:8,17

**timeframe** 26:10 133:7

**times** 36:2 52:11 56:23 57:9 79:13 89:24 110:16

**tired** 60:9 70:4 83:16

**title** 14:17,19 22:17

**today** 4:19,22,25 5:15 6:19 7:22 8:16 107:25 109:6 125:23

**told** 19:18 63:21 83:3,4 84:19 85:15 87:18 91:23 98:9,12 104:8 123:10,17,19 124:3 127:19

**Tom** 4:18

**tool** 4:20

**top** 109:11 116:6 117:7

**total** 35:23 114:6 128:3,5

**touch** 4:23

**track** 45:9

**traditional** 84:9

**trained** 88:23

**training** 19:4

**transition** 77:11

**Transunion** 21:25 81:21,22 87:10 131:22

**trash** 37:17 79:11 93:11

**treated** 31:9 34:11 40:7 78:15

**treatment** 41:11

**trial** 20:8,21 21:11, 15,16,17

**trouble** 38:17

**troubling** 101:3

**true** 39:2 42:3

**truth** 59:18

**truthful** 45:25 50:9

**tune** 81:24

**turned** 16:19 72:19

**turning** 16:17

**Twenty-five** 96:15

**type** 13:25 20:17 21:17 38:14 64:19 71:18 82:21 90:7 96:24 126:12 127:22 130:3

**typically** 7:5,9

**U**

**U.S.** 107:19

**Uh-huh** 55:7 117:8, 10

**unable** 72:24 100:11

**underemployment** 16:22

**underneath** 117:2

**understand** 6:2 16:4 17:3,5 23:17 27:10 30:20 31:4 34:22 38:4 41:12 42:11,14 72:18 74:21 115:24

**understanding** 46:14 58:19 60:17 85:13

**understood** 7:12 47:2

**underwriter** 105:23

**underwriting** 17:4

**unemployed** 15:3,6, 16,22

**unfair** 102:15

**unfairness** 102:11

**unintentional** 78:2,3

**Unit** 8:25

**United** 48:15 60:25

**universally** 46:25 92:4

**University** 13:5,12

**unlimited** 88:3

**unsecured** 96:22 99:24

**untruth** 72:3

**upheld** 78:19

**upper** 53:11

**UPS** 24:23

**user** 129:11

**V**

**vacation** 11:21 105:2

**validate** 36:9 39:19 49:23 50:14 75:23

**validated** 36:6 59:14

**validation** 39:20 46:7

**VCC** 18:7,10,23 19:4 126:7,8 127:8

**vegan** 108:10

**verbal** 5:17

**verbally** 5:19

**verifiable** 45:25

**verification** 33:6

**verified** 59:14 65:13 70:11,12 107:14,20, 21

**verifies** 36:10

**verify** 49:16 107:17

**versed** 36:4 43:19

**versus** 110:15 119:9 120:5

**view** 5:2 46:5

**viewed** 118:22 123:11,20

**Vigh** 125:21,22,24 126:3,5 133:10

**violating** 41:6 59:7

**violation** 21:21 41:7 48:15 58:17,25

**visit** 104:23

**visited** 114:11

**volume** 108:22

**VP** 84:18 85:5

**VP's** 84:22

**W**

**wait** 69:3,5,15 70:9 80:6 108:21

**wake** 102:9,24

**walk** 131:5

**wanted** 6:7 41:19 56:7 104:9 109:10 125:17 130:8

**wanting** 61:12

**waste** 80:3

**water** 51:21

**website** 128:24

**websites** 17:18

**week** 83:25

**weekly** 109:21 110:10

**weeks** 33:20 84:3

**Welch** 13:12

**West** 8:25 11:6 12:24 13:23 14:15 24:18 25:3 28:21 94:20

**Williker** 31:12

**window** 91:11

**wiped** 101:12

**Woods** 104:13

**word** 5:14

**words** 35:9

**work** 13:22,25 14:5, 6,7,9,15 15:8,11 23:6 50:5 97:21 99:22 100:22 108:11 113:4, 10,15,21,22

**worked** 16:10,24 17:2,13,16,20 18:5 27:19 37:2,10 51:2 100:23 126:6 127:8

**working** 36:14 104:13

**works** 5:12 17:4,5 107:2 129:7

**world** 35:15 43:4 105:5

**worse** 98:7

**worst** 97:24

**worth** 36:22

**write** 5:18 73:22 118:19

**writing** 5:15 84:19 92:4

**written** 53:16

**wrong** 81:14 118:25 120:16

**wrote** 20:14 37:25 73:20

---

**X**

**X-RAY** 29:5

---

**Y**

**year** 12:19 13:14 15:8,13 52:7 57:14 69:25 83:21 102:6 109:13 110:4

**yearly** 14:22,24

**years** 9:19 10:24 68:23 69:3,5 89:19 91:4,10,12 94:13,14, 15,17 101:12,14 102:16 104:9 107:23 117:7

**young** 104:6

**youngest** 9:25

---

**Z**

**zip** 89:25

**Zoom** 5:20 127:2