Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANGELA FOWLER,

CASE NO. 8:21-CV-01038-WFJ-AAS

Plaintiff,

vs.

EXPERIAN INFORMATION SOLUTIONS, INC.
and PREFERRED COLLECTION AND
MANAGEMENT SERVICES, INC.,

Defendants.
_____

VIDEO CONFERENCE DEPOSITION OF CORPORATE REPRESENTATIVE
MATTHEW KIEFER
Taken on Behalf of the Plaintiff

DATE TAKEN:        NOVEMBER 29, 2021
TIME:              10:01 A.M. to 11:21 A.M.
LOCATION:          BY VIDEO CONFERENCE

Examination of the witness taken before:
Robin Gonzalez, RPR, FPR
Court Reporter

Page 2

A P P E A R A N C E S

APPEARANCES FOR THE PLAINTIFF VIA VIDEO CONFERENCE:
    DENNIS A. CREED, III, ESQ.
    Creed Law Group, PLLC d/b/a Creed & Hall, P.A.
    13043 West Linebaugh Avenue
    Tampa, Florida  33626

APPEARANCES FOR THE DEFENDANT PREFERRED VIA VIDEO
CONFERENCE:
    ROBERT A. VIGH, ESQ.
    Solomon, Vigh & Springer, P.A.
    P.O. Box 3275
    Tampa, Florida  33601

APPEARANCES FOR THE DEFENDANT EXPERIAN VIA VIDEO
CONFERENCE:
    TOM K. SCHULTE, ESQ.
    Jones Day, P.A.
    600 Brickell Avenue, Suite 3300
    Miami, Florida  33131

Page 3

I N D E X
Video Conference Deposition
of MATTHEW KIEFER                          Page No.

Direct Examination by Mr. Creed            4
Cross-Examination by Mr. Schulte           47
Stipulation                                52
Certificate of Oath                        53
Certificate of Reporter                    54
Errata Sheet                               55

PLAINTIFF'S EXHIBITS INDEX
No.      Description                        Page No.
1        Complaint                          7
2        Bates 186 - 196                    8
3        Answers to Interrogatories         16
4        Preferred's Response               28
5        Bates 213 - 225                    31
6        Credit Report                      34
7        Answer                             38
8        Notice of Deposition              47

DEFENDANTS' EXHIBITS INDEX
No.      Description                        Page No.
***** NONE *****

Page 4

THEREUPON:

MATTHEW KIEFER

called as a witness, was sworn/affirmed via video conference to tell the truth, the whole truth, and nothing but the truth, and was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. CREED:

Q.  Good morning, Mr. Kiefer.  This is Dennis Creed.  We've never had the pleasure of meeting before. I understand you're here represented by Robert Vigh today.

Do you understand that you are here not on your individual behalf but as the corporate representative of Preferred Collection and Management Services, Inc.?

A.  Yes.

Q.  Okay.  Can you state your name for the record, and spell it, please.

A.  My full name is Matthew, M-a-t-t-h-e-w, Maurice, M-a-u-r-i-c-e, Kiefer, K-i-e-f, as in Frank, e-r.

Q.  And where are you currently located for today's deposition?  Just city and state, just so --

A.  Tampa, Florida, our office.



Page 5

Q. Now, I see behind you that kind of your screen says the Preferred Group of Tampa. Is that the -- is that a d/b/a or is that a separate entity from Preferred Collection and Management Services, Inc.?

A. Yeah, it's a d/b/a of Preferred Collection and Management Services.

Q. Let me ask what is your position and/or title at Preferred Collection and Management Services, Inc., currently.

A. I am the chief officer of information compliance and development.

Q. And how long have you been working with Preferred Group of Tampa?

A. Since 2015, I believe.

Q. In the same role?

A. Yeah.

Q. And as the chief officer of information and compliance development for -- well, let me back up.

For the Preferred Collection and Management Services, Inc., what does that company do as a business generally?

A. 98 percent of our business is third-party debt collection. We also do a small portion of in-service training and development for clients. And we also have a first party -- what's in the medical industry termed

Page 6

early out, where we do collections before an account is delinquent, considered delinquent, and before it's written off as bad debt.

Q. Can you explain that early out debt for medical?

A. We do -- I'm sorry. State your question again.

Q. Sorry. It's not a great question. So you're saying early out, it's not delinquent, but the medical debt comes to you before it's delinquent?

A. So basically if you think of a provider, a physician who has an office, he sees patients every day, but he doesn't have the staff to collect, when after insurance pays, the early out division of our company would act as an extension of the client's business office before the account would ever be sent to collections.

Q. Kind of like an administrative arm of a medical services provider to collect debts beyond the insurance payments; correct?

A. After the insurance has adjudicated, right. Or in some cases, it's self pay. There is no insurance.

Q. Okay. All right. And have you -- are you familiar with the complaint in this action of Angelia Fowler v. Experian Information Solutions and Preferred Collection and Management Services, Inc.? Have you reviewed that complaint?

Page 7

A. I have and I am.

MR. CREED: Okay. I'm going to attach the complaint. And what I would like to do is, I usually kind of text to an inbox, or would you all prefer a shared screen? Because I can -- is everybody on their own computer?

THE WITNESS: I am.

MR. CREED: So a lot of times, I go into chat and I'll send to everybody. And what I do is, I send the document in the chat screen on your Zoom. Okay?

THE WITNESS: Okay.

(Plaintiff's Exhibit Number 1 was later marked for identification.)

BY MR. CREED:

Q. I just sent it. Let me know when you have it.

A. I see it. I have it.

Q. Okay. If you can open that up. I'm going to report to you that this is the complaint that my client filed in this case. You can see that the document was filed in the blue numbers at the top. This is a complaint my client filed on April 30th of 2021, and I just want to kind of go through some of the allegations here, and, you know, as it pertains to Preferred Collection and Management Services.

Page 8

Do you mind if I call it PCMS? Is that okay?

A. That's fine, yeah.

Q. Okay. So PCMS, my client -- are you aware that my client sent PCMS a letter, if you look at paragraph 13, sent PCMS a letter on May 18, 2019? Are you familiar with that letter?

