EXHIBIT

5

**Handling Refusals, Disputes, Cease and Desists and Combinations thereof**

**Updated: May 26, 2016**

*Policy Overview*

The purpose of this policy is to ensure that all of Preferred Collection and Management Services' agents are in compliance with FDCPA, HIPAA, FCRA, FACTA and all other acts or laws governing debt collections. This policy dictates that all staff follow set guidelines for handling patients that "Refuse to Pay", request a "Cease and Desist", "Disputes" an account or any combinations thereof regardless of whether PCMS receives notification through written correspondence, phone, email, E-Oscar, fax, whether from the patient, his/her attorney or the client.

## DISPUTES

Plaintiff's Ex. 5
11/29/2021 RG

**Definition:**

It shall be the policy of Preferred Collection and Management Services *that a <u>dispute</u> is any (verbal or written) communication that a debtor conveys using the word "dispute". BUT…It is also a communication where the debtor states he/she does not owe the bill because of (insert any reason".* In other words, they don't necessarily have to us the word "DISPUTE". Our company will treat verbal and written disputes the same regardless of whether or not the debtor gave a reason for their dispute. The dispute can come from the debtor, their attorney, our client or a third party representing the patient regardless of whether received by letter, email, E-Oscar, fax, phone call, or notes from the client. It does not matter whether or not it is during the validation period or after. *It shall not matter* whether or not *the collector agrees* with their "reasoning" for the dispute or not. The account will still be coded as a "dispute". To simplify, if the debtor gives any explanation on why they do not owe the debt or any portion of it, treat as a dispute. If they dispute the entire amount or all accounts, mark them accordingly. You can even ask them if they are disputing it to reaffirm the action you take or inform them that you are marking the account as disputed, but you can also inform them that, if the client credit reports, while the account will be marked "disputed" it does not help their credit by having it marked as such.

Comment and Background:

A dispute hinders the collection process in so much as you cannot continue collections from the debtor until the debt is validated--hence, the term, "validity of this debt". The debt must be validated! You should also try and resolve the dispute if you can but not all disputes can or will be resolved in the mind of the "least sophisticated consume". If you CAN resolve it by a phone call by all means do it. If they dispute but are willing to pay the account ask them if they still dispute the account. You must document the account as such. A PAID, DISPUTED ACCOUNT IS STILL A DISPUTE (for credit reporting purposes). Sometimes, you may get a check that says, "Paid under protest!" That is also a dispute. Regardless, even if the dispute can be resolved over the phone, verification must be mailed so that we can prove compliance if needed in court.

For instance, a debtor may state that they dispute the debt because their insurance should have paid and, at the same time, they may give you insurance information. You would then look at the account to see if insurance was billed and then make the determination whether to bill it, if it wasn't previously, or to pull an EOB and ICOB to "validate the debt". You could still do this over the **phone if it is as simple as this**. However, if they still dispute it, you would need to clarify and document what the dispute is, mail them a copy of the ICOB and write down the payments and adjustments and leave the account coded as a dispute. For bad debt, It can be turned to the credit file as long as it is marked as a dispute and after it is verified in writing back to the debtor. However, it should not be turned to credit reporting if the dispute is something an employee can rectify with follow-up with the client and/or the insurance company. Most of the disputes received through correspondence or through E-Oscar are simple, generic template disputes off of the web. However, some disputes are not! **Generic dispute received through the mail, email or fax are to be processed and then given to the compliance officer to file.**

*If a dispute is very involved (complicated or contains specificity),* **document the account** if it hasn't been documented already, and **send to the Support Worklist with clear direction of what you need from the client** (that they can get to resolve or try to resolve the dispute) or, **if they need to send to their contact at the provider and have our client**

research the dispute, write the CLIENT Account number at the top right hand corner of the document  (dispute) and put in the support mailbox ensuring you process the dispute in WebAR as well.  Support will scan and send to the client and attach the complex dispute to the account as a document so all who deal with the account can see the image if needed.

 Make sure you do this timely. *Remember! You cannot continue collection activity until you verify the debt!* You may never resolve the dispute, but you have to verify the debt. The dispute may be that the debtor thought the prices for the services were too high. In this case, it would be verified in writing by sending the dispute response letter and marking the account as a dispute and may eventually be turned to the credit file if not paid by the time the account is to report (if the client permits reporting); and, if pricing is the issue, you will never be able to satisfactorily resolve that dispute.

