Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANGELA FOWLER,                    )
                                  )
      Plaintiff,                  )
                                  )
vs.                               ) CASE NO.:  8:12-CV-01038
                                  )
EXPERIAN INFORMATION              )
SOLUTIONS, INC., and              )
PREFERRED COLLECTION AND          )
MANAGEMENT SERVICES, INC.,        )
                                  )
      Defendants.                 )
_____)

DEPOSITION OF CHRISTINA HAMILTON

DATE TAKEN:      December 10, 2021
TIME:            10:00 a.m. to 12:12 p.m.
PLACE TAKEN:     Zoom Videoconferencing
BEHALF OF:       The Plaintiff.
REPORTER:        Kimberly Anne Votta, RPR
                 Notary Public
                 State of Florida at Large

Page 2

A P P E A R A N C E S

Dennis A. Creed, III, Esquire
Creed Law Group, PLLC, d/b/a
Creed & Hall
13043 West Linebaugh Avenue
Tampa, Florida 33626
Representing the Plaintiff

Thomas K. Schulte, Esquire
Jones Day
600 Brickell Avenue, Suite 3300
Miami, Florida 33131
Representing Defendant Experian

Robert A. Vigh, Esquire
Solomon, Vigh & Springer, P.A.
1702 North Florida Avenue
Tampa, Florida 33602
Representing Defendant Preferred Collection

I N D E X

|                                          | PAGE |
|------------------------------------------|------|
| Direct Examination by Mr. Creed          | 5    |
| Cross Examination by Mr. Schulte         | 61   |
| Cross Examination by Mr. Vigh            | 63   |
| Redirect Examination by Mr. Creed        | 70   |

Page 3

E X H I B I T S

| NUMBER |              DESCRIPTION                  | PAGE |
|--------|-------------------------------------------|------|
| P-1    | Notice of Corporate Rep Deposition        | 16   |
| P-2    | ACVDs                                     | 18   |
| P-3    | Experian's Disclosure Log                 | 40   |
| P-4    | Experian's Responses to Interrogatories   | 52   |
| P-5    | Letter                                    | 70   |

Page 4

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely. This arrangement is pursuant to the Florida Supreme Court Administrative Order until further notice. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the recording.

MR. SCHULTE:  Tom Schulte for Defendant Experian.  I agree to the remote deposition.

MR. CREED:  Dennis Creed for Angela Fowler, the plaintiff, and I agree to this deposition.

MS. HAMILTON:  Christina Hamilton for Experian.  I agree to the deposition.  Sorry.

MR. VIGH:  That's all right.  Robert Vigh for Preferred Collection.  I agree to the deposition.

Thereupon,

CHRISTINA HAMILTON, the Witness herein, having been first duly sworn, testified as follows:



Page 5

DIRECT EXAMINATION

BY MR. CREED:

Q.   All right.  So, Ms. Hamilton, can you please state your name and spell it for the record.

A.   Yes.  My first name is Christina, C-H-R-I-S-T-I-N-A, last name is Hamilton, H-A-M-I-L-T-O-N.

Q.   Okay.  And have you ever had your deposition taken?

A.   No, I have not.

Q.    So you've never acted as the corporate representative for Experian before?

A.   No, I have not.

Q.    All right.  So just to go over some ground rules, then, I'm going to be taking your testimony today, and it's under penalty of perjury just like you would be in a court of law.  I ask that you let me finish my answers verbally, and then I will wait for you to respond fully verbally, as the court reporter here is taking everything down that we say.  Do you understand that?

A.   Yes, I do.

Q.    Okay.  And, again, you know, we're on video conference, so it helps a little bit more, but, you know, no head nods or gestures.  I need actual verbal

Page 6

answers to the questions to keep a clear record, okay?

A.   Okay.

Q.   Okay.  And this is also not like a torture session.  If, at any time, you need a break, you need to go get something to drink, bathroom, whatever, just let me know.  I ask that you let me finish the question that is pending at that time on the record, and then we can take a break thereafter, okay?

A.   Okay.

Q.   Okay.  And from time to time, your attorney -- well, the attorney for Experian; that is, your corporate attorney today, he might be objecting on the record to the question, and unless he instructs you not to answer, you can go ahead and answer the question.  The objection is for us to take to the court later on, okay?

A.   Okay.

Q.   Okay.  And because I never met you before, I'm going to go through some of your background.  Do you have any post-high school education?

A.   I have a few college courses.

Q.   Okay.  And do you have any -- where did you take those college courses?

A.   At Front Range Community College.

Q.   And do you have any post-high school

Page 7

certificates, technical certificates, or anything like that?

A.   No, I don't.

Q.   Okay.  And how -- when did you start working -- well, who is your employer right now?

A.   It's my Experian.

Q.   Okay.  And how long have you been at Experian?

A.   Twenty-one years.

Q.   Okay.  That's quite a while.  And when did you -- so you've been there 21 years.  Have you ever really -- was that your first professional job?

A.    In an office-type setting, I guess.  Prior to that, I did manufacturing, assembling and manufacturing.

Q.   Okay.  And what is your current position now at Experian?

A.   I'm a senior legal and compliance specialist.

Q.    And can you explain what that position is and what are your job duties.

A.    It is essentially a litigation support.  So we -- we assist the corporate attorneys with pulling documents and summarizing a situation or a case that's before us.

Q.   Okay.  So are you -- you deal solely, then -- and when I'm asking these questions, because of your

Page 8

position, I want you to know that I don't want to -- if I ever ask you a question and it pertains to discussions with your attorney, I don't want to know the substance of those discussions, okay?

A.   Okay.

Q.   Okay.  But -- so in your role as senior legal and compliance specialist, do you have anything to do with cases prior to a case being filed?

A.   No, I don't.

Q.    Okay.  So there's -- you're not involved in the dispute process at Experian at all?

A.   No.  Not before filing, no.

Q.    Okay.  So only after it's been actually filed as a litigation; is that correct?

A.   Correct.  Yes.

Q.    And who do you report to?

A.    My manager's actually in the process of changing.  It's been Carrie Higginbotham, and it's transitioning to Kim Case.

Q.   Okay.  And what is their title in that role?

A.    I honestly don't know the specific wording for it.  I'm -- I'm going to just generalize as manager of litigation support, but I'm not 100 percent sure on their actual title.

Q.    Okay.  And how long have you been in your



Page 9

current role as senior legal and compliance specialist and litigation support?

A.    Since the beginning of May of this year.

Q.    And what were you doing prior to May of 2021?

A.    I was a quality auditor.

Q.    And what does a quality auditor do?

A.    We would -- we audit the agents that take the phone calls and work the mail, different various points of the company, and audit their work throughout the month to ensure they're abiding by the policies and procedures.

Q.    And what agents would you be auditing, I guess?  Is that the agents that would be dealing with customer disputes or -- or kind of explain that.

A.    Yes.  It's a mix of those that deal with the customer disputes, those on the phone and by mail.  The team also audits the mailroom teams that handle the mail as it comes in, and also the team that handles the pre -- pre-litigation, pre-filing consumers as well with their disputes.

Q.    Okay.  And is pre-filing and pre-litigation, is that dealing like ACVD disputes and/or, you know, people that basically maybe send a letter to Experian and say, hey, you know, this isn't mine on my credit report?  Is that -- would that be considered

Page 10

pre-litigation, or is there another step after that initial dispute that would be considered pre-litigation?

A.    Those are primarily going to be the consumers that are in the process of -- of getting an attorney or have an attorney that is representing them.  There may not be necessarily anything filed just yet, but they are working with an attorney.

It can also encompass a little more of the more difficult consumers that have been determined to be handled by the specific team and not by a regular agent.  The auditing team does also audit the ACVD team, the agents that process those ACVDs that come back to us.

Q.    Okay.  How long were you a quality auditor?

A.    For 16 years.

Q.    So prior to being a quality auditor -- well, strike that.  That's so -- well, so kind of explain the -- okay.  Actually, before you were a quality auditor, did you ever work in handling ACVDs or, on the phone or in the mailroom, handling additional client customer disputes with Experian?

A.    I never worked with ACVDs, but I did do some calls and mail as a regular dispute agent, and then I was specifically trained for different areas; and so I

Page 11

handled those phone calls and files.  I briefly did work in the mailroom for a couple months and assisted with them with their work.