A. Yes.

Q. Okay. And PCMS has actually produced that letter back to us. Do you know if PCMS ever responded to that dispute letter directly to my client?

A. We would have responded through the e-OSCAR system. I believe that the letter from your client was a duplicate of what was received through e-OSCAR when she provided the dispute to them, I believe. I would have to go back and review the notes on the account.

Q. Okay. So did -- in the letter, and I'm going to bring the letter up right now so you're not at a disadvantage. I'm not trying to trick you.

MR. CREED: I'm going to attach what is Exhibit 2, which is -- when you get that, open it up.

(Plaintiff's Exhibit Number 2 was later marked for identification.)

THE WITNESS: Okay.

BY MR. CREED:

Q. And I'm going to report to you that these are



Page 9

documents that were produced by PCMS to us in discovery in this matter, and these are documents Bates numbered 186, and if you go down to the last page, through 196. Do you see that?

A. I do.

Q. Okay. If you go up to midway through these documents, it's not Bates for some reason, but there's a letter, it's page 5 of this Exhibit 2, and it's a letter from my client to PCMS dated May 18, 2019. Do you see that?

A. Yes, I do.

Q. And it's a three-page letter?

A. Uh-huh.

Q. Is that a yes? Sorry.

A. Yes, it is.

Q. And in this letter, my client is asking PCMS to -- on the second page, midway through, she says, "Please provide a breakdown of fees, including any and all collection costs and medical charges, and a copy of my signature with the provider of service to release my medical information to your company." Do you see that?

A. Yes, I do.

Q. Okay. And do you see, "requesting full documentation of what you received from the provider of services in connection with this alleged debt"? Do you

Page 10

see that?

A. I do.

Q. Okay. Do you know if Preferred, PCMS, ever went and asked for the original breakdown of medical fees in relation to this debt that was being reported?

A. I don't believe so. This was long after the account was first sent to collections.

Q. Okay. Well, was there any attempt by PCMS to go to the original provider of medical services to verify that these services were actually provided to Angelia Fowler?

A. As far as getting in touch with the client on this specific dispute, no. When the accounts come over, they come over from the client, and it was just the balance owed Incare Medical Services, which is the billing company that serviced the accounts of the different -- I would call it a rounding physician when she was hospitalized.

Q. A rounding physician? Can you describe what a rounding physician is.

A. Yeah. In the old days, your doctor would go in and see you and follow your care in the hospital. Now because PCPs, your personal physician is so busy, they outsource this so there's a continuum of care inside of a hospital when somebody is hospitalized that follows their

Page 11

treatment, and then they coordinate that care with the person's personal physician once the person is discharged. That's my understanding of it.

Q. If you go down to the document right after the letter, can you explain what this kind of green spreadsheet here is over the next four pages.

A. Yeah. This is what would be -- for each account that's placed in collections, we assign -- it has its own account number from the provider, but we also assign an internal account number. So the one, two, three -- fourth column over is our internally assigned account number, which is unique to, say, a particular date of service. The Sonnet references an overlay which is -- it's a tool used with e-OSCAR or in conjunction with e-OSCAR to present the information that is contained within our own collection software, along with disputed information that comes from a system called e-OSCAR, which is the bureau's credit dispute reporting tool mechanism.

Q. Okay. It looks like you, PCMS, onboarded these accounts in and around October 25, 2017; is that correct?

A. As far as when they were first reported?

Q. Yes.

A. Let me review my notes here real quick. The accounts were credit reported 5/25 and 5/28 of 2017.

Page 12

Does that answer your question?

Q. Yes.

A. Okay.

Q. Do you know when PCMS received these accounts from Incare Medical Services, Inc.?

A. Yes. The accounts were assigned 12/12 of 2016, and the validation notice, which is the required first notice informing the patient of their rights to dispute the account, were sent on or about 12/27/2016.

Q. Do you have a copy of the notice?

A. No. We have templates that we use, but the actual letter itself is generated through, I'll call it for lack of a better word, like a Word document where you insert the data that's in a database, like a mail merge.

Q. So PCMS does not have a copy of that alleged notice that went out; is that correct?

A. Yes.

Q. It's just a notation in the system; correct?

A. Correct.

Q. If you go to the top of this Exhibit 2, at the top it says Bundle Member. What does that mean?

A. So a Bundle Member is when a person has many accounts, there's what's called a bundle ID, which, basically, instead of me calling you five times for five different accounts, it aggregates the accounts together



Page 13

so I can make one phone call and discuss all accounts with you. So a bundle ID is an internal aggregate grouping mechanism which has a unique ID.

Q. And what does "Locked" mean?

A. What does what?

Q. Locked mean.

A. On your Exhibit 2?

Q. Yes. At the very top, it says Bundle Member, and right next to it, it says Locked, L-o-c-k-e-d, Locked.

A. Okay. I'm looking at Sonnet ID.

Q. All the way up on the first page.

A. Oh.

Q. Sorry. It says Bundle Member, and then Locked right next to it?

A. Okay. So the very first page, 1 of 11; correct?

Q. Correct.

A. Okay. Locked just means the account is locked. So these are what we reference as important note lines. So they'll stay up there until -- I think it allows for four or five important notes, and then when you do another important note, it will replace.

But these accounts, because they were canceled, they're locked. So nobody can do anything with it.

Page 14

There's going to be no -- for instance, the words next to Locked says Canceled, meaning it's a canceled account. It's disputed. It's also Do Not Call, and it's been marked Do Not Mail.

Q. And is that some internal collection -- I'm sorry. I'm getting an echo. Does somebody have multiple mikes on?

A. I don't hear an echo.

(Discussion off the record.)

BY MR. CREED:

Q. Does that sound better? Yeah, the echo is gone. Sorry about that, Mr. Kiefer.

A. Can you repeat the question.

Q. Sorry. So Do Not Call, Do Not Mail, are these put up there pursuant to some type of internal policies of PCMS?

A. Well, we have different statuses of accounts. So for instance, these notes would be stamped any time, for instance, a cease and desist, because we're not going to call somebody if there's a cease and desist on the account. If there's an attorney involved, we would only call the attorney. So Do Not Call could be stamped on the account. So there's various reasons why any one of these would apply to any unique account in our system, similar situations. Does that make sense?