**GENERIC REGULAR (NONSPECIFIC) DISPUTES**

*Steps for Handling Regular (Generic form letter) Disputes in WebAR:*

1. *Ensure that the address is correct on the account before processing.*

2. *Click on the Side Menu for Disputes in WebAR.*

3. *Dispute code choices are:  Cease and Desist Dispute; XB-Information disputed by Consumer; Identity Theft Possible; Attorney Dispute and, Refusal To Pay.*

    a. *(Ignore DRC and not use anymore. Clients that do not credit report will NOT credit report simply by marking the account as disputed.)*

4. *Click on the XB option.*

5. *Enter the amount disputed (or entire balance if not specified).*

6. *Enter the reason details in the Reason block and,*

7. *Click APPLY.*

8. *Support will Review account details and/or client system for any abnormalities.*

*SPECIAL EXCEPTION : If the patient is represented by an attorney and the account is disputed, ensure that the attorney's address is in the guarantor section of demographics, i.e. "Patient Name c/o Attorney's name, attorney's address, etc. It is entirely permissible for address line to reflect that of the attorney with the name field showing "c/o the attorney" so that the DSR can go to the attorney, in fact, this is required by law when a consumer is represented by an attorney unless his/her attorney directs otherwise.*

    a. *If the account is in a legal status send to support worklist so they can forward the attorney notification as appropriate to the client.*

9. *Put Dispute correspondence in Compliance mailbox marked completed at the top. If the dispute is sophisticated or complex or legal in nature, scan all documents and attach to the account using the documents sidebar in WebAR.*

*Note: If the account notes say "Recvd dispute via Eoscar" then the dispute came in from a credit reported account and will be handled by the appropriate support person.  If the dispute was ONLY through E-Oscar, then there is no need to send the dispute response letter to the patient or his/her attorney unless there are attachments or circumstances within the documentation that necessitate that we should. For instance, the account may have been previously disputed and a DSR was already sent because it lacked specificity but now it is disputed again through E-Oscar with more specificity*

Preferred_Resp_Plaintiff_RTPs  214

*and/or documentation that warrants a reinvestigation. The only reason a new DSR would have to be sent is if the New Dispute contained New information that triggers higher due diligence.*

**Remember that if the patient is represented by an attorney, the dispute response must go to their attorney. Also, while it is true that there is no obligation technically to respond to the debtor after the 30 day validation period, given the "pro-consumer" direction the CFPB is taking, we will consider it a best practice to do so- assuming it came AFTER via a phone call, fax, email, or through correspondence.**

### COMPLEX DISPUTES (WITH SPECIFICITY)

**Steps for Handling a COMPLEX  or specific Disputes in WebAR that need more due diligence:**

1. *Ensure the address is correct on the account.*

2. *Click on the Side Menu for Disputes in WebAR.*

3. *Dispute code choices are:  Cease and Desist Dispute; XB-Information disputed by Consumer; Identity Theft Possible; Attorney Dispute and, Refusal To Pay.*

   a. *(Ignore DRC and not use anymore. Clients that do not credit report will NOT credit report simply by marking the account as disputed.)*

   b. *Click on the XB option.*

4. *Enter the amount disputed (or entire balance if not specified).*

5. *Enter the reason details in the Reason block and,*

6. *Click SAVE*

7. *Send to Support worklist along with any documentation that requires researching the specifics contained therein.*

8. *(Support will send to the client and scan to the account as a document attachment.)*

   a. *Attorney representation rules apply as in regular disputes.*

9. *When Support gets the client specific information back, the account balance may stay the same or be adjusted depending on what is found. Support will scan received information from client to the account for the collector to review.*

10. *Support will send account back to the collector's worklist for follow-up.*

## CEASE & DESIST

**Definition:**
It shall be the policy of Preferred Collection and Management Services that a **_CEASE AND DESIST_** is any (verbal or written) communication that a debtor conveys that they do NOT want to be contacted further by phone, by mail or both. After we receive or code the account as Cease and Desist, we are by law allowed only one further communication with the debtor and that is to communicate our intent or what will be happening with the account going forward.