Q.    Can you explain the process when, say, a person files a dispute -- actually, strike that.  Does Experian have a dispute process on-line where someone can dispute their -- anything on their credit report with Experian on-line?

A.    Yes.  We do have an on-line site where they can submit their disputes.

Q.    And then when they dispute their disputes, what happens once that dispute is submitted to Experian?

A.    It would go directly to the data furnisher for verification.

Q.    So it comes in through the e-OSCAR, correct?  Does it go into an e- -- into the e-OSCAR platform?  Is your landing page at Experian tied into the e-OSCAR platform?

A.    I -- I honestly don't know the back-workings, the interworkings, of where it actually lands.  I know e-OSCAR is involved in that process, but I'm not sure exactly what the steps are and where it goes.

Q.    You don't -- okay.  So when someone disputes something on-line, you don't know if an agent actually

Page 12

reviews that before sending it to the data furnisher, or do they just immediately --

A.    I don't know --

Q.    I'm sorry.  Go ahead.

A.    Sorry.  Go ahead.  I'm sorry.

Q.    Do they immediately -- or does it immediately, like, through automation go to the data furnisher?

A.    It -- it does immediately go to the data furnisher.  It's not seen or handled by an agent.

Q.    So when a dispute first comes in, there's not an independent investigation by Experian to that initial dispute?  Is that it's immediately just sent to the data furnisher to validate?  Is that -- or -- or deal with the dispute?

A.    Correct.

Q.    Okay.  What about by mail, if you get -- if Experian gets a dispute by mail, like a letter or, you know, a fax, I mean, probably a letter, but, you know, say -- we'll go with letter.  So if Experian gets a letter dispute, what happens with that letter dispute?

A.    When it's received, it's evaluated for what is included with the dispute, if the consumer has included any proof documentation that we could evaluate, perhaps use for internal update.  If there's not anything that we can use to make any sort of change at the time, then



Case 8:21-cv-01038-WFJ-AAS    Document 21-12    Filed 01/07/22    Page 4 of 19 PageID
302

CHRISTINA HAMILTON
FOWLER vs EXPERIAN

December 10, 2021
13–16

Page 13

we initial the ACVD out to the creditor, and they attach the documentation that was sent so that the creditor can see the whole dispute as well as the encompassing proof docs that were sent.

Q.   Okay.  When you say proof documentation, would that be like any kind of like bill or ID or, I mean -- I mean, kind of flush that out a little bit.  So if I sent a letter, what type of proof documentation would be considered actual proof documentation that Experian would take into consideration?

A.   Perhaps they included -- just generally speaking, perhaps they included a letter that they received from that creditor to state the way their account should reflect or what has -- actions that they're taking with the account, those types of scenarios.  If they've included anything that, perhaps, they think is -- is proof, maybe a bill, maybe a canceled check, those would all be taken into consideration as a proof document.

Q.   Okay.  Will Experian ever, based on any of that proof documentation from an individual, take action on the credit report before it sends an ACVD to the data furnisher?

A.   There are some scenarios, yes, that we can go ahead and use that internally.  An example would be if,

Page 14

maybe, there's a delinquency appearing on an account for a certain month, they have a letter from the data furnisher that says they are agreeing to remove that delinquency, or they found that the account was never late; then we can go ahead and take internal action to update the account without sending an ACVD.

Q.   Okay.  But that's when there's a letter with the proof documentation, but if there is just a letter, say, without any kind of documentation attached, just saying "this isn't my account," or explaining in narrative, does Experian take any action on just a letter without proof documentation?

A.   No.  Not for an account.  We would need some -- some type of a proof document to be able to make that internal update for our records.  Without that, we would need to send it off to the data furnisher for them to verify it.

Q.   Okay.  Now, if someone, you know -- and this is a hypothetical, but this is kind of, you know, what this case is about.  If someone writes in and says, "Well, I want validation of an account that's being reported on my credit.  I don't know what this account is, and I don't know where this debt is coming from, and please validate that debt," does Experian do anything above and beyond to validate that debt, or

Page 15

just ask the data furnisher for the information?

A.   Without any type of documentation sent to us, we have no choice but to send it to the data furnisher for them to verify the information.  We relay the dispute or the consumer's concern.  In many cases, they will -- an agent would go ahead and attach that document so that the data furnisher can see the plaintiff or consumer's exact verbiage that they're using in their letter, and then they would research on their end.

Q.   But then if the data furnisher just affirms the debt, and the client still disputes it, Experian doesn't take any other independent investigatory steps?

A.   It -- it's not our role to do the investigation.  That's the data furnisher's role.  They are bound by the FCRA to report accurate information; so if they are verifying the consumer's -- like in this case, the consumer's name, her social, is what they have on file for the account, then that's going to match our records to stay on.

Q.   So if they just verify that the demographic information is correct, no other investigation is taken; is that correct?

A.   From our end, we don't do -- do an investigation with that account.  We -- we

Page 16

reinvestigate and send it off to the data furnisher.  What they do exactly on their end for that investigation, I'm not fully advised of.  We just receive that response back to us once they're complete.

Q.   Going to -- and the way I'm going to do this is, I'm going to -- do you have a computer up, Ms. Hamilton, just so -- and there's --

A.   Yes.  Uh-huh.

Q.   There's a chat app here, and what I will do is, I'm going to be dropping in different documents, and they're going to be attaching as exhibits to this deposition.

A.   Okay.

Q.   And -- and you'll see it here in a second.  So what I'm first going to do is, I'm going to attach the notice of corporate rep deposition today.  Do that in one second.  The first one takes a second.  Tell me when you get that document.  I'm going to be attaching that as Exhibit 1 to this deposition.

(Whereupon, Plaintiff's Exhibit Number 1 was marked for identification.)

BY MR. CREED:

Q.   And have you ever seen this document before?  Is it -- did you get -- were you able to get it open?

A.   One second.  It's -- it's populating over one



Page 17

another screen. Sorry. I'm trying to get it to open.

Q. Oh, no.

A. It's not wanting to --

Q. No problem.

A. Okay. I have it here.

Q. Okay. And just take a second to review that. Have you ever seen -- did you review that document before today?

A. This may have been part of the binder, but I -- I -- I probably glanced at it, but it's not something I spent a lot of time on.

Q. Okay. But this is just -- just so you know, this is the corporate rep's -- this is my notice of deposition for your deposition today. And you've been produced --

A. Okay.

Q. -- to answer questions on these categories. Do you see, if you go down to page 4 of this exhibit?

A. Yes.

Q. Okay. And did you review this?

A. I -- I did. I'm sorry. Can you say that last part again.

Q. Did you review those categories before in preparation for today?

A. Yes, I did.

Page 18

Q. Okay. So did you review the ACVDs in this case in regards to Ms. Fowler and the disputes in regards to this case?

A. Yes, I did.

Q. Okay. I'm going to attach the ACVD. One second.

(Whereupon, Plaintiff's Exhibit Number 2 was marked for identification.)

BY MR. CREED:

Q. All right. I'm attaching what I'm going to mark as Exhibit 2 to this deposition. And everybody should be able to see these. These are the ACVDs that Defendant Experian produced in this case. It's a document compilation of 28 pages. Just let me know when you have that open, Ms. Hamilton.

A. Okay. It's up here.

Q. Okay. And are you familiar with this type of form from Experian, Ms. Hamilton?

A. Yes, I am.

Q. And what is this?

A. This is an ACVD, or the response from the data furnisher for the -- that we initiated.

Q. So you would send -- so explain the process. Experian sends over a communication through the e-OSCAR portal; is that correct?

Page 19

A. That's correct.

Q. Okay. And then this is what Experian receives back from the data furnisher; is that correct?

A. That's correct. Yes.

Q. Okay. So let's go through these a little bit, and there's -- from different time periods, but there's 28 pages of ACVDs, just so we're aware of what this exhibit is.

A. Okay.

Q. So at the very top, it says Experian Consumer Assistance. Do you see that?

A. Yes, I do.

Q. Okay. And it says the run date is July 9, 2021. I guess that's when they printed this out. Do you see that?

A. Correct. Yes. That's when it was printed.

Q. Okay. And if you look, it says that this is -- the subscriber's Preferred CMS, Inc. Do you see that?

A. Yes, I do.

Q. Okay. And I'm -- I'm going to purport to you, in your preparation for this deposition, do you understand Preferred Collection Management Systems, Inc., to be the other defendant in this case?