Page 15

Q. Yes. Do you know how many times did PCMS receive an ACDV from Experian in this case regarding these accounts?

A. Yes.

Q. How many times?

A. So I'm just going to read through the notes, which was my answer that I performed, because it kind of sums it up in chronological order, if that helps.

Q. Is that the answer that you provided in the response interrogatories?

A. Yeah. Number 4, it gives the --

Q. Okay. What I'm going to do then, is I'm just going to attach those, and we can go through them.

A. Okay. And also, I would reference in Number 4, the answer to one of your previous questions, or one that you had asked me was the fact that the letter your client provided was a duplicate of the letter that was provided to e-OSCAR as an attachment, and it references the date it was received before your client had actually sent the same letter to us. It was actually presented in e-OSCAR and reviewed on 5/8/2019. It alleges the HIPAA violation and all of the same content.

Q. Have you got that open?

A. Got the letter open?

Q. No, no. Do you have -- I just sent you the

Page 16

answers to interrogatories, which I'll attach as Exhibit 3.

(Plaintiff's Exhibit Number 3 was later marked for identification.)

A. Yeah. I printed a copy as well, so I have my answers to the interrogatories open.

Q. Okay. I just want to make sure we're talking about the same thing. That's fine.

So if we go through the -- I'm attaching as Exhibit 3, these are the Preferred Collection and Management Services, Inc.'s, answers to the plaintiff's first set of interrogatories. Is that the document you're referring to?

A. Correct.

Q. Okay. And I had asked you a question regarding each and every communication, you know, regarding, you know, from the Experian to PCMS regarding these alleged accounts and debts from Incare; correct?

A. Yes.

Q. So you were going to go through and give me the answer to that question. So go ahead.

A. Correct. I mean, I can read word for word, but everything is presented in there that you submitted as an exhibit, I think you said, B or C. So do you want me to read through it?



Page 17

Q. We can go through it. It says the accounts -- it says the accounts were assigned on December 12, 2016, which we already discussed; correct?

A. Correct.

Q. And then we discussed a validation letter is notated as being sent out in your system on December 27, 2016, but PCMS does not have a copy of that; correct?

A. Correct.

Q. Okay. And then these call attempts, these were collection call attempts from PCMS to Angelia Fowler; is that correct?

A. Correct.

Q. Okay. And the accounts were credited -- reported on May 25th and May 28th. That's the first time that these accounts were sent to the credit reporting agencies?

A. Correct.

Q. By PCMS; correct?

A. Correct.

Q. Okay. And Odalys here, that is someone that used to work for PCMS; is that correct?

A. Yeah. She's somebody who actually still works for PCMS.

Q. She still works. All right. Christina Morales and Caridad Vinson no longer work there; correct?

Page 18

A. Correct.

Q. So Odalys received nonspecific dispute code 001, not his or hers. Explain to me in your -- you know, based on your knowledge, what code 001 is, nonspecific dispute.

A. Sure. When a person disputes with the bureaus, they have a drop-down menu that they can pick from, and there are certain selected codes that they can actually pick from. In this case, the patient picked code 001, which is just not his or hers. That's all it says, meaning not my account.

Q. And this was an 11/9/2017 dispute; correct?

A. Yes, that's correct.

Q. Okay. And then it says, "Verify the information in our system against what was presented in e-OSCAR and generate a response letter to go out to the consumer for her accounts. This would have contained the account information that we have, along with our contact information and name of original creditor, as well as dates of service." Is that correct?

A. That's correct.

Q. So was there any investigation beyond just verifying the information in PCMS's computer database?

A. No. We verify the information that's in our database and compare it with the information in the

Page 19

e-OSCAR.

Q. Now, you said that Incare is the out -- is a third-party billing company for rounding physicians; is that correct?

A. So I think if I said they are, they are -- they used to be. They are no longer.

Q. Used to be?

A. Yeah. So I want to correct that if I said they are still in business. They are not. They have basically dissolved.

Q. So they were a third-party billing company, though, for rounding physicians; correct?

A. Correct, the group of physicians. And the wife of the billing software builder was actually one of the docs that was one of the rounding physicians.

Q. Now, was that doctor, though, one of the rounding physicians that provided services to Angelia Fowler for which this alleged debt was related to?

A. Yes, yes. I forgot what document it is that was produced, but you'll see a list of the physician providers' names, and she is one of the providers that actually, you know, provided services to Angelia Fowler.

Q. It's on this document again, what you're talking about, and we'll go through those names in a second.

Page 20

A. Okay.

Q. What was her name?

A. Her name is Sheela R. Shah.

Q. Okay. Now, if my client looked up Incare, the company Incare, how would she know if she had ever done business with Incare considering it's a third-party billing company?

A. I can't answer specifically for another party, but I can tell you generally that a billing company bills insurance, and then they send what's called dunning notices to a patient, along with the patient getting an explanation of benefits from their own insurance, if they have insurance, and then they would get a series of dunning notices thereafter after insurance has adjudicated showing patient responsibility, and that dunning notice generally would contain information about the debt, the service, who the provider is. But I don't -- I don't work for Incare, so I can't purport to know exactly what they sent out in their dunning letter series, but generally that's what happens.

Q. All right. So let's talk about that. In relation to any investigation during any period of time regarding these accounts being reported to Experian, did PCMS ever go to Incare and ask for copies of any dunning notices or any paperwork other than this is the account



MATTHEW KIEFER
FOWLER v EXPERIAN INFORMATION SOLUTIONS

November 29, 2021
21–24

Page 21

and this is how much is owed?

A.  No.

Q.  So do you have -- does PCMS have any paperwork in its files wherein Angelia Fowler signed for any of these services that are trying to be collected?

A.  No.  They would be at the hospital in what's called their HIM Department, Health Information Management.

Q.  Well, would Incare have to have a copy of some of those services provided or any kind of documentation to try to collect the debt?