*Please note: After our final communication with the patient after having received a Cease and Desist notification, or having coded the account as such, we will require a letter of revocation (in writing, fax or email from the patient), stating*

Preferred_Resp_Plaintiff_RTPs  215

*that they (the guarantor) revoke the cease communication in order for us to contact them by phone, mail or email. THIS IS STATED IN THE CDD LETTER.*

**Exception: (If THEY call US (or their attorney calls us) we CAN talk with them. But, we will not follow up or contact them.**

### REGULAR CEASE AND DESIST REQUEST (NOT DISPUTED)

**Steps for Handling Regular Cease and Desist in WebAR:**

All employees are expected to recognize a Cease and Desist if they come across that while working account. If there is any question as to what to do they should bring it to the attention of their supervisor or manager. Essentially any wording that says "don't call, Don't write, Don't Ever contact me…" all will be treated as a Cease and Desist (CND status code).

1. Ensure demographics are correct on the account.
2. Ask why, if on phone, the patient is requesting the cease and desist and see if you can identify if it just a stall or objection of if their intent is to clearly not pay and avoid this bill.
3. Add any relevant notes to the account pertaining to the call.
4. Change the status code to CND.
5. In WebAR, scroll down to the DEBT INFORMATION section, Check the DO NOT MAIL box and the DO NOT CALL box. At some point the system may be wired to do this automatically for you based on status code selection.
6. Any documents received should marked with account number in upper right hand corner along with CND and sent to support to attach to the account as an image for future reference if needed.
7. **Send account to Worklist SUSPEND**

# CEASE & DESIST *& DISPUTED*

*If an account is a Cease and a Desist AND ALSO a dispute (CDD) we must validate the debt and do so by sending the CDD letter instead of the dispute response letter and follow the steps above.*

*Please note: A Cease and Desist but Disputed account is any account known to be disputed (see definition of Dispute in Dispute Section) but meets the definition of a Cease and Desist (see definition in Cease and Desist section). After our final communication with the patient after having received a CDD or CND notification, we will require a letter of revocation in writing, fax or email, stating that they revoke the cease communication in order for us to contact them by phone, mail or email. Exception: (If THEY call US (or their attorney calls us)- we CAN talk with them.*

**Steps for Handling a Cease and Desist Coupled with a Dispute in WebAr:**

All employees are expected to recognize and work a Cease and Desist coupled with a dispute if they come across that while working account. If there is any question as to what to do they should bring it to the attention of their supervisor or manager.

1. Ensure demographics are correct on the account.
2. Ask why the patient is disputing and requesting the cease and desist and see if you can identify if it just a stall or objection of if their intent is to clearly not pay and avoid this bill; or, if you think the dispute can be resolved, encourage the debtor to work through or allow you to try and resolve their dispute to assist them without effecting the Cease and Desist.
3. When the Cease and Desist is coupled with a dispute lacking any specificity and received in written format, note the account and request the CDD letter in the Letter Actions menu. The system will be wired to do this automatically based on the status code in the near future.
4. Change the status code to CDD from the Left Hand Dispute Menu in WebAR.

Preferred_Resp_Plaintiff_RTPs  216

5. In the DEBT INFORMATION section, check the DO NOT CALL box.
6. If research is required ( i.e. the dispute has more specificity)  then forward the account to the the support worklist so support can research the issue and put documents in Support Mailbox with the Account number and CDD written on top right corner of the document(s).
7. Documents should be scanned by support, attached to the account and/or sent to the client if they contain specific issues that need to be researched.

## Attorney disputes

If an attorney represents the patient and disputes the account

1. Use left hand DISPUTE menu in WebAR to select proper dispute code "ATTORNEY DISPUTE..".
2. Change the address first to the attorney C/O the "patient name" so that any letter should go to the attorney thereafter.
3. Send correspondence to the COO for review and handling
4. COO will have Support send to client and request what is needed to resolve the dispute. Then the attorney letter w along with an ICOB and copy of the guarantor form if available and signed by the patient if available. Ensure to change the status from the Dispute menu, and enter the attorney information.

*Most disputes will get the standard dispute response letter after verification takes place (or CDD letter if appropriate). Where more specificity as to the dispute is given, a support rep will perform due diligence to investigate the dispute and analyze if it is valid or not and he/she will send a customized dispute response letter TO THE ATTORNEY while STILL MARKING THE ACCOUNT as "Disputed". All disputes should be answered within 30 days from the date received in our office or the date it was signed for (certified mail).*

## Refusal to Pay

It should be notes that pursuant to FDCPA, a refusal to pay shall be treated the same way as a regular Cease and Desist Dispute.