A. Yes, I do.

Page 20

Q. Okay. And they were the, quote, unquote, data furnisher for this account to Experian; is that correct?

A. Correct. Yes.

Q. Okay. Can you explain what a data furnisher is in the -- basically in the language of a credit reporting agency such as Experian.

A. A data furnisher would be a company that holds accounts for consumers, and then they're reporting the status of those accounts, or how those accounts appear, or how they're making their payments and whatnot to the credit reporting agencies.

Q. Now --

A. They are furnishing that, essentially.

Q. Okay. And so does Experian make any differentiation between the data furnisher that is like a first-party data holder, like a credit card company, or -- or differentiate between a collection agency such as Preferred?

MR. SCHULTE: I'm going to object to the form of it, but, Chris, you can go ahead and answer.

THE WITNESS: They both would be able to report their data in the same manner even though they're different companies. On the credit report itself, it would differentiate between the type of



Page 21

account it is. If it's just a credit card with Company A, it would reference that. If it's a collection, it would say it's a collection, and it would list the original creditor where they have obtained the debt from.

BY MR. CREED:

Q. Okay. Where do you see -- is that listed here on the ACVD?

A. On the ACVD, no, it's not listed.

Q. And where would that be listed?

A. It is on the credit report itself to the consumer where it would list the original creditor.

Q. During the investigation -- or, sorry, strike that. During the dispute process, is there any differentiation between the way Experian handles a dispute that is with a credit -- or, I'm sorry, a debt collection company and/or a first-party debt holder?

A. There's no differentiation. It's handled the same way.

Q. And if we look at the right -- and I'm just going to kind of go through this document to just get it on the record. So if you look at the upper right-hand corner, it looks like the inquiry was sent to the data furnisher from Experian on October 25, 2017; is that correct?

Page 22

A. Yes. That's correct.

Q. And it looks like the date that the response was due back was November 17, 2017; is that correct?

A. That's when it was due back. Yes. Uh-huh.

Q. And then it looks like the data furnisher Preferred actually responded on November 9, 2017?

A. Correct.

Q. Okay. And here on -- if we go over to the name, it's Angela S. Fowler and Angela Fowler, so it's a little different just with the initial. Do you see that?

A. Correct. And an omission is not going to necessarily be different.

Q. Okay. And then we have the same Social Security number, same date of birth, correct?

A. Correct.

Q. And then we have a different address. Do you see that?

A. I do. Yes.

Q. Okay. Now, over here, it says name flag and second name. Can you explain what these codes mean over here on the right, S and U and S and U?

A. Yes. The S is same. The U is unknown. So it's letting us know the data -- the data furnisher is telling us, on the name flag, the first name is the

Page 23

same, the middle initial is unknown. They can't verify it as an S, so they must not have a middle initial. The last name is the same. And the last one is for generation code, which is unknown.

Q. Okay. And then if we go down here, it says subscriber response, account status/rating. What does account status/rating mean?

A. That's going to be the status the account is in. There -- we are letting them know that we had it as a collection account, which is the on profile, that's how we had it. They responded with a code 93, which is a collection account. It's the same meaning.

Q. Okay. And then you have, down here, it says balance. So the balance at the time of this response was $476, and they're reporting back that that's correct, $476; is that correct?

A. Correct. And I do need to correct myself previously. I do see there it does list the original creditor there at the bottom. My apologies.

Q. Okay. Yeah. So then the original creditor is down here, the Incare Medical Services?

A. Correct. Uh-huh.

Q. So then we know from just this report that Preferred is not the original creditor, right?

A. That's correct.

Page 24

Q. Okay. And what is this term? It says type, term, frequency. You see this down here, 48? What does that mean?

A. It is a type 48. The terms in the frequency are blank where they're responding to that, and what that just means is they don't have different information. So sometimes they will fill in just the same information, but if it's blank, we know that it just remains the same as we have it, but they chose to fill in the type 48, which just points, back again, to a collection.

Q. Okay. Let me -- let me ask you this: This says Incare Medical Services, Incare, what -- if an account was being reported by the original data -- by the original debt holder, Incare Medical Services, in this instance, and that was reporting on the credit report, would then the collection become a separate account on the credit report, or would it be merged into the same account?

A. It would be a separate account, but in those instances, the original creditor; for example, like Incare, if -- if they were reporting on file, once they sold it to a collection company, their account -- they would update their account to show it's transferred, purchased by another lender, and that it's no longer



Page 25

actively being collected. It's essentially a closed type of account because they sold it.

Q.    Now, it looks like here it says the dispute reason is 001. That's the code for "not his or hers"; is that correct?

A.    That's correct. Uh-huh.

Q.    Okay. And it looks like you're asking -- or, it's not you, sorry. Experian is asking Preferred to provide a complete ID on the account; is that correct?

A.    That's correct. Uh-huh.

Q.    And then it says the dispute is -- is, Ms. Fowler is stating that she has never received services from this company and has no knowledge of this account, never agreed to pay. Validate or remove. You see that?

A.    Correct. Yes. I see that.

Q.    Okay. So as to validation, it's your testimony that Experian sends this to the data furnisher to validate but doesn't do an independent investigation unless there is proof documentation provided by the account holder who's disputing it; is that correct?

A.    Well, in this case, specifically, this one was done on-line. So the plaintiff did this herself on-line, and it went directly to the data furnisher.

Page 26

There was no interaction with an agent prior.

Q.    Okay. So on the landing portal, in 2017, Angela Fowler went on and she entered this dispute. It immediately skips the Experian in-person dispute process and goes directly to the furnisher; is that correct?

A.    That's correct.

Q.    So no physical person at Experian would have ever looked at this?

A.    No. Not prior to the offense. They would only review the ACVD if it was sent to an agent back.

Q.    Okay. So when the ACVD comes back, explain the process of who reviews that.

A.    In most cases, it's done by automation. There are certain instances where it gets to an agent for further review. Those scenarios I don't believe would necessarily apply to this case. When that happens, like I said, most of it is done -- done in automation, that it gives a response and updates or deletes or verifies as they responded.

Q.    Okay. And I'm going to kind of go through a couple pages, and I just want you to follow me here.

A.    Sure.

Q.    So we're here on -- it says Experian-Fowler 002080 in the bottom. Do you see

Page 27

that?

A.    Yes, I do.

Q.    Okay. I'm going to purport to you that's the Bates number -- what we call in the legal field Bates numbering of the documents produced by Experian. Okay?

A.    Okay.

Q.    Okay. So if you go down, and I'm just going to kind of go down one -- page 2081, 2082, 2083, 2084, 2085, 2086, 2087. If we're going through these pages -- actually, I'm going to go back up.

So if we're at the first page, you see it says original deling date? What does that mean? On the very first page, sorry, 2080?

A.    2080, and you're -- you said you're looking where?

Q.    The original debt -- deling date. It's a D-E-L-I-N-G -- or delinquency date. Sorry. Original delinquency date. So you see that?

A.    Yes. The original delinquency date. Yes. I see that there.

Q.    That was November 15, 2015?

A.    That's correct.

Q.    Okay. But do you see on the file history created below that there's no delinquencies reported until September of 2017? Do you see that?

Page 28

A.    I do see that.

Q.    Okay. Is there any reason why there would have been two years of nonreporting?

A.    It -- it could be that that was the date that this company purchased the debt. If they purchased it in 2017, those are going to be the months that they actively reported the status, but they still need to maintain the original delinquency date of the account. They can't alter that date.

Q.    But it says original delinquency date, November 15, 2015, but then if we go down to the open date, it says December 12, 2016. Do you see that?

A.    Okay. I do see 12/12/16. And with an ACVD, like I said before, anytime they leave it blank, it is -- it -- it's not that they're wiping out the information. It's that they're leaving it the same as we have. They're not adding to it or changing it. They're leaving it. They're just blanketing it to be the same. So this could be a scenario where it's already been reported, but they're not changing any data prior to 2017.

Q.    All right. We'll go to the next page, the second page of this 2081.

A.    Uh-huh.

Q.    And then you see an original delinquency date



Page 29

of November 16, 2015; do you see that?