A.  I can't speak to Incare and what their policies and procedures are.  But generally speaking, the -- I can give the example of another hospital system, AdventHealth.  The physicians that service the ER for AdventHealth would rely on the hospital's what's called a patient guarantor agreement, and if and when it was ever needed, they would go secure that and use it for whatever purposes they need.  Specifically if it was needed to settle a dispute with an -- an attorney was disputing an account or something like that, they would request that.  But generally speaking, a patient would go get their -- they would have their explanation of benefits, and they can go to the HIM department of the hospital where the services were rendered and get any and all medical

Page 22

documentation.

We are subject to HIPAA, the minimum necessary rule to collect on the debt, so we don't get access to more than we need to actually collect on the debt.

Q.  Let me ask you this.  Let's continue through Answer 4 on Exhibit 3.  It says, "Christina then received a certified mail dispute letter 5/28/2019."  Do you see that?

A.  Yes.

Q.  Okay.  Is that -- and that was the same letter that was received 5/8/2019 from Experian also?

A.  Yes, or a copy.  I can't say it was exactly the same, but it was, you know, probably a copy, because it was materially not different than the information provided to -- through the e-OSCAR system or uploaded through e-OSCAR.

Q.  And then PCMS, another letter on 6/10.  Did you have a copy of that letter also in your files?

A.  I think it was the exact same letter sent certified, but I can -- as far as what we provided, did you -- did we -- we provided you with a copy of the letter she sent.  Did we provide one copy or two copies of the same letter?

Q.  I have only one copy dated 5/18, the one I showed you.

Page 23

A.  Okay.  So then it was a duplicate of the letter that was sent to us, and we would upload that and attach it to the account.  Back then, we had a system, and we still do, where you can upload attached documents to the account.

Q.  Okay.  And then it says, "February 24, 2021, PCMS received another e-OSCAR dispute from Experian and saw that the demographics had not changed."  Does that mean that PCMS just then again validated the reporting?

A.  Yeah.  In other words, it would mean that the -- there was no difference in the dispute or the nature of the dispute than what was sent through e-OSCAR before.  So, for instance, a not his or hers.  It could be a not his or hers again.  And a patient could do that indefinitely every month or however often they wanted to dispute it with the actual bureaus.

Q.  And after 5/8/2019, though, PCMS did have this letter from before from Angelia Fowler regarding, you know, asking for validation of the debt; is that correct?

A.  Well, when you say asked for validation of the debt, we would have sent the debt validation letter upon sending the -- receiving the accounts in place.  That's the validation notice that goes out that gives their dispute.

As far as verification of the debt, we would

Page 24

compare the information received in the dispute to the information in our system, unless there was, you know, something -- some specificity that would require more documentation.

For instance, if a person were to claim identity theft, then we would get information from the client such as a copy of the driver's license, if the client has that, or anything that a client may have.  Like hospitals now have biometric identification when a person presents, and they might even have, you know, a hand print or something like that.  Not that we would get the hand print, but we would get whatever is -- whatever is available in order to not necessarily resolve the dispute, because it may never be resolved, but to answer whatever the allegation is or the specificity within a dispute.

Q.  Okay.  Let's go to answer -- the answer to Interrogatory Number 8 that's on page 5 of Exhibit 3, and you are referencing this list of accounts and provider names.  Do you see that?

A.  Yes.

Q.  Okay.  So these are, on the right, the purported alleged providers of services to Angelia Fowler looks like all in and around the time frame of November and December of 2015.  Do you see that?



Page 25

A.  Right.

Q.  And there's -- it looks like it's not -- and this is 28 separate client accounts.  Do you see that?

A.  Yes.  This is -- it looks like it kind of covers dates of service 11/15/2015 to 12/14/2015.

Q.  Correct.  So on here you said that Sheela R. Shah, she was one of the providers of services, but actually, she was an owner of the Incare billing company?

A.  I believe her husband is the owner or the builder of Incare Medical Services, or was.  But yes, she is a provider physician who would attend to the rounding and following of the patient's care while they're hospitalized.

Q.  Was this list of providers ever provided to Angelia Fowler by PCMS?

A.  I don't believe so.

Q.  Was this list of providers ever provided to Experian so they could provide it to Angelia Fowler?

A.  No, because the individual physicians was not our client.  Our client was Incare Medical Services.

Q.  Okay.  And there's 28 accounts here, but only 13 were ever reported to Experian; is that correct?

A.  I can't answer that yes or no.  All I can say is, we report the information.  I do know that the bureaus in some cases will not take an account if it's

Page 26

less than $50.  So we may report it.

So to answer your question, I can report it, but it doesn't necessarily mean that the individual bureau is going to put it on the credit file because it may not meet their criteria, whatever their criteria is, which I can't speak to.

I just know, generally speaking, an account less than $50 will not be picked up and put on a person's credit file.

Q.  Let me ask this, I'm going to attach -- so this information here was never provided to Experian or Angelia Fowler from PCMS, to your knowledge; correct?

A.  No.  This information as presented was not provided to the credit bureau, again because our client was Incare Medical Services, and medical debt has specific protections as far as credit reporting.

Q.  So if you want -- on Exhibit 3, go down to Answer 16, which is on page -- the bottom of page 8.  It says, "Describe in detail all steps you," which is PCMS --

A.  Right.

Q.  -- "when acting on your behalf took to investigate any and all disputes made to you by claimant in the past three years."

And the answer is, is there -- there were two

Page 27

types of disputes made by the plaintiff, and that was one directly to PCMS, and then one through the credit reporting agency Experian; correct?

A.  Experian and/or Equifax.  It comes to our system through a system called e-OSCAR, so it could come from one or both bureaus that we report to.

Q.  And that comes by a generated form regularly referred to as an ACDV; correct?

A.  Yes.

Q.  And then you send back what is an AUD; is that correct?

A.  We send back -- okay.  So you said a form.  It's data.  So there's no paper ACDVs anymore.  I mean, there might be ACDVs out there, but this is electronic data received through the e-OSCAR system, and we send the data back.

Q.  So there's no form that would be produced.  It's just data in the system; correct?

A.  Correct.  Yeah.  There's no paper form that we receive from e-OSCAR.  That used to be the case, but no longer.

Q.  And it says here that all of the disputes that PCMS received from the credit reporting agencies were all generic codes of 001, not his/hers; is that correct?