1. In WebAr, use the Dispute MENU in left hand sidebar to select REFUSAL to PAY.
2. In Debt Information block check both the DO NOT CALL and the DO NOT MAIL boxes.
3. Note the account appropriately

## Dispute Removal requests

In recent years, consumers have been requesting to have DISPUTE STATUS REMOVED from their credit file. Some employers and financing companies may frown upon not only the unpaid debt, but the fact that it is "disputed". Regardless of the reason, if the consumer wants the dispute status removed, we must comply. Our policy shall be to remove ANY dispute if asked by the patient via some written proof that we can save (email, fax, letter, etc.).

### STEPS to REMOVE DISPUTE STATUS

1. Go to the affected account that you want to remove the dispute status from.
2. Go to the left hand DISPUTE menu.
3. Select the XH option and save.

Preferred_Resp_Plaintiff_RTPs  217

**Policy and Procedure**
**Handling Workers' Comp Accounts at Preferred CMS**
**April 4, 2017**
*Policy Overview*

The purpose of this policy is to ensure that all of PCMS agents are in compliance with FDCPA, FCCPA, HIPAA, FTC, FCRA and all other acts or laws governing debt collections. This policy dictates that all collectors follow set guidelines when working accounts that are currently known to be or potentially could be covered by Workers' Compensation. W**orkers' compensation** is a form of insurance providing wage replacement and medical benefits to employees injured in the course of employment in exchange for mandatory relinquishment of the employee's right to sue his or her employer for the tort of negligence. Florida has a Division that has more information and enforces the program (http://www.myfloridacfo.com/division/wc/). The agency can also reach out to the state for assistance with claims or employers to provide information to assist in recovery of amounts owed service providers. It is important to note that known Workers' Comp-covered accounts or potential coverage necessitates that the account be handled differently than a regular collection because the patient is not liable for the account until and unless there is a denial from the Workers' Comp insurance company.

DIVISION DIRECTOR
**Tanner Holloman**
ASSISTANT DIRECTOR
**Andrew Sabolic**

*Workers' Compensation*
*200 East Gaines Street*
*Tallahassee, FL 32399-0318*

Workers' Compensation Claims
(800) 342-1741

Workers' Compensation
Exemption/ Compliance
(850) 413-1609

How to handle Potential Workers' Comp Accounts.

In general, during the course of working an account if it becomes known that an account could be covered under the Workers' Comp program, then the agent will:

1. Collect and document the date of service details and how it is related to a liability covered by workers' comp. Ask for a NOI (Notice of Injury) and the carrier information including the claim representative's name and phone and input that information into the insurance form in WebAr.

Preferred_Resp_Plaintiff_RTPs 218

**Policy and Procedures for Handling Identity Theft & Red Flag Rule Program**
**Updated: 2016**

The purpose of this policy is to ensure that all of Preferred CMS' agents are in compliance with FDCPA, FCRA, HIPAA and HITECH ACT, and the Red Flag Rules per the Federal Trade Commission. This policy dictates that all collectors follow set guidelines when working accounts that are related to the potential for or claim of identity theft and the Red Flags that trigger such need for extra due diligence.

**Section 1:   Purpose**

To establish an Identity Theft Prevention Program ("Program") designed to detect, prevent and mitigate identity theft in connection with the servicing of a covered account or an existing covered account placed on the patient's credit file and to provide continued administration of the Program in compliance with 16 C.F.R. Part 681.

This Program enables Preferred CMS to protect existing consumers, reduce risk from identity fraud, and minimize potential damage to Preferred CMS and its clients from fraudulent accounts placed with Preferred CMS for servicing. The Program will help Preferred CMS:

A.    Identify risks that signify potentially fraudulent activity within new or existing covered accounts;
B.    Detect risks when they occur in covered accounts;
C.    Respond to risks to determine if fraudulent activity has occurred and act if fraud has been attempted or committed; and
D.    Update the Program periodically, including reviewing the accounts that are covered and the identified risks that are part of the Program.

**Section 2:  Scope**

This Program applies to employees, subcontractors, consultants, temporary workers, service providers, including all personnel affiliated with third parties.