A.    Yes.  I see that.

Q.    And the amount past due is 476.  Do you see that?

A.    Yes.  I see that.

Q.    Okay.  And if we go to page 3, you have an original delinquency date of November 23, 2015.  Do you see that?

A.    Uh-huh.  Yes.  I see that.

Q.    And then it's the same exact amount due, 476 again, on this account.  Do you see that?

A.    I see that.  Yes.

Q.    Okay.  And then if we go again, again 476 on the fourth page, 2083.  Do you see that?

A.    Yes.  I see that.

Q.    Okay.  And it's November 24, 2015, a different delinquency date.  Do you see that?

A.    Yes.  I see that.

Q.    Okay.  And if we kind of go through these, 2084, 2085, 2086, 2087, 2088, 2089, 2090, 2091, 2092, all of those are this original, up in the right-hand corner, dispute date of October 25, 2017.  Do you see that?

A.    Yes.  I see that.

Q.    And then all 13 of these different accounts

Page 30

all have the same exact balance due.  Do you see that?

A.    I did.  Yes.

Q.    With different original delinquency dates.  Do you see that?

A.    Yes.  I see that.

Q.    Okay.  So when you have 13 identical accounts, identical amounts, with just different delinquency dates, from the same original creditor, and the client, the individual, Angela Fowler is saying, "These aren't my accounts, and I don't recognize them," even though it's 13 identical accounts, there's no back -- is there any policy or procedure from Experian that would trigger an investigation due to that anomaly?

A.    No.  In this case, all of the accounts have a different account number so that -- the data furnisher is signaling to us that these are all different debts, they're different lines of a collection debt.

Q.    Even though they're the exact same amount?

A.    Correct.

Q.    Now, if we go down to page -- sorry, page 14, which is 2093 in the bottom left-hand corner, you'll see that this starts another dispute.  And it looks like this dispute was sent, again, on-line by Angela Fowler; is that correct?

A.    That's correct.  Yes.

Page 31

Q.    And it says -- it looks like the date sent was May 7, 2019?

A.    Correct.

Q.    And the date due was May 30, 2019?

A.    Correct.

Q.    And it looks like the furnisher responded within 24 hours on May 8, 2019.  You see that?

A.    Yes.  I see that.

Q.    Okay.  Do you think there's any way that the data furnisher could have done a reasonable investigation within 24 hours?

MR. SCHULTE:  I'm going to object to the form.

THE WITNESS:  I -- if you could.  Yep.

MR. SCHULTE:  You can still answer, Chris.  I was just noting the objection for the record.

THE WITNESS:  Yes.  I -- I -- I just believe they can.

BY MR. CREED:

Q.    And how would they perform a full, independent investigation within 24 hours of this debt?

MR. SCHULTE:  Again, I'm going to object on that one.

THE WITNESS:  I don't -- I -- I don't know their -- their procedures once they've receive it on their end.  I'm not familiar with that process,

Page 32

but the -- the FDRA allows them up to 30 days.  They can take the full 30 days, or they can do it immediately, but I don't know what happens once they receive it.

BY MR. CREED:

Q.    Okay.  Do you know, or has Experian ever in this case reached out to the data furnisher Preferred to see if they have the original billing for this account?

A.    No.  That's not our place to obtain the original documents.

Q.    Okay.  Do know if there was ever a bill for these accounts sent to -- does it -- well, strike that.  Does Experian have any knowledge or information that Angela Fowler ever received a bill on any of these 13 accounts that are reporting on her credit report?

A.    I don't -- I don't know that information.

Q.    So there was no -- in this case, there was no independent investigation into Angela Fowler's accounts by Experian; is that correct?

MR. SCHULTE:  I'm going to object to the form.  Sorry, Chris.  I got to jump in.  I'm going to object to the form, but you can go ahead and answer.



Page 33

THE WITNESS:  Experian does a reinvestigation. Since she did not provide any proof documents that we were able to accept, we had no choice but to contact the data furnisher to process their own investigation.

BY MR. CREED:

Q.    So you never -- does Experian ever ask -- other than an ACVD validation of demographic information, does Experian ever reach out to the data furnisher and say, "Look, this person's saying that this isn't their account.  Can you provide us with an original bill or -- or anything to that nature?"

A.    No.  That is -- that is not our place.  We are a repository for information, so they are bound to report accurate information by their agreements, and by all that we can see available to us, it is accurate.

Q.    So if someone provided an affidavit to Experian and said, "Look, these are absolutely not my accounts, and I've never been billed by this company," Experian would just forward that information to the furnisher, and if the furnisher verified the demographic information, it would continue to be reported on Experian's credit report?

A.    That's correct.  If they affirm it's accurate, we believe it's accurate, and it would remain.

Page 34

Q.    Is there any validation done by Experian into the data furnishers that are providing this information?

A.    When they're on-boarded, they are -- they have an agreement to report accurate information.  They are bound by the FCRA, like Experian is.  We -- they -- they have an understanding of their role in the reinvestigation, their -- their duty to verify information, and when they respond, to update the lead or verify.

So if -- if, for some reason, a creditor was found unreliable, their agreement would be terminated, but until that time, they are abiding by their agreement.

Q.    Or Experian believes they're abiding by their agreement, correct?

A.    I have no reason to think otherwise.

Q.    Okay.  So if we go through these ACVDs again, we now look -- this is 2019.  Do you see that?

A.    Yes.  I see that.

Q.    Okay.  If we just go from 2 -- 2093 and you go back up to 2092, here you have in this file history in 2017, you have G codes for September, August, July, and June, in page 2092.  Do you see that?

A.    Yes.  I see that.

Q.    What's a G code mean?

Page 35

A.    It means collection.

Q.    Okay.  And if we go back up to 2093.

A.    Uh-huh.

Q.    Now, if you look at September, August, July, and June 2017, there is no collection.  Do you see that?

A.    I do see that, but those are two different account numbers, too.

Q.    Okay.  Let's go -- down.  We'll go back up. through these first 13.  We'll start at 2092 and go back up.  And if you look through all 13, you see those G codes are the same for all 13, for September, August, July, June 2017?

A.    Yes.  I see that.

Q.    Okay.  And then if you go down to 2093 and we go down through the next 13 pages to 20 -- 2105, you see that the G codes all remain the same for August, September, October, November, December of 2018, and January, February, March of 2019?  Do you see that?

A.    Yes.  I see that.

Q.    There's no G codes for any of the 2017.  Do you see that?

A.    Yes.  I see that.

Q.    Okay.  So if it was in collections in 2017, from the first 13, and then you come to the second 13

Page 36

and it's still the same report of 476 on all 13 accounts and nothing's been paid, allegedly, why are there no G codes for 2017?

A.    Well, like I said before, that, well, just because it's blank doesn't mean it's not reporting for that month.  We may have already had it as such, and it just -- to leave a blank, which means -- translates to the same information; there's no change.

But, secondly, this is a collection account, in and of itself, so you can't have a different status on a collection account.  It's always going to be a collection account, so it's going to be a G.

Q.    But so, you know, Experian had knowledge in 2017 of a dispute, and then in 2019, they have the same dispute about the same accounts, but there's no -- Experian wouldn't look at the -- would -- would Experian ever look at the two different disputes, even though they're identical disputes, and compare them, and -- and would any of this different information in that file history grid trigger any additional investigation by Experian?

A.    No.  The account is reporting as accurate as we see it.

Q.    Based on the affirmation by Preferred, by the collection agency, in this case, correct?



Page 37

A.    Correct.  And that it's a collection account.  The status will always be a collection.

Q.    Okay.

A.    It will always be a G.

Q.    But Experian never reached out to Incare Medical Services, Inc., or did any other investigation to look into these accounts other than getting it validated through the e-OSCAR program, correct?

A.    We wouldn't reach out to the original creditor, because they're not reporting the data.  We're only going to reach out to who's reporting the data for them to investigate, and they verify the information.

Q.    And you said this is just an automated process because she did this on-line, correct, and -- is that correct?

A.    That's correct.  She did this on-line, so it was automatic.

Q.    Okay.  Do you know if any physical person at Experian ever reviewed these two disputes that we've just gone over in 2017 and 2019?

A.    When it's automat- -- when it's on-line.  It's not automatic.  It's not intercepted by an agent.

Q.    And just -- just to keep the record clear, if you want to go through the 13 from 2105 to 2093, I just

Page 38

want to verify that the balance and amount past due is 476 of each of those 13 accounts.

A.    That's correct.

Q.    And then if we go to the last two pages, you see that this is another dispute.  Was this through the automated portal, or was this a letter dispute?

A.    This one was a letter dispute.

Q.    Okay.  And do we know that because it says document viewed?

A.    Correct.  There was a document viewed.  So this means that at the time of the dispute, an agent attached the document to the dispute, with a letter from the consumer, in this case, for the date of furnisher to review the letter.