A.  Correct.

Page 28

Q.  And then all PCMS did then was to verify the demographic information; is that correct?

A.  Correct.

Q.  And there was no investigation beyond that; correct?

A.  Correct.

MR. CREED:  All right.  I'm going to attach -- I'm going to attach this as Exhibit 4.  Open that when you get it.

(Plaintiff's Exhibit Number 4 was later marked for identification.)

THE WITNESS:  Okay I have it open.

BY MR. CREED:

Q.  Okay.  And this is an excerpt of a 185-page document.  It looks like just like an information flow sheet from PCMS.  This is the first four pages of that marked Preferred Response Plaintiff RTPs 001 through 004.  Do you see that at the bottom right-hand corner?

A.  Yes.

Q.  Okay.  Do you know what this document is?

A.  This document is our system notes for lack of, you know, a better explanation.  Our notes has systems -- I'm sorry.  Our system has notes for everything from the data placement to loading demographic information to all activity that happens onto an account.



Page 29

Q.  So every time these accounts are touched, they would be marked; is that correct?

A.  Correct.  Whether it's through job, like you see job, that's an automated job, or an actual individual.  For instance page 1, you'll see user name, O-d-a-l-y-s-d, that would be Odalys as a user name. Mkiefer would be myself.

Q.  Mkiefer is yourself.  So that in 5 -- looks like May 3rd, you viewed this account, and then -- but it looks like on April 1st all the debt was removed, and you said that's because Incare closed; is that correct?

A.  Incare requested us to cancel the accounts.  I don't know when they actually closed as far as billing. I know the husband's wife, the doctor, I believe, got sick and they could no longer keep it open, something to that effect.

Q.  And then if you look at the bottom half of the first page, it just says job, which you said were automated.  It says like debt reported to the credit bureaus; is that correct?

A.  Correct.

Q.  Is that all of the accounts that you have reported for Angelia Fowler?

A.  Yes.  I mean, the job -- once the account is credit reported, it's flagged, and then every month

Page 30

thereafter, it's updated.  If there's any changes in balance or anything like that, it would update and re-report to the bureau every month since it was first reported until it's canceled.  Then it would be removed.

Q.  Okay.  So then if you come back to page 3, you see Odalys logs in here, it looks like, around November 9, 2017.  Do you see that?

A.  Correct.

Q.  It looks like there's a dispute response letter.

A.  Correct.

Q.  And it just says the consumer states that this account does not belong to her.  And then it looks like they just verify her demographic information; is that correct?

A.  Correct.

Q.  It says status code changed from ACT to DXB. What does that mean?

A.  So XB is the Metro2 code for disputed account. ACT is active.  So on that date, that particular account, which is our internal account number ending in 74, was changed from ACT to DXB, meaning disputed.

Q.  And then this is when you also put the Do Not Call on the account?

A.  Correct.

Page 31

MR. CREED:  I'm going to send what is a document received from you.  I'm going to mark it as Exhibit 5 to this deposition.

THE WITNESS:  Is this the Bates 213 to 225?

MR. CREED:  Yes.

THE WITNESS:  Excellent.

(Plaintiff's Exhibit Number 5 was later marked for identification.)

BY MR. CREED:

Q.  And all these Bates numbers, most of them are going to be ones that I received from PCMS.  Okay?

A.  Yes.

Q.  All right.

A.  I have it open.

Q.  All right.  So this appears to be a Handling Refusals, Disputes, Cease and Desist, and Combinations Thereof.  Are you familiar with this document?

A.  Yes.

Q.  And what is this document?

A.  This document is part of our policy and procedures as of May 26, 2016, for handling disputes, refusals to pay, cease and desist, combinations of disputes.

Q.  Okay.  So if you go to the second page of this document, at the bottom of the section Comment and

Page 32

Background, the first full paragraph on the second page it says, "Make sure you do this timely."  It says, "Remember, you cannot continue collection activity until you verify the debt."  Do you see that?

A.  Correct.

Q.  Okay.  So what -- not -- outside of the realm of the credit reporting agencies, when you're trying to collect a debt, right, from an individual like Angelia Fowler, aside from the reporting, what does PCMS do to verify that, other than send that verification letter at the beginning when it onboards, kind of, the accounts?

A.  Well, it depends on the nature of the dispute. The policy and procedures goes into quite detail for what's deemed a non-generic dispute.  So if somebody said my EOB says this, X, and we're trying to collect on Y, then we would try and go and find out, you know, was the explanation of benefits wrong, did the provider take the wrong contracted amount off, or adjustment.  So it just depends on the specificity given in the dispute as far as which direction we go and what we request.

For a generic, like a 001, not his or hers, we would look at the information in our system, compare it with what, for instance, is in e-OSCAR.  The dispute response letter would be sent to the patient showing them, and if they have any, you know, other specificity



Page 33

to add to the dispute, then hopefully they would call us or write us and let us know, for instance, this is not my account, but it's identity theft, and they make a claim of identity theft, which would trigger a greater response and more due diligence on our part as far as what we do. Sorry. I'm sinking in my chair.

Q. So let me ask you this, then. So at PCMS, you said that you send a verification letter at the beginning of this process, and there's a notation in the account that Angelia Fowler was sent such a verification letter; is that correct?

A. It's a validation notice. We refer to it as a validation notice, and that is sent to the patient upon the accounts first coming to PCMS to collect on.

Q. Okay. And if there's no response, as there wasn't in this case, once you get a response, even if it was some time later -- in May 8, 2019, PCMS got a letter from, you know, Angelia Fowler basically saying this isn't my debt -- is there anything that is done at that point to look into the matter further as far as validating those accounts as being hers and that those service providers provided her services?

A. So in the case of Angelia Fowler, when an account is marked 001 and it's a -- there's no specificity, it just says it's not his or hers, a letter

Page 34

would be sent to her showing the information we have in our system and to contact us or write us, you know, if there's any more specificity to add to the dispute, which we would then investigate depending on what's sent in her dispute. As far as, for instance, identity theft, we would go in a different direction. It just all depends on what the patient consumer puts in their dispute letter to us.

Q. Okay. So did PCMS ever send any direct correspondence to Angelia Fowler, other than collection notices, in regards to trying to verify this debt?