**Section 3:    Definitions**

A.    **Identity theft** means fraud committed or attempted using the identifying information of another person without authority.
  B.    A **covered account** means
  i.      An account that a medical provider/creditor (client) offers or maintains, covering a healthcare services account which involves or could involve the possibility of multiple payments or transactions and/or a payment plan to resolve the balance or,
  ii.     Any other account that the financial institution or creditor offers or maintains for which there is a reasonably foreseeable risk to customers or to the safety and soundness of the financial institution or creditor from identity theft, including financial, operational, compliance, reputation, or litigation risks.
C.    A **Red Flag** means a matter, practice or specific activity that indicates the possible existence or potential for identity theft.
D.    **Personally identifiable information** includes the following items whether stored in electronic or printed format:
  i.      Consumer's

        a.     First, middle, or last   name
        b.     Date of birth
        c.     Address
        d.     Telephone or wireless numbers
        e.     Social Security number
        f.     Government-issued identification number
        g.     Maiden name
        h.     Account number
  ii.     Credit card information, including any of the following:
        a.     Credit card number (in whole or in part)
        b.     Credit card expiration date

Preferred_Resp_Plaintiff_RTPs  219

      c.     Cardholder name
      d.     Cardholder address

iii.     Medical information for any customer, including but not limited to:
      a.     Doctor names and claims
      b.     Insurance claims
      c.     Prescriptions
      d.     Treatment or diagnoses
      e.     Any related personal medical information

**Section 4:     The Program**

Preferred CMS establishes this Identity Theft Prevention Program to detect, prevent and mitigate identity theft. The Program shall include reasonable policies and procedures to:

A.     Identify relevant red flags for covered accounts it services and incorporate those red flags into the Program;

B.     Detect red flags that have been incorporated into the Program;

C.     Respond appropriately to any red flags that are detected to prevent and mitigate identity theft; and

D.     Ensure the Program is updated periodically to reflect changes in risks to customers and to the safety and soundness of Preferred CMS from identity theft.

E.     Alert the clients of Preferred CMS of their affected account(s) to mitigate risk of their bad debt accounts as well as their current AR not in bad debt or outsourced to another partner; but also enable them to flag the medical record number for higher scrutiny and possible future visits.

**Section 5:     Administration of the Program**

A.     The management team and owners of Preferred CMS shall be responsible for the development, implementation, oversight and continued administration of the Program.

B.     Approval of the initial Program must be appropriately documented and maintained.

C.     Operational responsibility of the Program is delegated to all Preferred CMS Staff.

**Section 6:     Identification of Relevant Red Flags**

A.     The Program shall include relevant red flags from the follow categories as appropriate:

i.     Alerts, notifications, or other warnings received from consumer reporting agencies or service providers, including:
     a.     A fraud or activity duty alert included with a consumer report; (BLOCK notifications in E-Oscar) or by way of documentation submitted along with and included in the E-Oscar dispute notification.
     b.     A notice of credit freeze from a consumer reporting agency in response to a request for a consumer report;
     c.     Documented and valid filing of a police report for Identity Theft citing the specific accounts being serviced.
     d.     Information provided to or received from the CFPB or any other state or federal government entity.

ii.     The presentation of suspicious documents, such as:
     a.     Documents provided for identification that appears to have been altered or forged;
     b.     The photograph or physical description on the identification is not consistent with the appearance of the applicant or customer presenting the identification;
     c.     Other information on the identification is not consistent with information provided by the person opening a new covered account or customer presenting the identification.

iii.     The presentation of suspicious personal identifying information, including:
     a.     Personal identifying information provided is inconsistent when compared against external information sources used by Preferred CMS;
     b.     Personal identifying information provided is associated with known fraudulent activity as indicated by internal or third-party sources used by Preferred CMS.

Preferred_Resp_Plaintiff_RTPs 220

     c.    The Social Security number provided is the same as that submitted by another patient(s) having an account or other persons as verified through some data source such as Accurint used for Skiptracing;

     d.    The address or telephone number provided is the same as or similar to the address or telephone number submitted by an unusually large number of other customers or other persons opening accounts;

     e.    The customer or the person opening the covered account fails to provide all required personal identifying information on an application or in response to notification that the application is incomplete;

     f.    Personal identifying information provided is not consistent with personal identifying information that is on file with Preferred CMS.

     g.    When using security prompts the patient cannot provide authenticating information beyond that which generally would be available from a wallet or consumer report.