Q.    Okay.  Would the -- is there anything on here that says that the -- do we know what agent at Experian reviewed that letter by anything on this form?

A.    Anything -- for this form, no.  We would have to go into another system to review the agents to see the agent who did -- who processed it.

Q.    And this is only two accounts of the 13 we originally viewed.  Do you see that, the next two pages?

A.    Correct.  Just two.

Q.    Okay.  And I'm going to purport to you that

Page 39

these are the only two ACVDs I was provided by Experian for the two -- it looks like a February 11, '21, dispute?

A.    Correct.

Q.    And then the date due was March 3rd of 2021?

A.    Correct.

Q.    And, here, they responded on February 26, 2021?

A.    Correct.

Q.    And, again, the amounts due is the 476 on both of these?

A.    Yes.  Correct.

Q.    Okay.  Then this has the accounts in collection.  It looks like bottom -- both of these are grids from August of 2018 through November of 2020.  Do you see that?

A.    Yes.  I see that.

Q.    But then there's no reporting for December 2020, January '21.  Do you see that?

A.    I see that.  Uh-huh.

Q.    Do you know why that is?

A.    I don't know specific -- specifically why the G is not there, but, like I said, a collection account is always a G.  It will always be a collection.

Q.    Okay.

Page 40

MR. CREED:  Sorry.  Just a minute.  Can you give me five minutes.

(Whereupon, a brief recess was taken.)

BY MR. CREED:

Q.    So I'm going to now attach -- we've gone over the ACVDs.  We're going to attach now what I'm going to be calling Experian's Disclosure Log as Exhibit 3, but, Ms. Hamilton, if you want to tell me if it's named something else, that's fine.

A.    I -- disclose log?  Well, let me look at it, just to make sure.

Q.    Okay.

A.    Yes.  This is what we print, the disclosure log.

(Whereupon, Plaintiff's Exhibit Number 3 was marked for identification.)

BY MR. CREED:

Q.    Okay.  And where does a disclosure log come from at Experian?

A.    It is from our CAP system, the system we mainly use to access a consumer's credit report to process disputes.

Q.    And what's -- and explain your CAP system.  What is that?

A.    I'm not sure I'm qualified enough to explain


ESQUIRE
DEPOSITION SOLUTIONS

Page 41

fully what it is.  I know it's to be where we access the credit reports to process disputes.  We can look at past history of disputes or disclosures in this case.

Q.   Okay.  And your CAP system, is that an internal software, or is that like a cloud-based software that Experian licenses?

A.   I honestly don't know the difference.  I'm sorry.

Q.   Okay.  That's fine.  So this disclosure log, is there a difference between this and a long form administrative form?

A.   No.  This is the only form we have for disclosure log.

Q.   Okay.  So if you go down, it looks like there -- you see the, like, greater than or less than, kind of, symbols across in a line?  Do you see that?  It's kind of like a diamond shape that separates --

A.   Yes.

Q.   Okay.  Is that separating two different, basically, events in this report?

A.   That's correct.

Q.   Okay.  All right.  Now, if we go down here, it looks like this is -- so the first thing we see here is a yearly free report on April 20, 2021; is that correct?

Page 42

A.   That's correct.  Yes.

Q.   That's something that would have been requested by Angela Fowler?

A.   That's correct.

Q.   Okay.  And then we go down, and it looks like on April 20, 2021, that same date of the phone dispute?

A.   A lot of times when it's the same day, it could be that they first accessed and then they had to edit information to get the complete information to be able to process the request.  So it doesn't necessarily mean it's a separate phone call.  I would read these as together, they're one phone call.

So the agent accessed the file; they did, basically, edit, or a -- or a refresh to ensure we have the information correct.  It looks like they added the word unit in front of 265 to make it more complete, and then they processed the disclosure.

Q.   And what does this agent name, MCE agent?  What is -- what does that mean?  That doesn't look like an actual name.  I mean, what's MCE mean?

A.   No.  That is a generic default that we have here.  We -- we would be able to research and locate which agent this actually is, but this is -- this is a default listing.

Q.   What's MCE stand for?

Page 43

A.   My Consumer Experience.

Q.   And then if we go down to April 12, 2021, it says there was a mail dispute?

A.   That's correct.

Q.   And that mail dispute was handled by a Daniela Duran?

A.   That's correct.

Q.   And do you know what type of dispute that was by looking at this form?

A.   By looking at just this, no.

Q.   And if we keep going down on March 30, 2021, there's another mail dispute.  Do you see that?

A.   Okay.  I think this is reflective of, like, the instance in April, where the agent accessed the file, and then they did some updates or refreshes -- I'm sorry, edits or refreshes, and then sent out a yearly copy of the report.

Q.   Okay.  So why -- so when it -- will it automatically say "mail dispute" if they have to access the file?

A.   Yes.  That's -- that's usually the -- the standard one that they use when they first access the file, and then when they -- if they have to change it to reflect something else, then they'll edit, or refresh, and -- and do that portion of it.

Page 44

Q.   So sometimes a consumer might call or mail, and it's a dispute that may not generate an ACVD request from the furnisher?

A.   I'm sorry.  Can you say that one -- that one more time.

Q.   So I'm just going to purport to you, the only ACVDs that I received in the discovery responses are the ones we went over in Exhibit 2, which were for October 2017, May of 2019, and then February of 2021.  And looking at this long form, there seems to be more phone disputes, more mail disputes.  So what I'm asking is, is there phone and mail disputes that are handled internally by Experian that don't generate ACVDs from the furnisher?

A.   No.  If we initiate an ACVD, we will always have the response.  Looking at this, though, I don't know what was handled during that contact.  We have to look at another portion, but the ACVDs provided with this binder were only referenced for Preferred.  So it's possible she had a dispute for a different type of account, and that's why it was not included.

Q.   Okay.  So if we go down to -- just trying to match up.  So on May 7th -- so if we go down to, this is page 5 of 108 of this Exhibit 3.  Do you see that there is -- at the bottom, it's Bates number 2119.



Page 45

A. Okay. I see that here.

Q. Okay. And is that -- it says ACI dispute. What is ACI dispute?

A. I don't know offhand what the abbreviate is, but this basically translates to an automated source that the disputes or access was done through an automated source other than My -- than My Experian directly.

Q. All right.

A. Some type of membership or something.

Q. Do you know what CIC trial giant is?

A. I don't offhand, no.

Q. So this -- you're saying this looks like -- so if you go back to Exhibit 2, and I don't want to bludgeon this, but this -- the ACVDs, the second batch of 13 we say was from May 7, 2019, and then we're looking at this dispute log, this disclosure log, and it looks like there was an automated dispute, which you said was through probably some type of portal at Experian; is that correct?

A. Right. Some -- an on-line dispute was submitted on that date. So this is the direct -- I don't know if you want to say link or site, or however you want to word it, that would use, which is usually - and I'm going to say usually, indicating of some type

Page 46

of membership the consumer may have that she's processing the disputes through that portal.

Q. And then if we go down to page 6, you see in October 25, 2019, another one of these Internet -- the automated disputes. Do you see that?

A. I do see that. The way this is listed here, this would be the My Experian portal directly. She's not using another -- a different portal. This is ours directly for on-line.

Q. Does it tell you anywhere on here what was being disputed on the -- you know, if you look at, like, this October 24, 2017, which is on page 2121, 7 of this 108 doc -- 108-page document, it says phone disputes, and it tells you the agent name, Raquel Soto. Do we know what she's disputing at all by this disclosure log, but -- or no?

A. No. By the disclosure log, no. We don't see what was actually disputed.

Q. And where would that be found?

A. There's another log called -- we reference our DR log, and that's where the actual disputes are housed that's printed out.

Q. And do you know if the DR log was produced in discovery?

A. Yes, it was.

Page 47

Q. That might actually be a part of this exhibit. If we go down to page 15, it starts the DR log. Do you see that?

A. Yes. There -- yes. This is what we reference as the DR log. So this is a detail of each contact and what actually happened.

Q. Okay. So now we can kind of go through these and look and see what's actually going on. All right. So if we go down again on 2 -- on February of 2008, it starts on page 15, 2129. Do you see that?