A. No.

MR. CREED: I'm going to be attaching a document. You may not be familiar with this document maybe, but I want to send it to you and go over it a little bit. I'm going to be marking this as Exhibit 6 to this deposition, and this is Angelia Fowler's -- I'm going to purport to you that this is Angelia Fowler's Experian credit report from March 13, 2021.

(Plaintiff's Exhibit Number 6 was later marked for identification.)

BY MR. CREED:

Q. Do you have that document?

A. I do. It's open.

Page 35

Q. Okay. If we go down to starting on page 3, we have what is really what my client was disputing, is Preferred Collection and Management partial account number, they have here, and they basically have, you know, the reporting from PCMS notated as being in collections for most of the reporting period, from 2018 to 2021.

Now, this is one account, but if you go down about 13 total Preferred accounts if you go down the next five -- four or five pages. Do you see that?

A. I do.

Q. Okay. And in every account, the amount trying to be collected is the same, $476. Do you know why that is?

A. I can speculate that a rounding physician -- I mean, I'm not in the billing end of it, but I can probably speculate that the charges for a rounding physician are probably the same code that's used. But again, I can't speculate. That's not my job. I go off of what the client sends me in terms of the balance to collect.

And I don't mean to not answer your question. I just can't speak in terms of billing. I just know from my own procedures and things that I've had that, generally, that's what happens. It's the same code used,

Page 36

and that the amount with the insurance company would be a certain set amount that's allowed, and then the balance would be any patient responsibility and/or deductible.

Q. I don't mean to move around. Exhibit 3, the answers to interrogatories, we went through those 28 accounts that were handed over to Preferred from Incare, and then her credit report on Exhibit 6 is showing 13 of those accounts reporting all with the same amount, all $476.

Do you know if -- because it doesn't say in this answer to interrogatory, Number 8, what the amounts for each account were sent over from Incare. So if you go back to my Exhibit 3, it says like 278505 and gives the account number. It says Ahmed Jahangir, so -- but there's no amount of the account. It just gives the client account and agency account.

A. You're talking about the document that you produced that has the providers' actual name on it; right?

Q. Yeah. That's your document.

A. Yes. That's a query from our system. If you wanted to show more or less data, I can put it on there. But that was a query done to basically match the specific provider to the account number that we use as an internal account number.



Page 37

Q.  But it doesn't say -- so in your internal documents, PCMS, do you -- does PCMS retain the information regarding what -- who -- who provided the services and for what amount?  And so like does it say in your files Sheela R. Shah provided services on such and such date, which it looks like, and the services were X for the amount of Y?  Does it give that type of specificity?  Or is the account, when it comes over to you, Sheela R. was the provider, and Angelia Fowler owes X number of dollars?

A.  It's the latter of what you just stated.  It's the -- it comes over as Incare Medical Services as being the client and whatever detail the client provides.  In this case, it's just the balance owed to or by the patient to Incare Medical Services.

Q.  With no description of services provided?

A.  It does not give CPT codes for this specific client.  It doesn't tell what was done.  We just know that Incare Medical Services is a billing company and these providers are like rounding physicians.

Q.  You have in front of you Exhibit 6, and I know this is not PCMS's document, but on this credit report, nowhere on any of this information does it say -- it doesn't give the providers' name.  It just gives Incare Medical Services' name; correct?

Page 38

A.  Correct.

MR. CREED:  I'm going to mark this as Exhibit 7 to this deposition, what I just sent over.

(Plaintiff's Exhibit Number 7 was later marked for identification.)

THE WITNESS:  I have it open.

BY MR. CREED:

Q.  And have you seen this document before?

A.  That's the actual complaint that was filed, yes.

Q.  No, no.  This is the answer and defenses filed on behalf of Preferred Collection and Management Services, Inc.

A.  I'm sorry.  Yes, I have it.

Q.  Okay.  If you go down to page 8, these are the defenses, and I know this is legal, so I'm not going to ask you for legal conclusions, but I want to go through some of these defenses with you, sir.

A.  Okay.  Page 8, you said; correct?

Q.  Correct.  Page 8 and then actually go to page 9.

A.  Okay.  So not the page that says Defenses, with Bates number --

Q.  That's where it starts, but I'm going to be asking you about the third defense on page 9, top of page

Page 39

9.

A.  Okay.

Q.  So here it says, "Third defense:  The reasonableness of the investigation depends on the dispute presented," and it says, "Fowler's 41 disputes to Experian and Equifax in October 2017 were all the same.  They were standard dispute code available on e-OSCAR, 001, which translates to the account is not his or hers."

Does that comport with your notes that you looked through?

A.  Yes.

Q.  Okay.  And so in all of these is it PCMS's position then, in all of these disputes made by Fowler through the credit reporting agencies, Experian and Equifax, that all PCMS was required to do is verify the demographic information?

A.  For that specific dispute, generic dispute with no specificity, yes, correct.

Q.  But some of the disputes do have an attached letter that went beyond the e-OSCAR code of 001; correct?

A.  Well, as far as -- okay.  So e-OSCAR -- the letter that was provided when the account was first received and disputed through e-OSCAR was basically the same content as the letter sent to us certified mail.

Q.  So you did have that e-OSCAR letter in hand,

Page 40

the one that was sent directly to PCMS during some of these disputes after May 8th of 2019?

A.  Correct, the ones that allege HIPAA violations, et cetera, yes.

Q.  And that is -- and that goes beyond an e-OSCAR code of 001; correct?

A.  I don't believe so, and I'll give this example.  There's a lot of information that comes from the Internet that is put in a dispute that we have -- for instance, we have to provide this, we have to provide that, and we don't.  I mean, some of it is just bad information coming from the Internet.

Q.  Okay.  Let me ask you this, and we kind of talked about this a little bit.  So there was 28 accounts that PCMS had that it was trying to collect on from Angelia Fowler from Incare Medical; correct?

A.  Correct.

Q.  But only 13 -- and I showed you a credit report of Angelia Fowler.  But only 13 were reported to the credit reporting agencies, and you believe that -- you're not sure, it's not in your document, but you believe that it might be because those accounts were less than the other 13 accounts; is that correct?  You said they don't report anything under 50 bucks?