iv    The unusual use of, or other suspicious activity related to, a covered account, such as:

     a.    Shortly following the notice of a change of address for a covered account, Preferred CMS receives a request for new, additional, or replacement goods or services, or for the addition of authorized users on the account;

     b.    A covered account is used in a manner that is not consistent with established patterns of activity on the account;

     c.    Mail sent to the customer is returned repeatedly as undeliverable although transactions continue to be conducted in connection with the customer's covered account;

     d.    Preferred CMS is notified the customer is not receiving paper account statements;

     e.    Preferred CMS is notified of unauthorized charges or transactions in connection with a customer's covered account;

     f.    Preferred CMS receives notice from customers, victims of identity theft, law enforcement authorities, or other persons regarding possible identity theft in connection with covered accounts held by Preferred CMS

     g.    Preferred CMS is notified by a customer, a victim of identity theft, a law enforcement authority, or any other person that it has opened a fraudulent account for a person engaged in identity theft.

B.    The Program shall consider the following risk factors in identifying relevant red flags for covered accounts as appropriate:

    i.    The types of covered accounts offered or maintained;

    ii.    The methods provided to open covered accounts; iii.    The methods provided to access covered    accounts;

    iv.    Its previous experience with identity theft.

C.    The Program shall incorporate relevant red flags from sources such as:

    i.    Incidents of identity theft previously experienced;

    ii.    Methods of identity theft that reflect changes in risk; and

    iii.    Applicable supervisory guidance.

**Section 7:    Detection of Red Flags**

The Program shall address the detection of red flags in connection with the opening of covered accounts and existing covered accounts, such as by:

    A.    Obtaining identifying information about, and verifying the identity of, a person opening a covered account; and

    B.    Authenticating customers, monitoring transactions, and verifying the validity of change of address requests in the case of existing covered accounts.

**Section 8:    Responding to Red Flags**

The Program shall provide for appropriate responses to detected red flags to prevent and mitigate identity theft. The response shall be commensurate with the degree of risk posed.

Preferred_Resp_Plaintiff_RTPs  221

Once potentially fraudulent activity is detected, an employee must act quickly as a rapid appropriate response can protect customers and Preferred CMS from damages and loss. The employee must gather all related documentation and write a description of the situation and/or communicate to management and the designated privacy officer. This information must be presented to the designated authority for determination. The designated authority will complete additional authentication to determine whether the attempted transaction was fraudulent or authentic.

Appropriate responses to the detection of red flags include:

A. Monitor a covered account for evidence of identity theft;

B. Contact the patient and/or client as necessary for due diligence in investigating the potential or claim of ID theft (not all "claims" of ID theft are valid and may be mere attempts to clean up one's credit).

C. Change any passwords, security codes or other security devices that permit access to a covered account such as any online payment portal accessible to patients on account tracking system;

D. Reopen a covered account with a new account number after assessing the proper patient (if possible);

E. Not open any new covered account for the victim of ID theft and, if possible, check with the client to prevent any "new accounts" from coming if fraudulent;

F. Close an existing covered account if the proper party cannot be identified and remove from credit file if account is credit reported;

G. Notify law enforcement or the client should they be inclined to notify law enforcement.

H. Determine no response is warranted under the particular circumstances.

**Section 9:     Periodic Updates to the Program**

A. At periodic intervals established in the Program, or as required, the Program will be re- evaluated to determine whether all aspects of the Program are up to date and applicable in the current business environment.

B. Periodic reviews will include an assessment of which accounts are covered by the Program.

C. As part of the review, red flags may be revised, replaced or eliminated. Defining new red flags may also be appropriate.

D. Actions to take in the event that fraudulent activity is discovered may also require revision to reduce damage to Preferred CMS and its customers.

**Section 10:     Oversight of the Program**

Oversight of the Program shall include:

A. Assignment of specific responsibility for implementation of the Program;

B. Review of reports prepared by staff regarding compliance; and

C. Approval of material changes to the Program as necessary to address changing risks of identity theft.

**Section 11:     Duties Regarding Address Discrepancies**

A. Preferred CMS shall develop policies and procedures designed to enable Preferred CMS to form a reasonable belief that a consumer report relates to the patient for whom it was requested; if Preferred CMS receives information of an address discrepancy (from the patient or E-Oscar, but the Social Security number, date of birth, and or other identifying information received matches, the account will be presumed to be valid and that the patient merely moved from the previous address at some point after the date of service. An address change by itself is not an indicator or proof of identity theft.