A. Uh-huh.

Q. And --

A. Yes. I see that.

Q. Sorry. And it looks like there's a mailed dispute. It says CDF delivery; is that correct?

A. Yes. This was the mail dispute that was done. Yes.

Q. Okay. And it looks like it's going through just two accounts? Do you see that?

A. Yes. There were two Preferred accounts that were disputed.

Q. And the agent here, do we see the agent's name here who handled this?

A. No. We see that the -- no. We see that default ID is CD8001200. That's another -- that's

Page 48

research we have to do just in another system to locate which agent this is.

Q. Okay. Sorry. I'm just trying to -- okay. If we go down to page 24 of this document, that's 2138 in the bottom right-hand corner.

A. Okay. I'm there.

Q. And it looks like there's some -- there's a dispute here. It says dispute completed; so it's 014. Do you see that, the very bottom?

A. Oh, the number ends in 014?

Q. Yes.

A. Or the dispute number? Yes. I see that.

Q. And that's the bottom of 2138. What is CDF delivery? That's -- this looks like this was a mail dispute again?

A. The CDF delivery would be how we are sending the results back to the -- to the consumer. So, in this case, the CDF was mailed to her.

Q. Okay. And it looks like a -- what's a -- what does the CDF stand for?

A. Consumer Disclosure Final.

Q. Okay. And it looks like date generated was May 27, 2019?

A. Correct. Uh-huh.

Q. Okay. Is this a different dispute? Sorry. I



Page 49

don't mean to bounce back, but if we go to Exhibit 2, it looks like this was a dispute, the second set was on May 7, 2019. So is this a different dispute from the May 7, 2019, dispute?

A. Well, this is a different company. So this ACVD wasn't provided since it didn't -- it's not for Preferred. This account is for First Progress First Equity.

Q. Correct. Then if we go down, it looks like this is -- you go to the next page, 2139, and it looks like this is wrapped up in an original tag of Preferred Collection, and there's another account. Looks like she's disputing multiple accounts in and around the said date?

Oh, okay. I see. ACVD sent, May the 7th. Okay. This is different. But it looks like she was disputing multiple accounts at that time?

A. Right. She disputed multiple Preferred, along with other creditors, such as this First Progress.

Q. So if you look at this, it says, on page 2140, or, actually, on most of these tags, even 2139, talking about the Preferred, it says reinvestigated from 11/9/2017. Do you see that?

A. I'm not seeing offhand where the 11/9 is. Where -- where are you seeing that?

Page 50

Q. Okay. If you look at 2139, and then you look at the First Preferred --

A. Yeah.

Q. -- Collection, the original data, it says reinvestigated from then.

A. Correct. The reinvestigate at 11/2017 would reference that the item was previously investigated on that date -- previously reinvestigated on that date.

Q. That's before Experian really didn't have an independent investigation. It just sent an ACVD request to the data furnisher, who then confirmed the demographic information, and no additional steps were taken by Experian, correct?

A. At that time, it was an on-line dispute by the plaintiff, and there was no other documents for us to review, since it was automatic, and then the data furnisher would do their own part to investigate and research.

Q. So we saw, in other areas of this log, where there would be an agent name, but, because there was no agent involved, there's no agent named here in this log, correct?

A. Right. On this specific one, the EC777139 is a reference to on-line. Any time there's an EC777, that's an on-line portal.

Page 51

Q. Okay. What's soft delete mean on this form, as -- as in to update data? What does that mean?

A. That would mean an update data soft delete. That would mean that that is the ultimate intention of the dispute, or the consumer's -- based on the reason code used, what the desired out -- outcome is.

Q. So that didn't actually happen; that's just what the consumer wanted, correct?

A. Correct. Based on the reason codes that they used, the consumer states inaccurate info. That -- that would be the outcome if, let's say the data furnisher did not respond to the dispute, that -- that would be the outcome that would be felt to be needed.

Q. Okay. If you go to page 2151, which is page 37 of 108. Tell me when you're there.

A. 2151. Okay. I'm here.

Q. Okay. And it looks like -- never mind. So if we go down to -- sorry. So 2157, so just page 43 of 108.

A. Uh-huh.

Q. We go to the second part here, the -- there's a Preferred Collection from October 25, 2017, that kind of starts right here. Do you see that?

A. Yes. I see that.

Q. Okay. It says "I've never received services

Page 52

from this company, and I have no knowledge of this account, never agreed to pay. Validate or remove." So this was another on-line dispute, correct, that we went over previously on the other ACVDs?

A. That's correct.

THE COURT REPORTER: I need a brief emergency moment. I apologize.

(Whereupon, a brief recess was taken.)

BY MR. CREED:

Q. All right. Going to attached -- tell me when you get this, and I'm going to be marking this as Exhibit 4.

A. Okay. I have it up.

(Whereupon, Plaintiff's Exhibit Number 4 was marked for identification.)

BY MR. CREED:

Q. All right. And are you familiar with this document?

A. Yes. I did -- I did read over it.

Q. Okay. Did you help prepare this document at all?

A. No, I did not.

Q. Okay. And I'm going to purport to you that this is the Experian's responses to the interrogatories that we propound -- you know, propounded to Experian,



Page 53

and this is basically our chance to gather information before your deposition today as the corporate representative. And you reviewed this document, but you did not take part in creating this; is that correct?

A. Yes. That's correct.

Q. Do you know who Teresa I -- Iwan- -- and I'm going to butcher this --

A. Iwanski.

Q. Yeah.

A. Yes. She's a fellow 30(b)(6) witness, a teammate of mine.

Q. Okay. Is she -- so is she also a senior legal compliance specialist?

A. She is. Yes.

Q. Okay. Was she originally on this case, and then you are now the lead on this case, or you both work the case?

A. She would have done the research at the time of the notification of filing of the lawsuit. She would have produced the documents and done the research. She happened to sign this interrogatory, and when the time for depo came up, for whatever reason, she may not have been available, and so I stepped in to do the depo.

Page 54

Q. Okay. Do you know if anybody at Experian ever had discussions with Preferred Collection about Angela Fowler outside of the ACVDs that were produced in this case?

A. Not to my knowledge, no.

Q. Let me ask you this: As far as Experian, do they ever contact a data furnisher by phone or by e-mail or mail outside of an ACVD in regards to a consumer's credit reporting account?

A. There are certain scenarios where that would occur. I don't believe this case pertains or would encompass that, but there are situations that that would happen.

Q. And when would -- and what type of situation would that happen?

A. Sometimes it's, the ACVD comes back and it doesn't make sense. There's conflicting information as to what they're providing. Let's say they provided a different social and a different name but reported for the item to remain. That -- that's going to be a conflict. They're going to call and get further information about it.

Q. So unless a consumer provides definitive proof that the account information being reported on their credit report is false, Experian keeps that information

Page 55

on the credit report as long as it's validated by the data furnisher; is that correct?

A. That's correct. If -- if we cannot use anything that they sent us as valid proof, we will reach out to the data furnisher to verify it, and then they will response accordingly.

Q. Sorry. I'm just looking at something. Did you review anything in these files as -- in preparation of the deposition today from the plaintiff, Angela Fowler, that would have triggered an outside investigation by Experian above and beyond sending the data furnisher a request for an ACVD?

A. No. I didn't see anything.

Q. So we went through a little bit of the ACVDs and just having different codes and collections of different periods of times, you know, from the dispute from 2017 and 2019, back, in and of itself, wouldn't trigger any additional investigation by Experian, correct?

A. Not without something provided from her, solid proof to make a change, we will rely on the creditor's reporting.

Q. Okay. In this case, or, you know, as alleged, not -- and I'll say as alleged by the plaintiff, you know, she receive services, these services, hasn't seen

Page 56

a bill from Incare, doesn't know what these medical services are for. How is a consumer expected to produce documentation disproving a bill that they've never received before?

MR. SCHULTE: I'm going to object to the form, but you can answer, Chris.

THE WITNESS: They would need to reach out to the original creditor that's listed, or the collection company, to try to find more information out about it and -- and see what they can determine from that point, or what they can provide at that point.

BY MR. CREED:

Q. Okay. If they reached out to the data furnisher or the collection service agency in this case and asked for original bills, and then the data furnisher never produces those to the consumer outside of Experian, how is it expected that a consumer can prove a debt doesn't exist if nobody will provide them with original information?

MR. SCHULTE: I'll object to the form again. You can answer, Chris.