A.  That is an example of when they wouldn't



Page 41

report. I would have to go back and look at the actual amounts for each account to see if that were the case. But generally speaking, we report an account to the credit bureau, it's up to them whether they put it on or do not. And I will say from experience -- and there are cases where one bureau will go ahead and pick it up and put it on and another one won't.

What that reasoning is or logic is, I have no idea. I just suspect it's algorithms that go on in the background of their own software.

Q. Do you know if PCMS was reporting all 28 accounts to the credit reporting agencies?

A. We would have picked up and flagged all accounts that we have in our system because that's our credit reporting client, unless the account was canceled or some other reason it would be excluded from credit reporting.

MR. CREED: Okay. We've been going for about an hour. Can we take a five-minute break? I'll be right back.

THE WITNESS: Okay.

MR. CREED: Five minutes. Off the record. Come back at 11:05.

THE WITNESS: All right.

(Recess taken.)

Page 42

BY MR. CREED:

Q. Back on. So I just have a few more questions, and I think we'll be done here.

How long did PCMS act as the collection agency for Incare Medical Billing?

A. Up until he asked -- I think they dissolved and they canceled their accounts. That was -- I'd have to go back and review the notes, but I believe it was earlier this year.

Q. But before that, how long was PCMS doing business with Incare?

A. I believe since 2017.

Q. 2016, at least; right? Because those debts were picked up by PCMS in 2016?

A. Well, her dates of service might have been 2016, but that doesn't mean that the accounts came to us until some time after. I would have to go back and look at the specifics to find out, you know, when Incare was signed on as a client.

Q. The dates of service, according to answer to 8 on Exhibit 3, is 2015, and I think we went over a previous document that showed -- if you look at Exhibit 4, which is the Bates 01 through 04, which shows that these accounts came over from Incare in December of 2016 to PCMS. Remember that?

Page 43

A. Yes.

Q. Okay. So at least from -- were these part of the first group of collections that PCMS was doing for Incare?

A. I'm not sure. I would have to go back and see how often the client placed accounts with us, when the contract was signed as opposed to when the very first file came over. But I don't know -- other than the date this account was placed, I don't know which file and how many were received by Incare.

Q. Let me ask you this: As far as PCMS doing business with Incare, was there ever a time when doing business with Incare that PCMS would go -- have an occasion on any account that they serviced for Incare where they found out that the account that Incare was reporting to PCMS was not the account as stated to the person they're trying to collect from?

A. Not to my knowledge.

Q. As far as PCMS goes, on occasion, how many e-OSCAR ACVDs does PCMS handle on a given day or week, whatever your best estimate is?

A. It fluctuates based on the number of e-OSCARs, but there have been times when we would have two people working the e-OSCAR system. And then when we had the Sonnet overlay, it was much more efficient, so we went

Page 44

down to one person.

Q. So you have one person at PCMS that is working on the e-OSCAR suits?

A. Currently, correct. There have been times in the past where we had multiple people, though, working the account based on volumes, fluctuations, who is here, who is not, items of that nature.

Q. Okay. So Odalys Diaz, is she still the person that's working on the e-OSCAR?

A. Yes.

Q. And did Caridad Vinson work on the e-OSCAR?

A. Yes, at one point.

Q. And did Christina Morales also work on the e-OSCAR?

A. Yes. They were all trained on the e-OSCAR.

Q. And Jennifer Thorpe, who is she?

A. She's our admin person, IT, for lack of a better term.

Q. Okay. And what information, if any, would she have regarding this lawsuit?

A. Only information she needed to provide documents to me or a query. She did not work in the e-OSCAR system, per se, because, you know, she's management, so --

Q. Okay. So Jennifer Thorpe basically would just



Page 45

be the person who retrieves the business records for PCMS in response to any disputes; is that correct?

A.   No.  That would be the support services department.  So if something were necessary to be retrieved from the client, our support services department would handle that.

Q.   What type of documents then would Jennifer Thorpe be providing you, then, in relation to this case?

A.   E-mail, a request to -- that I need something, or a query, and she would probably farm that out to her team, hey, I need this recording or I need that or see if there's any recordings.

Q.   Do you know if PCMS had any internal e-mails regarding Angelia Fowler's disputes regarding these accounts?

A.   I would have e-mailed requests for information in order -- for instance, the request to produce, I would e-mail certain people within PCMS to retrieve whatever I need based on what they handle in terms of documentation or a document that was attached to the account or a recorded phone call.

Q.   But before this actual lawsuit and litigation, would there have been any correspondence regarding Angelia Fowler's disputes, or was that all just automated system information?

Page 46

A.   It's pretty much automated.  I believe the only information came after the lawsuit was filed and we received it.

Q.   Is there ever an occasion where there's e-mail traffic from the people doing the e-OSCAR where a dispute has escalated beyond just the functionary person that's running the e-OSCAR?

A.   Absolutely.  Depending on the nature of the dispute, they would, you know, get me involved, for instance.

Q.   Who is the person that they're tasked to get involved regarding a dispute if the e-OSCAR people can't handle it?  Is there someone directly above them, or do they come directly to you?

A.   They would go to Jennifer Pierce now.  But back in that period of time, they would go to Jennifer Thorpe. And for instance, if it's a system issue, something is not working, things like that, they would go to their supervisor, which back then would have been Jennifer Thorpe.  And, of course, anything beyond that, as the chief compliance officer, they would send it to me or a supervisor.  At that time, I believe it was Stephanie Werk (phonetic) would have been the supervisor that would be in charge, you know, over answering questions.  Kind of a chain of command, if you will.

Page 47

MR. CREED:  I'm going to attach this last exhibit here.  This is the notice of deposition today.  I'm going to attach this as Exhibit 8 to the depo.

(Plaintiff's Exhibit Number 8 was later marked for identification.)

THE WITNESS:  Yes.

BY MR. CREED:

Q.   And have you ever seen this before today?

A.   Yes.

Q.   Okay.  And then if you go to the Exhibit A that's attached to the notice, it's a list of 15 categories, and you understand that you were giving information as the PCMS's corporate representative today, not in your individual capacity?

A.   Correct.

MR. CREED:  And I have no further questions. Anybody have any follow-up?