B. Preferred CMS may reasonably confirm that an address is accurate by any of the following means:

Preferred_Resp_Plaintiff_RTPs 222

    i.      Verification of the address with the consumer;

    ii.     Review of the client's records;

    iii.    Verification of the address through third party sources such as Trans Union, CBC Innovis or Accurrint; or

    iv.    Other reasonable means.

C.    If an accurate address is confirmed, Preferred CMS shall furnish the consumer's address to the credit bureau or other entity from which it received the notice of address discrepancy (such as an address update received from E-Oscar, the CFPB, the BBB, or notification from an attorney) as well as the client and update the account in the collections software if:

    i.      Preferred CMS establishes a continuing relationship with the consumer (continues to service the account); and

    ii.     Preferred CMS regularly and in the ordinary course of business, furnishes information to the credit bureaus (As required by FCRA and the Fact Act).

**Section 12:**    **Physical Security of Personal Identifying Information Is Protected**

A.    All paper documents or files, as well as CDs, floppy disks, zip drives, flash drives, tapes, and backups containing personally identifiable information will be stored in a locked file cabinet or any server protected by a firewall.

B.    File cabinets containing personally identifiable information will be stored in a locked room or cabinet and will not be thrown away in the trash.

C.    Members of management] will control keys to the file cabinets, rooms, or office space and make any copies of the keys, and distribute those keys only to employees with a legitimate need.

D.    Files containing personally identifiable information are kept and maintained by designated personnel securely and out of the open except when an employee is working on the file.

E.    Employees will not leave sensitive papers out on their desks when they are away from their workstations.

F.    At the end of the day, employees will put files away, log off their computers, and lock their file cabinets and office doors where applicable.

G.    Access to offsite storage facilities is limited to employees with a legitimate business need. Access keys/codes will only be given to those employees. All employees who enter these facilities will document their visit.

H.    Any sensitive information shipped using outside carriers or contractors will be encrypted and an inventory of the information being shipped will be kept. It will be shipped using an overnight shipping service that will allow tracking of the delivery of this information.

I.    Visitors who must enter areas where sensitive files are kept must be escorted by an employee of Preferred CMS.

J.    No visitor will be given any entry codes or allowed unescorted access to the office.

**Section 13:**    **Security of Electronic Records**

A.    **General Network Security**

    i.      Personally identifiable information will not be stored on any computer with an Internet connection unless it is essential for conducting business.

    ii.     Personally identifiable information that is sent to third parties over public networks will be encrypted.

    iii.    Personally identifiable information that is stored on the computer network or on disks or portable storage devices used by employees of Preferred CMS will be encrypted and/or behind firewall.

    iv.    Internally, personally identifiable information may be transmitted using approved Preferred CMS e-mail. All personally identifiable information must be encrypted when stored in electronic format.

    v.     Any personally identifiable information sent externally must be encrypted and password protected and sent only to approve recipients. Additionally, a statement such as this should be included in the e-mail: "This message may contain confidential and/or proprietary information and is intended for the person/entity to whom it was originally addressed. Any use by others is strictly prohibited."

    vi     Anti-virus and anti-spyware programs will be run on individual computers and on servers on the network daily.

vii.    When credit card information, other sensitive financial data or health information is received or transmitted, Secure Sockets Layer (SSL) or another secure connection that protects the information in transit will be used.

B.    **Password Management**

i.    Access to personally identifiable information will be controlled using "strong" passwords. Employees will choose password with a mix of letters, numbers and characters. User names and passwords will be different. Passwords will be changed at least monthly.

ii.    Passwords will not be shared or posted near workstations.

iii.    Password-activated screen savers will be used to lock employee computers after a period of inactivity.

iv.    When installing new software, vendor-supplied default passwords will be immediately changed to a more secure strong password.