THE WITNESS: I -- I -- I'm not sure what, at that point, the next steps would be. I'm sure they could seek some legal recourse at that point, but



CHRISTINA HAMILTON
FOWLER vs EXPERIAN

December 10, 2021
57–60

Page 57

as far as our reporting, the data furnisher is reporting accurate information, so it's maintained on file.

BY MR. CREED:

Q.    So say the data furnisher is reporting inaccurate information, Experian has no way to -- to verify that?  There's no -- is there any mechanism above and beyond the ACVD that Experian has to investigate whether information is accurate or not accurate?

A.    Other -- they -- they're reporting according to their agreement, reporting accurate information; so we have no reason to believe otherwise that it's not.

Q.    So is the word of the data furnisher always taken over the word of the consumer as long as they validate the demographic information on the ACVD?

A.    Without any type of proof document from a consumer, we would have no choice but to verify with the data furnisher, and then they're verifying the information according to their agreement.

Q.    Okay.  But a data furnisher provides information to Experian, but what if they don't have any underlying documentation to validate that that debt actually exists?

MR. SCHULTE:  I'm going to object to the form,

Page 58

but you can answer.

THE WITNESS:  I don't know what their research encompasses once they receive it, or what they look at, what they have.  I wouldn't know that part of it.

BY MR. CREED:

Q.    Would you agree, though, that if Experian -- hypothetically, if these 13 accounts actually aren't Ms. Angela Fowler's debts owed, wouldn't you agree that that would be highly damaging to Ms. Fowler's credit score?

MR. SCHULTE:  I'm going to object to the form, but go ahead, Chris.

THE WITNESS:  If, in fact, they are not, that could potentially, yes, but our view of the information we have available to us is, this is accurate information that these belong to her.

BY MR. CREED:

Q.    But the only information you have is validation of demographic information from Preferred Collection, correct?

A.    They're verifying the information, yes, according to their agreement and accurate reporting.

Q.    But Experian doesn't have any information above and beyond what has been provided electronically

Page 59

from Preferred Collection, correct?

A.    We're -- we are not required to, no.

Q.    When you have 13 accounts of the exact same amount, that doesn't raise a red flag in any of Experian's systems?

A.    No.  They all -- they all came in with different account numbers, different delinquency dates, which could pertain to different dates of services.  So, no, that's not a red flag.

Q.    So when the -- I think we covered this, but I just want to be sure.  So when the second dispute came in, electronically, in 2000- -- May of 2019, there was no actual agent at Experian that worked on that file at that time.  That was just an automated process through the ACVD e-OSCAR platform, correct?

A.    Correct.

Q.    And it wasn't until the 2021 dispute on the Preferred that an actual agent, it looks like, looked at these accounts; is that correct?

A.    That's correct.  Since it was received by mail, an actual agent processes those.

Q.    So in 2017, an actual agent didn't process that dispute, either of the 13 accounts, correct?

A.    They process the disputes of the accounts that were on file.  If my memory serves, there was two left

Page 60

at that point.

Q.    Right.

MR. CREED:  All right.  Give me five or ten minutes.  Give me ten minutes, and I think I'm almost done.

(Whereupon, a recess was taken.)

BY MR. CREED:

Q.    All right.  So just to be clear on the record, so it -- if a consumer files a dispute --

THE COURT REPORTER:  Dennis, you froze.

BY MR. CREED:

Q.    -- and the data furnisher then will require --

THE COURT REPORTER:  Dennis?

MR. CREED:  I'm sorry.

THE COURT REPORTER:  You froze up.  I have, "So just to be clear on the record, if a consumer files a dispute," and then you froze --

MR. CREED:  Okay.  Can you hear me now?

THE COURT REPORTER:  Yes.

BY MR. CREED:

Q.    Okay.  If a consumer files a dispute on-line with Experian without attached documentation, that dispute then goes directly to the data furnisher, and if that information is validated by the data furnisher, no actual live agent gets involved with that dispute;



CHRISTINA HAMILTON
FOWLER vs EXPERIAN

December 10, 2021
61–64

Page 61

is that correct?

A. That's correct.

Q. Okay. And no further investigation would be had at that point absent attached documentation to that on-line dispute, correct?

A. That's correct.

MR. CREED: Okay. I have no further questions unless -- unless -- and I reserve for redirect -- I mean, follow-up, if you have any questions. Sorry.

MR. SCHULTE: Yeah. I just have a few questions.

CROSS EXAMINATION

BY MR. SCHULTE:

Q. So going back to Exhibit 2, which was the ACVDs, and, for reference, I'm on page Bates stamp 2080. Ms. Hamilton, do you remember talking about the original delinquency date and the open date?

A. Yes, I do.

Q. Okay. So in looking at this page, at page 2080, the original delinquency date that's listed as November 15, 2015; is that right?

A. That's correct.

Q. Okay. And then the open date is December 12, 2016; is that right?

A. That's correct.

Page 62

Q. So the open date, is that the date that Experian first received reporting regarding this account from Preferred Collection?

A. This is telling me it's the date the collection purchased the debt. How quickly they started to report it, I'd actually have to look at another -- another system, but that is when they purchased the debt, and they just have to still retain the original delinquency date provided by the original creditor. So that's why the date is sooner than the open date.

Q. And then one other question. You reviewed this file before testifying today; is that right?

A. That's correct.

Q. Okay. When Preferred began reporting these collection accounts to Experian, did Preferred provide Experian with certain identifying information regarding the plaintiff?

A. Yes. When they upload accounts, they will provide the information they have. Identification information is included so we are sure to match it to the correct file.

Q. Within that identification information, I guess, what are some examples of the identifying information that a furnisher will provide?

Page 63

A. It's usually the name, address, social, and date of birth, and the social is going to be your strongest match.

Q. Did Preferred Collection provide a name, date, social, and date of -- or, I'm sorry. Let me rephrase that. When it first reported this information -- I'm going to rephrase one more time. When Preferred reported these accounts to Experian, it did provide the name, social, date of birth, and address for the plaintiff?

A. Yes, it did.

Q. And that information that it provided, that identifying information from Preferred, did it match what Experian already had on file for the plaintiff?

A. Yes, it did.

MR. SCHULTE: Okay. That's it for me.

MR. CREED: No follow-up. Robert?

MR. VIGH: I'm sorry. I was on mute. Yeah. I have a couple follow-up questions.

CROSS EXAMINATION

BY MR. VIGH:

Q. Good morning, Ms. Hamilton.

A. Good morning.

Q. Can you explain to us what an ACVD is?

A. It is the response format for any types of

Page 64

reinvestigation that we submit to the data furnisher. Offhand, I don't recall what it stands for. We use acronyms so commonly.

Q. So it's an acronym?

A. Yeah. I believe it's automated -- the V is verification, but I honestly don't remember what the whole spell-out.

Q. And is e-OSCAR also an acronym that's used in the industry?

A. Yes, it is.

Q. And what is e-OSCAR?

A. Offhand, I -- I don't recall the spell-out. E is electronic, but I don't remember the rest.

Q. Yeah. I just -- I just want an understanding of what it is, not -- not --

A. Oh, I'm sorry. E-OSCAR, I'm not too well knowledged in as far as its workings or probably a good description, but I know it to be the platform that the disputes can be processed out and received in.

Q. That's for the on-line disputes?

A. The results would come back the same way. The ACVDS would come back through e-OSCAR.

Q. But what I'm asking, is e-OSCAR an on-line dispute format?

A. I don't know the answer to that question, is



CHRISTINA HAMILTON
FOWLER vs EXPERIAN

Page 65

it specific for on-line or if it's all avenues.

Q.   Okay.  So the ways that a consumer could dispute the debt with Experian is by calling in?

A.   Correct.  They can call in, they can send something by mail, or they can do it on-line.

Q.   And under each of those methods, your duties are the same?

A.   That's correct.  The reinvestigation process is the same for all.

Q.   And if the account information for Ms. Fowler had been incorrect that Preferred provided when they originally assigned the account, how would Experian know that there was a mismatch?

A.   For example, if they responded back they had a completely different Social Security number attached to the item, that would more than likely result in the deletion of the account.

Q.   Okay.  So you would -- Experian would automatically delete the account if there's a mismatch of the information?

A.   Yeah.  Either they would instruct us to the mismatch or that it's to be deleted -- I'm sorry.  They would either instruct us to delete it, or if it was kicked off to an agent for further review because of the mismatch, they would evaluate from there.