MR. SCHULTE:  Rob, unless you want to go first, I think I had three questions -- or actually, just two.

MR. VIGH:  I have no questions at this time.

CROSS-EXAMINATION

BY MR. SCHULTE:

Q.   Hi, Mr. Kiefer.  My name is Tom Schulte.  I'm

Page 48

the attorney for Experian in this case, and I just had a few points that I wanted to ask you about, mostly for clarification purposes.

Back on Exhibit 3, which would have been Preferred's answers to Plaintiff's interrogatories.

A.   Yes.

Q.   On page 3 of that PDF attachment, starting in the -- this is in response to Plaintiff's Interrogatory 4.  In the paragraph that says, "Christine then received a certified mail dispute letter," and it continues on, are those -- is that paragraph in reference to a direct letter that Preferred received from Plaintiff?

A.   Yes.  That paragraph refers to the copy of the letter that was provided through the e-OSCAR system, so it was sent certified.  So that comes -- that information comes directly from the notes.

Q.   Okay.  And when you say it's a copy of the letter that was sent through the e-OSCAR system --

A.   I just mean the information within the letter, the contents, was basically identical.

Q.   Okay.  So in this -- in this response to Interrogatory 4, I'm trying to think of how to best phrase this question.

In this response to Interrogatory 4, if the response mentions that a dispute came in through e-OSCAR,



MATTHEW KIEFER                                                    November 29, 2021
FOWLER v EXPERIAN INFORMATION SOLUTIONS                          49–52

Page 49

does that mean it came from a credit reporting agency?

A.   Yes.  We reported at the time to Equifax and Experian, so it would have come from one of the two bureaus, or both.

Q.   And so based on your records or the record that Preferred maintains in this case, how many disputes did you receive from the credit reporting agencies?

A.   From the bureaus themselves, and I'm going back to the answer to Number 4 --

Q.   Okay.

A.   So directly from e-OSCAR, 11/9/17 was one, another on 5/08 of 2019, and then -- no, that was a letter.  And then the next one was 2/24 of 2021.

Q.   Okay.  And then my last question:  You mentioned a verification letter or I believe you titled it a validation letter that was sent to Ms. Fowler after she disputed the accounts with Preferred.  Do you remember that?

A.   Yes.

Q.   That letter, that validation letter, is that sent to Experian to forward on to the plaintiff, or is that sent directly to the plaintiff from Preferred?

A.   Okay.  You're using the term "validation."  I used the term "validation" when we sent out our first notice.  Verification is something I refer to after

Page 50

receiving a dispute.

Q.   Okay.

A.   In the account notes that says DSR, meaning dispute response, that's a letter generated by the support department or, actually, the system -- it's automated now -- after they have verified the information in the account.  So terms verification, validation, I mean, I don't mean to mix and match, but I'm very specific when I respond to a dispute as verification versus validation, which we would refer to as the validation notice sent when we first get the account.  Does that answer your question?

Q.   It gives me -- I think it gives me the proper wording to ask what I'm trying to figure out.

So in this case, when Ms. Fowler disputed her accounts with Preferred Collection, after Preferred Collection conducted its investigation, it sent verification letters; is that correct?

A.   Correct.  We sent one in response to the -- any time we receive something by mail, we would respond by mail to the person who sent -- for instance, if the patient was represented by an attorney, that dispute response would then go to the patient's attorney.  By law, we can't send it to the patient.

If it came electronically through the e-OSCAR

Page 51

system, we only verify the information presented in e-OSCAR.  We do not send a letter to the bureaus to attach in response to an account.

MR. SCHULTE:  Okay.  That answers my question.  Thank you.  And I don't have anything further.

MR. CREED:  I have no follow-up.

MR. VIGH:  No further questions.

MR. CREED:  Do you want to explain read or waive, Rob?

MR. VIGH:  Matt, do you want to read or waive?

THE WITNESS:  I didn't understand.  I heard read or waive.  I'm sorry.  My hearing is not so great.

MR. VIGH:  You have the right to read the transcript.  Do you want to preserve your right to read, or are you willing to waive that right?

THE WITNESS:  I'll preserve the right to read it, you know, at some later date, if needed.

MR. VIGH:  Okay.

MR. CREED:  Thank you, everybody.  I guess that concludes it.

Do you have all the attachments, Robin?

THE COURT REPORTER:  Yes, I do.  Are you ordering the transcript?

MR. CREED:  I'm going to talk to my client and

Page 52

then we will get back to you.

(Thereupon, the video conference deposition was concluded.)

S T I P U L A T I O N

It is hereby stipulated and agreed, by and between counsel present at this video conference deposition and by the deponent, that the reading and signing of the video conference deposition is not waived.

Page 53

CERTIFICATE OF OATH

STATE OF FLORIDA:

COUNTY OF HIGHLANDS:

I, the undersigned authority, certify that MATTHEW KIEFER appeared before me via video conference on NOVEMBER 29, 2021, and was duly sworn.

WITNESS my hand and official seal this 17th day of December, 2021.



_____

ROBIN GONZALEZ, RPR, FPR

NOTARY PUBLIC - State of Florida

My Commission Expires:  2-7-2024

Commission Number:  GG920325

_X_ Identification provided:

        Driver's License

Page 54

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF HIGHLANDS:

I, ROBIN GONZALEZ, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the video conference deposition of MATTHEW KIEFER; that a review of the transcript was requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 17th day of December, 2021, at Sebring, Highlands County, Florida.

_____

ROBIN GONZALEZ, RPR, FPR

Page 55

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

IN RE:  ANGELA FOWLER v. EXPERIAN INFORMATION SOLUTIONS, INC. and PREFERRED COLLECTION AND MANAGEMENT SERVICES, INC.

        CASE NO.  8:21-CV-01038-WFJ-AAS

Video conference deposition of MATTHEW KIEFER, taken NOVEMBER 29, 2021.

PAGE LINE        CORRECTION              REASON

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

____ ____    _____    _____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____        _____
DATE                           MATTHEW KIEFER

CC:  DENNIS A. CREED, III, ESQ.
     ROBERT A. VIGH, ESQ.
     TOM K. SCHULTE, ESQ.