C.    **Laptop Security**

i.    The use of laptops is restricted to those employees who need them to perform their jobs.

ii.    If personally identifying information does not need to be stored on a laptop, it will be deleted with a "wiping" program that overwrites data on the laptop.

iii.    Laptops are to be stored in a secure place.

iv.    Laptop users will only have access to personally identifying information, but will not store the information on laptops unless secured and password protected or whatever security protocol is employed to protect and safeguard than informaiton.

v.    Laptops which contain personally identifying information will be encrypted and configured so that users cannot download any software or change the security settings without approval from the company's IT specialists.

vi.    All laptops will be configured with an "auto-destroy" function so that data on a computer that is reported stolen will be destroyed when the thief uses it to try to get on the Internet.

vii.    Employees are never to leave a laptop visible in a car, at a hotel luggage stand, or packed in checked luggage unless directed to do so by airport security.

viii.    If a laptop must be left in a vehicle, it must be locked in the trunk.

D.    **Firewalls**

i.    A firewall must be used to protect computers from hackers while the computer is connected to the Internet.

ii.    The computer network will have a "border" firewall where the network connects to the Internet. Access controls will be set to allow only trusted employees with a legitimate business need to access the network. Firewalls will be reviewed periodically.

iii.    Additional firewalls will be used to protect computers with personally identifiable information.

## Section 14: Staff Training

A.    Staff training shall be conducted for all employees, officials and contractors for whom it is reasonably foreseeable that they may come into contact with accounts or personally identifiable information that may constitute a risk to Preferred CMS or its customers.

B.    All Preferred CMS staff is responsible for ensuring identity theft training for all requisite employees and contractors.

C.    Employees must receive annual training in all elements of this Program.

D.    To ensure maximum effectiveness, employees may continue to receive additional training as changes to the Program are made.

## Section 15:    Security Practices of Contractors and Service Providers

The Program shall exercise appropriate and effective oversight of service provider arrangements.

A.    It is the responsibility of Preferred CMS to ensure that the activities of all service providers and contractors are conducted in accordance with reasonable policies and procedures designed to detect, prevent, and mitigate the risk of identity theft.

B.    A service provider or contractor that maintains its own Identity Theft Prevention Program, consistent with the guidance of the red flag rules (16 C.F.R. Part 681) and validated by appropriate due diligence, may be considered to be meeting these requirements.

Preferred_Resp_Plaintiff_RTPs 224

C.    Any specific requirements should be specifically addressed in appropriate contract arrangements.

D.    Contractors and service providers must notify Preferred CMS of any security incidents experienced, even if such incidents may not have led to any actual compromise of Preferred CMS' data.

**Section 16:**    **Disposal of Personal Identifying Information**

A.    When documents contain personal identifying information are discarded, they will be placed inside a locked shred bin or immediately shredded using a mechanical cross cut of Department of Defense-approved shredding device.

B.    Locked shred bins are labeled "Confidential paper shredding and recycling."

C.    When disposing of old computers and portable storage devices, a Department of Defense-compliant disc wiping utility program will be used.

D.    Any CD-rom, DVD-rom, floppy disk, or flash drive will be disposed of by shredding, punching holes in, or incineration.

# Steps For Handling Identity Theft Account(s)
# (Claimed or Verified)

1. **If notification is made through E-Oscar:**
   a. **Check supporting documentation to see if there is a police report.**
      i. **If exists, send the Verified Identity Theft letter to the claimant and change the status code to IDV.**
      ii. **If it does not exists, send the Potential Identity Theft letter to the claimant and change the status code to IDP.**
      iii. **If E-Oscar shows a Block notification, send the Verified Identity Theft letter to the claimant and ensure it does not re-report to the credit bureau by changing the status code to IDV.**
      iv. **If there is an identity theft affidavit but no police report, secure any documentation including signatures, guarantor forms or ID that may have been scanned or signed at the time of service by the client to send to the patient as verification just like any other disputed debt.**
      v. **Notify the client of any and all accounts and information if identity theft is validated by a Block notification or by submission of a "valid" police report.**
2. **If documentation is received through regular mail or by way of any governmental agency (law enforcement, FBI, AG, CFPB, OFR) or though attorney representation:**
   a. **Process as in step "1i" above**
   b. **If there is no police report, give any information received to the Preferred CMS designated privacy officer for determination of processing and client notification.**
   c. **Documentation received from the patient or his/her attorney that alleges ID theft, but falls short of submitting a valid police report shall follow step "1ii" above so the patient can do what is necessary to change the account to "verified identity theft".**
3. **Clients will only be notified of accounts which have been "verified" as ID Theft unless more information is necessary to rectify the dispute subject to 1 (iv) above.**

Preferred_Resp_Plaintiff_RTPs 225