Page 66

Q.   Okay.  So an agent at Experian would be notified, hey, these searches don't match up for this person?

A.   There would be something that would trigger it to go to an agent.  I don't know what exactly the triggers are, but for further review.

Q.   And so the disputes that you've reviewed, the 28 pages as Exhibit 2, these are all made by Ms. Fowler to accounts reported by Preferred?

A.   Yes.  The Exhibit 2 is the ACVDs that we received back based on her disputes with Preferred.

Q.   Okay.  And she disputed other debts during this time period of 2017 to 2019; is that correct?

A.   That's correct.  There were other creditors that were -- or accounts that were disputed.

Q.   Okay.  And the accounts for Preferred, there are 13 different accounts that are listed?

A.   That's correct.  When it came to the file, there were 13.

Q.   Okay.  And so she would -- would she be able to dispute all of them at the same time, or would she have to dispute each one of them?

A.   She would -- she would have to initiate the dispute for each one individually, but they all could be done at the same time and then get the responses

Page 67

back about the same time.

Q.   Okay.  Did she give the same dispute for each account?

A.   Roughly.  It looks like she did a "not mine." I think on another one she did "inaccurate information."  And I think on the third, she did a "not mine" again.

Q.   And "not mine" is the 001 dispute code?

A.   Correct.

Q.   Okay.  And what is a soft delete?

A.   The soft delete's the prefact (phonetic) from the consumer's view or from anyone who pulls the report from view.  It's -- it's someone hidden in our background, but we can see it in certain systems that we can see.  It's just kind of suppressed from -- from view.

Q.   So if a credit report was pulled by someone, they would not see a soft-deleted account?

A.   That's correct.

Q.   Would that soft-deleted account still affect a person's credit score?

A.   No.  Not at all.

Q.   Okay.  I know we used the term creditor and debt collector and data furnisher interchangeably in some of our questions, and I just want to clarify that

Page 68

a data furnisher could be a creditor or a debt collector?

A.   That's correct.

Q.   And the way it works is if the creditor reports at the same time the debt collector reports, Experian won't report both?

A.   If an original creditor is reporting along with a collection, they both can report on file, but the original -- the original collector, original creditor, would report their account as transferred, purchased by another lender, zero balance, and then the active collect -- debt collector would have the active account collecting.

Q.   So if -- someone that's knowledgeable is looking at credit reports would know that it's the same debt; its not another debt?

A.   Correct.  They would know it relates to one another.

Q.   And they would know the history that it was with the original creditor and now it's within the collection?

A.   Correct.

Q.   Does Ms. Fowler's credit report show whether or not she was turned down for credit?

A.   I did see a couple of inquiries on her report,



CHRISTINA HAMILTON
FOWLER vs EXPERIAN

December 10, 2021
69–72

Page 69

but we don't know by looking at those if she was denied or not.

Q.   Do you know if those inquiries were for the extension of credit or for other things?

A.   From what I could tell, it appeared to be an extension of credit, but I -- I would have to research that further to be sure.

Q.   Okay.  What other reasons would a credit report be pulled, or is it permissible to pull a credit report other than for extension of credit?

A.   It could be an extension of credit.  Sometimes reports get pulled for employment.  That happens.  For insurance.

Q.   Okay.  Do you -- from what you could see on the credit report, it was for extension of credit and not the other two?

A.   For the hard inquiries, they were extension of credit.  The insurance and employment tend to be a soft inquiry.

Q.   Okay.

A.   I didn't do the soft inquiries.

Q.   So you only saw a hard inquiry, and that was for an extension of credit?

A.   That's what I recall, yes.

Q.   Okay.  And what would be involved?  How would

Page 70

it be different to check on soft inquiries as opposed to a hard inquiry?

A.   It's just another viewing section of the credit report that we can see in our systems.  It's not viewed by any data furnisher that requests her credit report, but it's visible to her when she obtains her disclosure, because we do have to disclose that.

MR. VIGH:  I don't have any further questions.

MR. CREED:  No follow-up.

Actually, I want to attach one last document, if that's okay, and ask a quick question about it.

REDIRECT EXAMINATION

(Whereupon, Plaintiff's Exhibit Number 5 was marked for identification.)

BY MR. CREED:

Q.   I'm attaching what is Exhibit 5 to this deposition, and if you go to Exhibit 2, at the very last two pages, it says there was a document viewed, and it was probably a letter attached to the dispute.  And if you look at Exhibit 5 and open that up, I'm going to ask, have you ever seen this letter before, Ms. Hamilton?

A.   Yes.  I saw it when I received the binder.

Q.   Okay.  And this is a four-page letter, and it looks like, on the third page, is a copy of Angela

Page 71

Fowler's driver's license, and then also a bill to validate her address.  Do you see that?

A.   Yes.  I see that.

Q.   Okay.  And it says here, you know, she's disputing 16 illegal entries from the Preferred Management, aka Incare Medical Services, in and around -- this letter was sent, dated by her, January 28, 2021.  You see that on the second page?

A.   Yes.  I see that.

Q.   Okay.  But we only have ACVDs for two of the 13 accounts that we previously looked at in February of 2011.  Do you see that?

A.   Yes.  I see that.

Q.   Looking at this letter and then looking back at the ACVDs, do you know if anything was done with the letter above and beyond -- and I think you already stated this, but just to be clear for the record, I wanted to attach the letter.  There was an ACVD sent to the furnisher, and then the furnisher validated the information, and that was the end of the, quote, unquote, investigation by Experian into this matter at that time, correct?

A.   We do a reinvestigation submitting it to the data furnisher.  They will investigate on their own side, but because there was no other proof included,

Page 72

that's what we had to do was, send it to the data furnisher to verify.

MR. CREED:  Okay.  No further questions.  Anything else, anybody?

MR. VIGH:  No follow-up.

MR. CREED:  All right.  Do you want to advise on read or waive, Tom?

MR. SCHULTE:  Sure.  So, Ms. Hamilton, you have the right to review the transcript of this deposition, and then you can file what's called an errata sheet if there are errors or anything that you view is incorrect in the transcription process.  You can also waive that right.  I recommend you do not waive it and that you maintain your right to read.  And then -- and then what you'll do after that is, you'll sign the transcript as sort of finalized.

THE WITNESS:  Okay.

MR. SCHULTE:  So would you like to -- would you like to waive it, or would you like to keep it?

THE WITNESS:  I would like to keep it.

MR. SCHULTE:  Hey, Kim, I think we're actually -- Experian's going to request a copy of the transcript.

THE COURT REPORTER:  So you're ordering, Tom?



Case 8:21-cv-01038-WFJ-AAS    Document 21-12    Filed 01/07/22    Page 19 of 19 PageID
317

CHRISTINA HAMILTON
FOWLER vs EXPERIAN

December 10, 2021
73–76

Page 73

MR. SCHULTE: Yes.

THE COURT REPORTER: Does anyone else want a copy?

MR. CREED: I do want a copy.

MR. VIGH: I'll take it, too.

(Whereupon, the deposition adjourned at 12:12 p.m.)

Page 74

CERTIFICATE OF OATH

STATE OF FLORIDA   )

COUNTY OF LEE      )

I, Kimberly Anne Votta, Registered Professional Reporter, and Notary Public, State of Florida, certify that CHRISTINA HAMILTON appeared via videoconference before me on the 10th day of December, 2021, and was remotely duly sworn.

WITNESS my hand and official seal this 22nd day of December, 2021.

_____
KIMBERLY ANNE VOTTA, RPR
Notary Public - State of Florida
Commission No.:  HH067919
Expires:  December 9, 2024

Page 75

CERTIFICATE OF REPORTER

STATE OF FLORIDA   )

COUNTY OF LEE      )

I, Kimberly Anne Votta, Registered Professional Reporter, and Notary Public, State of Florida, certify that I was authorized to and did remotely stenographically report the foregoing deposition of CHRISTINA HAMILTON; the witness called in the above-styled cause; that the witness was first duly sworn by me; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not an attorney or counsel to any of the parties, nor related to any of the parties, nor financially interested in the action.

DATED this 22nd day of December, 2021.

_____
KIMBERLY ANNE VOTTA, RPR

Page 76

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
DEPOSITION OF:  Christina Hamilton
DATE OF DEPOSITION:  December 10, 2021
RE:  Angela Fowler vs. Experian, et al
Case No.:  8:12-CV-01038

PAGE     LINE          CHANGE                REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under the penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.
_____
     DATE                    NAME

